AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

**FILED**

**Nov 17, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States of America )
v. )
Kenneth BASH, Stephanie MADSEN, Robert EVERSOLE, Todd )
MORGAN, ▓▓▓▓▓▓ Marlon PALMER )
Samantha BOOTH, ▓▓▓▓▓▓ David ZACHOCKI, )
▓▓▓, Jacob RENSHAW, Amanda GOURLEY, Regina BROOMALL, )
Geoffrey GUESS, ▓▓▓▓▓▓ Angel LOPEZ, )
and Joseph MCWILLIAMS )

Case No.

1:20-mj-00129-EPG

*Defendant(s)*

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 26, 2020 to November 16, 2020 (see complaint for further details) in the county of Fresno and Kern in the

Eastern District of California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC Sections 846, 841(a)(1) | Conspiracy to possess with intent to distribute 500g and more of a mixture containing methamphetamine |
| | Penalties: Mandatory minimum 10 years in prison to life imprisonment; fine of up to $10,000,000; 5 years to life of supervised release; $100 special assessment |
| 21 USC Sections 846, 841(a)(1) | Conspiracy to distribute and possess with intent to distribute 100 grams and more of a mixture containing a detectable amount of heroin |
| | Penalties: Mandatory minimum 5 years in prison to 40 years imprisonment; fine of up to $5,000,000; 4 years to life of supervised release; $100 special assessment |
| 18 USC Section 922(g) | Felon in Possession of a Firearm |
| | Penalties: 10 year maximum imprisonment; $250,000 fine; 3 years of supervised release; $100 special assessment |
| 18 USC Section 924(c) | Possession of a firearm in furtherance of a drug trafficking offense and carrying or using a firearm during and in relation to a drug trafficking offense |
| | Penalties: 5 year minimum imprisonment; $250,000 fine; 3 years of supervised release; $100 special assessment |
| 18 USC Sections 371, 922(a)(1)(A) | Conspiracy to deal and dealing firearms without a license |
| | Penalties: 5 year maximum imprisonment; $250,000 fine; 3 years of supervised release; $100 special assessment |

This criminal complaint is based on these fact.
See Attached Affidavit of ATF SA Anthony Gonzales.

✔ Continued on the attached sheet.

_____
*Complainant's signature*

Anthony Gonzales, SA ATF
*Printed name and title*

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) before me this 17 day of November , 2020.

Date: **Nov 17, 2020**

_____
*Judge's signature*

City and state: Fresno, CA

The Hon. Erica P. Grosjean, U.S. Magistrate Judge
*Printed name and title*

McGREGOR W. SCOTT
United States Attorney
THOMAS NEWMAN
STEPHANIE M. STOKMAN
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099
Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

1) KENNETH BASH, AKA "BASH",
2) ROBERT EVERSOLE, aka "Rage",
3) STEPHANIE MADSEN,
4) TODD MORGAN, aka "Fox",
5) ▆▆▆▆▆▆▆▆▆▆
6) DAVID ZACHOCKI, aka "Lil David Z",
7) ▆▆▆▆▆▆
8) ▆▆▆▆▆▆▆
9) REGINA BROOMALL, aka "G",
10) ▆▆▆▆▆▆
11) GEOFFREY GUESS, aka "Active",
12) ▆▆▆▆▆▆▆▆
13) ANGEL LOPEZ, aka "Rascal",
14) JOSEPH MCWILLIAMS, aka "Janky",
15) ▆▆▆▆▆▆▆
16) MARLON PALMER aka "P-Nut",
17) SAMANTHA BOOTH,
18) JACOB RENSHAW, aka "Shredder", and
19) AMANDA GOURLEY, aka "Biggie".

Defendants.

CASE NO.

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

Affidavit                                                                 i

# TABLE OF CONTENTS

## CONTENTS

II.    OVERVIEW OF INVESTIGATION ...................................................4

III.   PURPOSE AND STRUCTURE OF AFFIDAVIT ..............................5

IV.   CRIMINAL VIOLATIONS AND REQUESTED ARREST WARRANTS ................................6

V.    RELEVANT FOUNDATIONAL EXPERT OPINIONS ...................8

    A.   Narcotics Trafficking .................................................8

    B.   Criminal Gangs .......................................................10

    C.   Firearms .................................................................11

VI.   BACKGROUND OF THIS INVESTIGATION ...............................12

VII.  ORIGINS AND STRUCTURE OF THE ARYAN BROTHERHOOD .......................................13

    A.   Criminal Street Gangs in Central California Associated with This Investigation ...................................16

VIII. CRIMINAL ACTIVITIES OF THE DEFENDANTS ......................17

    A.   CONTROLLED PURCHASE AND SEIZURE OF FIVE POUNDS OF METHAMPHETAMINE INVOLVING LOPEZ, EVERSOLE, and ███████ ON MARCH 21- 27, 2020 ...................17

    B.   APRIL 29, 2020 CONTROLLED PURCHASE OF TWO AR-15 PISTOLS INVOLVING EVERSOLE BROOMALL AND ███████.........................24

    C.   ATF UC PURCHASE OF MULTIPLE FIREARMS FROM GEOFFREY GUESS AND REGINA BROOMALL, JUNE 12, 2020 ...................27

    D.   CONTROLLED PURCHASE OF HEROIN, June 30-July 1, 2020 .................32

    E.   CONSPIRACY TO DISTRIBUTE METHAMPHETAMINE BY KENNETH BASH AND CO-CONSPIRATORS ...................35

    F.   BASH, MORGAN, and PALMER agree to smuggle narcotics into Salinas Valley State Prison ...................38

    G.   MADSEN obtains methamphetamine at BASH's direction, and ███████ nd V.P. obtain and transport methamphetamine to S.R.'s house at BASH's direction ...................41

    H.   D.S., MCWILLIAMS, BOOTH, and S.R. prepare a pound of methamphetamine ...................59

I.      D.S. and MCWILLIAMS transport methamphetamine to Soledad, CA at BASH's direction, and BASH, PALMER, MORGAN, D.S., and MCWILLIAMS conspire to smuggle methamphetamine into Salinas Valley State Prison ................................................................................................63

J.      The next day, D.S. and MCWILLIAMS again attempt to smuggle contraband into Salinas Valley State Prison at the direction of BASH, PALMER, and MORGAN ......................................................................................................74

K.      D.S. and MCWILLIAMS arrested with methamphetamine ................................79

L.      SAMANTHA BOOTH SELLS METHAMPHETAMINE TO RAISE FUNDS FOR D.S.'S BAIL ...............................................................................................80

M.      DISTRIBUTION OF METHAMPHETAMINE TO ALASKA, SEPTEMBER 22, 2020 .............................................................................................................85

N.      DISTRIBUTION OF METHAMPHETAMINE TO MONTANA, SEPTEMBER 19-30, 2020 .........................................................................................92

O.      ZACHOCKI, AND ▉▉▉▉ ARE FELONS WHO POSSESSED A FIREARM .........................................................................................................97

P.      Jacob RENSHAW, Amanda GOURLEY, and ▉▉▉▉ CONSPIRE TO DISTRIBUTE METHAMPHETAMINE TO MONTANA, OCTOBER 12-15, 2020 ......................................................................................................110

AFFIDAVIT SUBMITTED BY EMAIL/PDF AND ATTESTED TO ME AS TRUE AND ACCURATE BY TELEPHONE CONSISTENT WITH FED. R. CRIM. P. 4.1 AND 41(D)(3) BEFORE ME THIS _____ DAY OF _____, 2020. .................................136

THE HONORABLE ERICA P. GROSJEAN, ......................................................................136

UNITED STATES MAGISTRATE JUDGE.................................................................................136

I, Anthony Gonzales, being duly sworn, hereby declare and state:

## I. **INTRODUCTION**

This affidavit is being submitted in support of the issuance of arrest warrants for Kenneth **BASH**, Robert **EVERSOLE**, Stephanie **MADSEN**, Todd **MORGAN**, ▓▓▓▓▓▓▓▓▓▓ David **ZACHOCKI**, ▓▓▓▓▓▓▓▓▓▓▓▓▓ Regina **BROOMALL**, Geoffrey **GUESS**, ▓▓▓▓ ▓▓▓▓▓▓▓▓ Angel **LOPEZ**, Joseph **MCWILLIAMS**, ▓▓▓▓▓▓▓▓▓▓▓ Marlon **PALMER**, Samantha **BOOTH,** Amanda **GOURLEY** and Jacob **RENSHAW** for violations of Title 21, United States Code, Sections 846 and 841(a)(1), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances (Methamphetamine); Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm; Title 18, United States Code, Section, 922(a)(1)(A), Engaging in the Business of Dealing Firearms Without a License, Title 18, United States Code, Section 924(c), Possession of a Firearm in Furtherance Drug Trafficking.

1.     I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1).

2.     I have been a Special Agent with the ATF since October of 2018.  I have completed the Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center and Special Agent Basic Training (SABT) at the ATF National Academy located at Glynco, Georgia.  In 2008, I completed a California POST Academy at Fresno City College and currently possess a California Peace Officer Standards and Training Basic, Intermediate and Advanced certificates.  I currently hold a Bachelor's degree in English and a Master's degree in Emergency Management and Homeland Security.  I have been assigned to the ATF San Francisco Division-Fresno Field Office since May of 2019.

3.     Prior to my employment with ATF, I was employed as a Deputy Sheriff and Sheriff's Detective for the Santa Cruz County Sheriff's Office, a Deputy Sheriff for the Madera County Sheriff's

Affidavit                                                                1

Office, a Police Officer and Police Detective with the Clovis Police Department.  While working as a detective with the Santa Cruz County Sheriff's Office I was assigned to the Santa Cruz County Gang Task Force.  While working as a detective for the Clovis Police Department, I was assigned to the Fresno County Multi-Agency Gang Enforcement Consortium (MAGEC).  While working as a Special Agent with ATF, I have continued to conduct investigations with MAGEC and the Federal Bureau of Investigation Safe Streets Task Force (SSTF).

4.      During the course of my employment, I have personally contacted hundreds of gang members including members and associates of the Fresneck criminal street gang and associates of the AB.  I have also had numerous conversations with other investigators, including CDCR Gang Intelligence investigators pertaining to the criminal activity and operations of the AB and its subordinate criminal street gangs inside the California prison system.  I have also monitored numerous electronic intercepts of "made" AB members, including conference calls between several members discussing criminal activity and business activities of the organization.  These intercepts have included AB members incarcerated in various prisons throughout California.  I have also monitored intercepts and recorded calls with AB associates Robert **EVERSOLE**, Kenneth **BASH**.  I have also personally conducted interviews of inmates inside various prisons who were documented by CDCR as being validated AB associates.

5.      I am familiar with the methods, language, structures, and criminal activities of street gangs and transnational gangs, including Fresnecks, Skinheads, Peckerwoods and AB, operating in and through this judicial district.  I am familiar with street and leadership level criminal activities of these gangs.  I am familiar with the types and amount of profits made by narcotics smugglers and the methods, language, and terms which are used to disguise the source and nature of the profits from their illegal narcotic dealings.

6.      I know from my training, experience, and the current investigation, that members and associates of both the Fresnecks and AB utilize cellular telephones for communication within the gang in order to organize and plan the gang's criminal activities, including but not limited to assaults,

Affidavit                                               2

violence, and drug sales. Additionally AB members and associates utilize these methods of communication to stay in contact with each other and to promote AB business.

7.     During my monitoring and review of legally intercepted phone calls, text messages, in this case, I have noted several slang terms used in reference to illegally obtained items or illegally possessed items.  The purpose of the use of slang during phone calls, and text messages is to obstruct law enforcement in their investigations.

8.     It is my opinion, that all defendants named in this affidavit are either AB gang members, Fresneck gang members, Skinhead gang members, Peckerwood gang members or are criminally associated with these criminal street gangs.  This opinion is based on my training, experience, knowledge of this investigation, and each individual meeting gang validation criteria including, but not limited to: associating with known AB members, corresponding with known AB members, writing about the AB enterprise, photographs and messages relating to the AB enterprise, and court authorized intercepted telephone phone calls and messages discussing AB activity and business.

9.     I make this affidavit, in part, based on personal knowledge derived from my participation in this and past investigations and in part, upon discussion of facts and information developed by other agents/detectives involved in this investigation.  The information contained in this affidavit is based upon my personal observations and training and, where noted, information related to me by other law enforcement officers and/or agents.

10.     The information set forth in this affidavit is not intended to detail each and every fact and circumstance of the investigation or all the information known to me and other law enforcement investigators.  Rather, this affidavit serves to establish probable cause for the arrest of the above named individuals.

Affidavit

3

## II.   OVERVIEW OF INVESTIGATION

11.     As set forth more fully herein, between March 2020 and November 2020, members of the several criminal street gangs conspired with and at the direction of members and associates of the Aryan Brotherhood (AB) to commit various felony crimes within the Eastern District of California and elsewhere.  Using contraband cellphones,[1] several members and associates of the AB, including Todd **MORGAN,** Robert **EVERSOLE** and Kenneth **BASH,** directed other AB members and associates[2] as well as criminal street gang members to commit crimes both inside and outside of prisons.  The AB received assistance from gang members belonging to the Fresnecks,[3] Peckerwoods,[4] San Luis Sick Boys[5] to commit drug trafficking along with others who associated with members of the Mexican Mafia[6].   These conspiracies alleged herein included efforts to distribute methamphetamine and heroin.

12.     The organizational structure of the AB and the criminal street gangs that support the AB, have a three-tier structure.  The first tier is comprised of "made"[7] AB members; the second tier includes

---

[1] Cellular telephones that were being used by incarcerated individuals.  California Department of Corrections and Rehabilitation (CDCR) does not allow possession of cellular telephones by prisoners, and any such device is considered contraband.

[2] CDCR is responsible for conducting validations of both members and associates.  CDCR gang investigators consider several factors prior to validating an inmate as a member or associate. Validations occur based on a weighted point system in which gang investigators consider factors such as gang symbols, gang-related written materials, self-admission and direct links to existing members. Validated associates are most often members of criminal street gangs who gain notoriety from an AB member inside prisons or jails for attributes seen by members to benefit the AB.  These attributes may include violent acts, the ability to demand respect or make money for the AB.  It is common for a member of a criminal street gang to be both a validated member of the street gang, as well as a validated associate of the prison gang.

[3] The Fresneck criminal street gang is a validated criminal street gang active in the Central Valley of California.  Their membership is comprised primarily of white gang members who have an allegiance with the Aryan Brotherhood (see footnote #2) in custodial settings.

[4] Peckerwoods is a broad term for a number of white supremacist subsets of criminal street gangs that operate throughout California.  Peckerwoods commonly align with the AB inside of custodial facilities and often run criminal activity on behalf of the AB inside prisons and county jails.

[5] San Luis Sick Boys, or just Sick Boys, is a criminal street gang active on the Central Coast of California in San Luis Obispo County and Santa Barbara County.  Members and associates of the Sick Boys submit to the authority of the AB both inside and outside of custodial facilities.

[6] The Mexican Mafia is another one of the seven validated prison gangs recognized by the California Department of Corrections and Rehabilitation (CDCR).  The Mexican Mafia exercises authority of Sureno criminal street gang members both inside and outside of prisons and jails.

[7] The term "made" is exclusively used in this Affidavit to describe AB members by members and

Affidavit                                                    4

validated AB associates and criminal street gang members that operate at the direction and for the benefit of the AB membership; and the third tier includes facilitators who are generally lower-level criminal street gang members, associates, or non-gang members who conduct business outside of custodial facilities for the benefit of the AB and the associated criminal street gangs.

13.     Through court-authorized wiretaps and other investigative means, the facts in this affidavit are based on the observations of and evidence gathered by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Fresno County Sheriff's Office, Special Operations Unit ("SOU," a team comprised of agents and officers from  California Department of Justice and California Highway Patrol), Fresno Police Department, Clovis Police Department, the Federal Bureau of Investigation and other assisting agencies (referred to hereinafter as the "Investigative Team") uncovered multiple conspiracies to commit murder, assisted in solving the homicide of an AB-targeted victim, seized substantial amounts of methamphetamine, heroin, and multiple firearms from multiple vehicle stops, search warrants and other legal means during the course of the operation.  In addition, the investigative team intercepted multiple communications between AB members, associates and criminal street gang members that provided a unique introspective into the organization of their criminal enterprise.

### III.     <u>PURPOSE AND STRUCTURE OF AFFIDAVIT</u>

14.     I submit this Affidavit to support my request for arrest warrants based on a criminal complaint alleging violations of federal law.  I have divided this Affidavit into three sections.

15.     First, in the section captioned "**Background of Investigating Agent**," I explain the basis for my knowledge of the facts asserted in this Affidavit and my background, training, and experience as it relates to this investigation.

16.     Second, in the section captioned "**Criminal Violations and Requested Arrest Warrants**," I set forth the charges, names, and other identifying information regarding the individuals for whom I am seeking arrest warrants (collectively referred to as the "defendants").

---

associates familiar with the AB.

Affidavit                                                    5

17. Third, in the section captioned "**Probable Cause**," I describe the facts and circumstances that establish the probable cause necessary for this Court to issue the requested arrest warrants.

## IV.   CRIMINAL VIOLATIONS AND REQUESTED ARREST WARRANTS

### A.   Charges

18. In the section below, I have listed each of the defendants included in this Criminal Complaint along with the charges for each.

| Defendant | Counts |
|---|---|
| Robert EVERSOLE, "Rage" | **1:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (March 2020)<br>**2:** Conspiracy to engage in and engaging in the business of dealing firearms without a license (April – June 2020)<br>**3:** Conspiracy to distribute and possess with intent to distribute 100 grams and more of a mixture containing a detectable amount of heroin (6/30/2020-7/1/2020) |
| Kenneth BASH | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020)<br>**5:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (10/1/2020 – 11/16/2020) |
| Stephanie MADSEN | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020)<br>**5:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (10/1/2020 – 11/16/2020) |
| Todd MORGAN, "Fox" | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020) |
| David ZACHOCKI, "Lil David Z." | **8:** Felon in possession of a firearm (10/3/2020-10/4/2020) |
| ▆▆▆▆▆▆▆▆▆ | **9:** Felon in possession of a firearm (10/3/2020-10/4/2020) |
| ▆▆▆▆▆▆▆▆▆ | **5:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (10/1/2020 – 11/16/2020) |
| ▆▆▆▆▆▆▆▆▆ | **3:** Conspiracy to distribute and possess with intent to distribute 100 grams and more of a mixture containing a detectable amount of heroin (6/30/2020-7/1/2020) |
| Regina BROOMALL, "G" or "Gina" | **2:** Conspiracy to engage in and engaging in the business of dealing firearms without a license (April – June 2020) |
| ▆▆▆▆▆▆▆▆▆ | **2:** Conspiracy to engage in and engaging in the business of dealing firearms without a license (April – June 2020) |

| | |
|---|---|
| **Geoffrey GUESS, "Active"** | **2:** Conspiracy to engage in and engaging in the business of dealing firearms without a license (April – June 2020) |
| ▓▓▓▓▓ | **1:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (March 2020) |
| **Angel LOPEZ, "Rascal"** | **1:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (March 2020) |
| **Joseph MCWILLIAMS, "Janky"** | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020) <br> **6:** Possession of a firearm in furtherance of a drug trafficking offense and carrying or using a firearm during and in relation to a drug trafficking offense (9/24/2020) <br> **7:** Felon in possession of a firearm(9/24/2020) |
| ▓▓▓▓▓ | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020) |
| **Marlon PALMER, "Peanut"** | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020) |
| **Samantha BOOTH** | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020) |
| **Jacob RENSHAW, "Shredder"** | **4:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (9/1/2020 – 11/16/2020) <br> **5:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (10/1/2020 – 11/16/2020) |
| **Amanda GOURLEY, "Biggie"** | **5:** Conspiracy to distribute and possess with intent to distribute 500 grams and more of a mixture containing a detectable amount of methamphetamine (10/1/2020 – 11/16/2020) |

19.    The charges set forth above will collectively be referred to as the "Subject Offenses."

## V.      RELEVANT FOUNDATIONAL EXPERT OPINIONS

### A.      Narcotics Trafficking

20.      Based on my training, experience, and consultation with other law enforcement officers, I know:

a.      Persons involved in the transportation, distribution, purchase, sale, and/or use of illegal narcotics often use vague or ambiguous terms to describe controlled substances.  Based on this information I know the terms "white", "clear", "w", "shards", "crystal" and "shit" are used to describe methamphetamine as defined in United States Federal Drug Enforcement Administration (DEA) Schedule II.  Any reference to white, clear, w, shards, or crystal shall be considered synonymous with methamphetamine.

b.      Persons involved in the transportation, distribution, purchase, sale, and/or use of illegal narcotics often use vague or ambiguous terms to describe controlled substances.  Based on this information I know the terms "black", "dark", "h", or "points" are used to describe heroin as defined in the United States Federal Drug Enforcement Administration (DEA) Schedule I.  Any reference to black, dark, h, or points shall be considered synonymous with heroin.

c.      Drug distributors commonly have in their possession (that is, on their person, at their residence, and in areas under their control), firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers, and other weapons.

d.      Drug distributors often utilize vehicles in which to transport and distribute controlled substances and/or analogues to facilitate their distributing activities.  Based on my training, background, experience, conversations with other law enforcement officers, and the knowledge I have gained through this investigation, I also know that distributors will also utilize vehicles as locations in which to store controlled substances and/or analogues prior to distribution.

e.      Individuals who manufacture and/or distribute controlled substances often travel, sometimes great distances, in order to acquire controlled substances and/or analogues or

Affidavit                                              8

materials and equipment to manufacture controlled substances and/or analogues.  This is often due to elevated prices of a particular controlled substance in certain areas of the United States. Therefore, by purchasing the substance in larger quantities in high-density drug trafficking areas

and distributing it on other parts of the United States, the organization can exponentially increase their profit margin.

**B.**     **Criminal Gangs**

21.     Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a.      Individuals involved in criminal street gangs and prison gangs utilize various means and instruments to recruit perspective members, communicate with established associates, and to promote and further their criminal activities.  These means include those that are considered traditional: graffiti/tagging, hand signs, open intimidation, etc.; as well as those more modern including, but not limited to, cellular / smart phones (a platform for voice, text & instant messaging, and internet access), social networking websites (i.e. Facebook, Twitter, Instagram, YouTube, etc.), and music, which can be distributed on a much larger scale on sites such as You Tube and Sound Cloud.

b.      Individuals involved in criminal street gangs and prison gangs often possess photographs or digital images depicting: 1) themselves and fellow gang members posing and displaying gang hand signs, 2) gang members or associates posing with weapons, 3) gang members or associates posing beside vehicles, 4) gang members or associates posing at known gang affiliated locations and hangouts, and 5) gang members and associates displaying tattoos of gang affiliation.  Often these images are displayed on internet websites and kept for long periods of time on digital media, cell phones, and computers.

Affidavit                                                        10

c.      Individuals involved in criminal street gangs or prison gangs often maintain or possess knowledge of the current phone numbers, addresses, electronic mail addresses (email), social network links or whereabouts of fellow gang members and or associates.  Individuals involved with criminal street gangs often keep lists of the gang rosters and current membership or cliques. These lists often include gang members' monikers.

**C.      <u>Firearms</u>**

22.      Individuals documented as, or associated with, criminal street gang members and prison gang members are typically engaged in a variety of illegal activity and often possess weapons, including firearms and ammunition to protect themselves and attack rival gang members.

23.      Individuals documented as, or associated with, criminal street gang members and prison gang members are often convicted felons and as such, are prohibited from purchasing or possessing firearms.  Due to this fact, firearms have become extremely valuable as they increase the gang's ability to control criminal activity through violence and are increasingly more difficult to obtain through legal means.

## VI.   BACKGROUND OF THIS INVESTIGATION

24.     Members of the Investigative Team identified several Fresneck, Skinhead, Peckerwood and Aryan Brotherhood gang members who are participating in criminal activities throughout California and several other states in the western United States.  These gang members were believed to be participants in several conspiracies to traffic firearms and narcotics.  In February of 2020, members of the Investigative Team conducted several controlled buys of firearms and drugs, including methamphetamine, heroin, AR-style rifles and pistols.   Many of the controlled purchases were facilitated and executed by convicted felons who had served prison time with Aryan Brotherhood members and associates who were acting under Aryan Brotherhood authority.  During the investigation, evidence of other crimes were uncovered.

25.     During the controlled purchases, the Investigative Team learned that two Aryan Brotherhood associates were primarily responsible for controlling the Fresno area on behalf of the Aryan Brotherhood -- Robert "Rage" **EVERSOLE**.  **EVERSOLE and** Kenneth **BASH**.   **EVERSOLE,** a validated Aryan Brotherhood associate and inmate at North Kern State Prison, was working under the authority of Aryan Brotherhood member K.J.  Through the use of contraband cellular phones inside the prison, **EVERSOLE** was able to coordinate the sale of multiple firearms and various quantities of both methamphetamine and heroin utilizing facilitators outside of the prison.  Through the use of Aryan Brotherhood authority, **EVERSOLE** not only coordinated these conspiracies, but was also able to profit from them utilizing online banking mediums such as CashApp and Green Dot.

26.     **BASH** was and is an inmate at Salinas Valley State Prison.  **BASH**, also a validated Aryan Brotherhood associate, directed a crew of Fresneck and Skinhead gang members active throughout Fresno County.  **BASH** oversaw several drug conspiracies, also through the use of contraband cellular phones, under the authority of Aryan Brotherhood members Todd "Fox" **MORGAN.  MORGAN,** who is also incarcerated at Salinas Valley State Prison, also utilized **BASH** to assist in multiple conspiracies to commit murder.  **BASH** was also found to be profiting from various criminal ventures including Employment Development Department fraud, methamphetamine sales,

heroin sales and firearms trafficking.  Similar to **EVERSOLE**, **BASH** utilized online banking applications such as CashApp and Green Dot to obtain money and transfer money to Todd **MORGAN**.

27.  As the investigation developed and additional investigative tools were used, such as wiretaps, several members and associates of the Aryan Brotherhood, Fresneck criminal street gang, Skinheads and Peckerwoods were identified as active participants in several criminal conspiracies. Within those ongoing conspiracies, members of the Investigative Team gathered evidence of the Subject Offenses outlined above.

### VII.     ORIGINS AND STRUCTURE OF THE ARYAN BROTHERHOOD

28.  The Aryan Brotherhood is a white, race-based gang formed in the California prison system in about 1964 by white inmates who wanted to gain power and authority in prison.  Some sources indicate the gang officially formed in 1968 in San Quentin State Prison.

29.  Aryan Brotherhood members are recruited from the prison population.  "For new members, the AB has a policy of 'blood in, blood out': potential members must commit a murder to gain full membership, and can only leave when they die."  *United States v. Bingham*, 653 F.3d 983, 987 (9th Cir. 2011).  However, exceptions have been made for new recruits who have shown a willingness to kill. *Id*. at 987 n.1.  Recently, there has also been precedent set for prospective members who have a greater earning potential or existing sum of money to contribute to the enterprise, to be "made" without committing a murder.  To be considered for AB membership, an inmate must be sponsored by two members, a primary and a secondary sponsor.  Generally, the inmate must also serve a probationary term, when his conduct is observed by Aryan Brotherhood members.  If his conduct is satisfactory, the inmate is admitted to the Aryan Brotherhood.  Once accepted, an Aryan Brotherhood member is required to commit any criminal act that the enterprise asks of him.  An AB member pledges his life to the enterprise.  All AB members are men.

30.  The Aryan Brotherhood is governed by a three-man commission with authority over the entire enterprise.  The primary purpose of the commission is to resolve disputes among AB members

Affidavit                                    13

and, when necessary, to approve the murder or assault of an Aryan Brotherhood member.  In theory, the murder or assault of an Aryan Brotherhood member in California may be executed only if the commission authorizes it.  Murder of a nonmember does not require commission approval.  The investigative team discovered in this case through several intercepts however, that certain senior members of the organization appear to have more authority than others.

31.     The Aryan Brotherhood does not have a formal, written code of conduct.  Instead, there are unwritten rules of conduct that govern the behavior of its members.  Most recently, three primary rules govern all the behavior of AB members.  They are: 1. Do not cooperate with law enforcement.  2. Keep your word.  3. Never be a coward.  Aside from these rules, AB members are required, when ordered, to kill without hesitation.  Members who do not fulfill their obligations to the Aryan Brotherhood are subject to murder.  AB members are also prohibited from engaging in other conduct, such as being convicted of child molestation, engaging in homosexual behavior, providing information to law enforcement and accruing a drug debt to an inmate of another race while in prison.

32.     In addition to members, the enterprise includes associates, who are people closely affiliated with the Aryan Brotherhood.  Associates are required to follow the orders of Aryan Brotherhood members.  Associates who do not fulfill their obligations to the enterprise are subject to murder.  The Aryan Brotherhood enforces its rules of conduct and promotes discipline among the enterprise by murdering, attempting to murder, conspiring to murder, assaulting, extorting, and threatening those who either violate the rules or pose a threat to the enterprise.  The Aryan Brotherhood also uses murder, the threat of murder, and assault to preserve, protect, and expand its position of power within the California prison system.  Specifically, AB members tend to believe that a prison stabbing committed by an AB member should be executed in a bloody and cruel manner so that it leaves a lasting impression on other inmates.  This AB belief stems from the reality that white inmates are a minority in every California prison.  Therefore, AB-ordered prison attacks, which tend to stand out as particularly gruesome, deter rival inmates from confronting the enterprise's members and associates.  In other words, the AB's extreme violence has a purpose: It warns other would-be attackers that they risk severe retaliation.  The deliberate message in the AB's violence is, "If you cross the AB, then this is what will

Affidavit                                                                14

happen to you."  Inmates and others who do not follow the orders of the Aryan Brotherhood are subject to murder, as is anyone who uses violence against an Aryan Brotherhood member.  As mentioned, inmates who cooperate with law enforcement authorities are instantly "put in the hat"[8].

33.     The purposes of the Aryan Brotherhood criminal enterprise include, but are not limited to, the following:

a.     Controlling illegal activities – such as narcotics trafficking, gambling, and extortion – within the California prison system for the purpose of generating money for Aryan Brotherhood members.

b.     Enriching the leaders, members, and associates of the enterprise through, among other things, illegal trafficking of controlled substances, often in interstate and foreign commerce.

c.     Preserving, protecting, and enhancing the power, territory, reputation, and profits of the Aryan Brotherhood through threats, intimidation, and violence, including – but not limited to – murder, assault, and obstruction of justice.

d.     Using threats and violence to keep victims in fear of the Aryan Brotherhood and in fear of its leaders, members, and associates.

34.     The means and methods by which Aryan Brotherhood leaders, members, and associates conduct and participate in the conduct of the criminal enterprise include the following:

a.     The leaders and members of the Aryan Brotherhood direct, sanction, approve, and permit other members and associates of the enterprise to carry out acts in furtherance of the enterprise.

b.     To perpetuate the enterprise and to maintain and extend its power, members and associates of the Aryan Brotherhood commit and conspire to commit murder, attempted murder, intimidation, and assault against individuals who pose a threat to the enterprise or who jeopardize its operations.  These targets include members of rival organizations, Aryan

---

[8] "Put in the hat" is prison vernacular for being marked for death.

Brotherhood members, and witnesses to the enterprise's illegal activities.

c.      To generate income, Aryan Brotherhood members and associates – under the protection of the enterprise – engage in illegal activities, including narcotics trafficking, weapons theft, firearms trafficking, fraud and smuggling contraband into prisons.

d.      Aryan Brotherhood members and associates employ and use gang-related terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang. During the period of this conspiracy, the Aryan Brotherhood – through its members and associates – engaged in multiple offenses in violation of Title 21, United States Code, Sections 841(a)(l) and 846.

35.     Aryan Brotherhood members use various symbols to signal their participation in the Enterprise.  The symbols can appear in tattoos, drawings, and writings.  The shamrock is the most prominent symbol used to signify membership in the AB.  If an incarcerated inmate who is not a member of the enterprise has a shamrock tattoo, members of the Aryan Brotherhood will require that inmate to remove or cover up the tattoo.  Additional symbols demonstrating enterprise membership include Nazi symbols, the letters "AB," the numbers "I" and "II" (representing the first two letters of the alphabet), the numbers "666," the number "88" (representing the phrase "Heil Hitler" because "H" is the eighth letter in the alphabet), and the number "14" (referring to a 14-word mission statement for white supremacists).

A.      **Criminal Street Gangs in Central California Associated with This Investigation**

36.     The Aryan Brotherhood maintains some influence over California's white criminal street gangs.  This includes the Fresneck, Skinhead, and Peckerwood criminal street gangs that further the AB's interests both inside and outside of detention facilities.

37.     Only certain members within the various white criminal street gangs have direct contact with AB members.  This limited chain of communication is important because certain criminal activities carried out by the various white street gangs may only be done when the acts have been condoned and/or authorized by the AB.  Besides receiving orders from the AB, the white street gang members who are in direct contact with AB members are typically also responsible for assuring that the gang collects "taxes"

Affidavit                                                    16

from narcotic transactions and other profitable criminal endeavors.  Specifically in the case of the AB, investigators have learned that AB members and associates who control yards will collect quarterly taxes, an annual fee and one-third of all profits from these transactions.  The money collected from these taxes is then utilized to finance other illicit business dealings.  Members may be contacted by other members or associates through contraband cellular phones when a white inmate fails to pay, or commits another violation of the AB's unwritten code on a given yard.  These inmates may be targeted for an assault or murder.  These assaults are often referred to as having someone "report to the back".[9]

### VIII.   CRIMINAL ACTIVITIES OF THE DEFENDANTS

**A.   CONTROLLED PURCHASE AND SEIZURE OF FIVE POUNDS OF METHAMPHETAMINE INVOLVING LOPEZ, EVERSOLE, and ▓▓▓▓▓▓ ON MARCH 21- 27, 2020**

38.   On March 21, 2020, CI1[10]  contacted members of the investigative team and stated that he/she was being directed by **EVERSOLE** to withdraw money from CashApp and GreenDot accounts in an attempt to purchase approximately five pounds of methamphetamine.  **EVERSOLE** directed CI1 to take the cash that had been withdrawn, and an unknown individual would contact him/her to exchange money for methamphetamine.

39.   On March 23, 2020, **EVERSOLE** provided the phone number 805-554-2045 as the contact for the pick-up of the methamphetamine.  A member of the investigative team conducted a records check on[11] the phone number provided by **EVERSOLE.**  The results of this search indicated that the phone was subscribed to ▓▓▓▓▓▓▓▓▓▓▓ I contacted CDCR Gang Intelligence officers and

---

[9] "Report to the back" refers to an inmate being assaulted and ordered to report to the AB member or associate who holds the keys (see footnote 24) to that particular yard so that their violation may be discussed.

[10] CI1 has been providing information to law enforcement since approximately January of 2020. CI1 has provided information to law enforcement hat has led to the seizure of narcotics, firearms and the identification of both drug and firearms traffickers.  CI1 has provided this information for monetary payment.

[11] Records checks include both local and national databases, both public and "law enforcement only", that identify users of phone numbers, potential subscribers of phones, addresses of subscribers and other identifying information that assists law enforcement in the identification of the users of the phone.

learned that ▮▮▮▮▮ was a known facilitator for Mexican Mafia associate Angel "Rascal" **LOPEZ**, who was incarcerated on B-yard at Salinas Valley State Prison.  CDCR Gang Intelligence agents also reported that **EVERSOLE** was housed on the same yard as **LOPEZ**, who was a known drug trafficker for the Mexican Mafia.[12]

40.    CI1 contacted ▮▮▮▮▮ as directed. ▮▮▮▮▮ asked CI1 to meet ▮▮▮▮▮ at an AM/PM gas station located near 1611 S. Blosser Road, Santa Maria, California.  A surveillance team comprised of members of the investigative team traveled to Santa Maria, California, and observed the below-described exchange of money for drugs.

41.    ▮▮▮▮▮ arrived to the location and members of the investigative team identified ▮▮▮▮▮ by referencing her California Driver's License photograph. ▮▮▮▮▮ met with CI1 and CI2 and took the cash that had been withdrawn by CI1. ▮▮▮▮▮ said she would contact CI1 when the methamphetamine was ready for pick up and explained that she was also a pound level methamphetamine dealer and an ounce level heroin dealer, and would do business with CI1 if it was ever needed. ▮▮▮▮▮ provided a sample of methamphetamine to CI1, which was later weighed and was 9.75g.  The sample was later booked into FSO evidence.

42.    Members of the investigative team obtained search warrants authorizing them to install/ use a GPS tracker on ▮▮▮▮▮ vehicle, and GPS precise location data for ▮▮▮▮▮ cellular phone.  Santa Barbara County Superior Court Judge Gustavo Lavayen issued the warrants which members of the investigative team implemented on March 24, 2020.

43.    On March 26, 2020, ▮▮▮▮▮ had not yet accomplished the delivery of the five pounds of methamphetamine.  EVERSOLE directed CI1 to contact ▮▮▮▮▮ and find out where the drugs were. ▮▮▮▮▮ stated that the drugs were still in Southern California and she would be picking them up that evening. ▮▮▮▮▮ made a reference to the pick-up location being near Highway 1.  Highway 1 runs through the small town of Guadalupe, in unincorporated Santa Barbara County, just

---

[12] I know through this investigation including numerous intercepts of text messages and phone calls, as well as interviews with inmates that the Aryan Brotherhood and Mexican Mafia have an alliance that allows for Mexican Mafia members and associates to conduct drug business with Aryan Brotherhood members and associates both inside and outside of prison.

Affidavit                                                  18

west of Santa Maria.  According to Santa Barbara County Sheriff's investigators, Guadalupe is a well-known area for drug traffickers to frequent.

44.     At approximately 1900 hours, the GPS device on ████ vehicle indicated she was in Guadalupe, California.  Members of the investigative team located her vehicle in Guadalupe and contacted the California Highway Patrol (referred to hereinafter as "CHP") to conduct a vehicle stop of ████ vehicle as she left Guadalupe.  CHP conducted a vehicle stop on S. Blosser Road, for violation of California Vehicle Code, Section 4000(a)(1).  CHP K9 Officer Dustin Snider conducted an open air sniff of the vehicle utilizing his K9 partner and the air around the vehicle yielded a positive indicator from the K9 for the presence of drugs.  Officer Snider conducted a search of the vehicle and located 47.7g of suspected methamphetamine, 47.3g of suspected black tar heroin and 25.1 grams of suspected marijuana.  ████ was released at the scene and cited for the violation.

45.     On March 27, 2020, surveillance units continued to monitor ████ location in Santa Maria, California.  At approximately 1200 hours, **EVERSOLE** contacted CI1 and stated that he needed someone other than ████ to pick up the methamphetamine in Southern California. **EVERSOLE** directed CI1 and CI2 to travel to the Los Angeles area.  **EVERSOLE** told the CI's he would then give them further instructions to obtain the methamphetamine.  Surveillance units followed CI1 and CI2 from Buellton, California to Inglewood, California.  Prior to leaving, CI1 contacted **EVERSOLE** through the talk/text application "Signal", as I observed, and **EVERSOLE** again provided a phone number (760-968-6049) to contact for further arrangements.

46.     CI1 contacted the number and an unidentified male who only identified himself as "Too Fast" answered the phone.  "Too Fast" told CI1 that the methamphetamine was in two separate locations (La Mirada and Lynwood) and made arrangements to consolidate the amounts of methamphetamine. "Too Fast" instructed CI1 to just drive south and contact him again when CI1 was in the Los Angeles area.

47.     Surveillance units followed CI1 and CI2 as they drove south to Los Angeles.  In Inglewood, CI1 stopped to call 'Too Fast', while I listened.  "Too Fast" instructed CI1 to meet near 1733 S. Anaheim Boulevard, Anaheim, California.  CI1 and CI2 were searched by members of the

Affidavit                                                    19

investigative team, to insure no narcotics were in the vehicle, and provided with an audio

transmitting/recording device before driving to the meet location.  No narcotics or other contraband was

located inside the vehicle or on the persons of CI2 or CI1.  Arrangements were made to conduct a

vehicle stop of CI1 after the methamphetamine was delivered.

48.     CI1 and CI2 drove to the address provided and were met by an unidentified Hispanic

male, who placed a bag in the backseat of the vehicle before leaving on foot and getting in an

unidentified vehicle.  As CI1 drove away, California Highway Patrol officers conducted a vehicle stop

of CI1 and CI2.  Inside the vehicle, officers located five packages of suspected methamphetamine

weighing a total of 5.09lbs (2310.8g).  The methamphetamine was seized and later booked into FSO

property.  SA Gonzales instructed CI1 to take a cellular phone photograph of the vehicle stop (prior to

getting pulled over) for later proof to **EVERSOLE.**

49.     On or about April 6, 2020, the investigative team was contacted by Institutional Gang

Investigator (IGI) Miguel Cortez, who worked at North Kern State Prison where **EVERSOLE** was

housed on A-yard.  IGI Cortez told me that he had recently obtained a cellular phone after the search of

an inmate who lived on **EVERSOLE'S** yard.  IGI Cortez stated that a cursory search of the phone was

conducted and he believed the phone actually belonged to **EVERSOLE**.

50.     On May 5, 2020, I obtained a federal search warrant for **EVERSOLE'S** cellular phone

that was found in the aforementioned inmate's cell.  I reviewed the data obtained from the phone, and

observed evidence of **EVERSOLE'S** and **LOPEZ'** direction of the above-described methamphetamine

transaction.  I saw a conversation in the WhatsApp[13] application between **EVERSOLE** and "Rscl", a

shortened version of **LOPEZ'** nickname, Rascal.  The following are excerpts from that conversation

which was dated March 27-28, 2020:

### MARCH 27, 2020

**EVERSOLE:** Screenshot of 1vehicle with drugs in it getting pulled over

---

[13] WhatsApp is a talk/text application that offers two-way encryption to users.  Based on training and experience, including this investigation I know that people who utilize cellular phones to commit crimes such as drug trafficking often use WhatsApp due to the encryption in an effort to avoid law enforcement detection.

1    **EVERSOLE:** Screenshot of vehicle getting pulled over with drugs in it.1

2    **LOPEZ:** Was it stashed good?

3    **EVERSOLE:** Don't know bro…they literally just left picking it up

4    **LOPEZ:** They look like highway patrol

5    **LOPEZ:** There was guy in trunk

6    **EVERSOLE:** Sleeping

7    **EVERSOLE:** Her husband

8    **LOPEZ:** She still not answering

9    **EVERSOLE:** No

10    **EVERSOLE:** She's sitting on curb

11    **LOPEZ:** I'm on with 2 fast now

12    **EVERSOLE:** Could you have him check it out

13    **LOPEZ:** Hes going now

14    **LOPEZ:** Why they get pulled over

15    **EVERSOLE:** Don't know bro

16    **LOPEZ:** Fuck

17    **EVERSOLE:** They been sitting out there for over an hour

18    **EVERSOLE:** They are not answering now

19    **EVERSOLE:** Because of covid 19…let them go

20    **EVERSOLE:** Wtf?!

21    **LOPEZ:** 5 pounds? No nothing?

22    **EVERSOLE:** Said two plains clothes rolled up

23    **EVERSOLE:** Picked up the dope

24    **EVERSOLE:** Rolled out

25    **LOPEZ:** wtf

26    **EVERSOLE:** Two CHP rolled them

27    **LOPEZ:** Were they even on free way

28    Affidavit               21

1    **EVERSOLE:** No bro The side street by the motel

2                    **MARCH 28, 2020**

3    **LOPEZ:** Good evening

4    **EVERSOLE:** Good evening bro

5    **LOPEZ:** The 5 I have made it to OC…but I'm nervous about moving it so were figuring

6    something out how were going to get from point A to B

7    **LOPEZ:** Once in 805 I got u

8    **LOPEZ:** I know youd do same for me

9    **EVERSOLE:** Of course bro..still tripping on it

10    **LOPEZ:** All cuz my girl got cracked the day before

11    **LOPEZ:** They gave her a citation too

12    **LOPEZ:** Possession and distribution

13    **LOPEZ:** Never been in trouble before

14    **EVERSOLE:** Same style cops?

15    **LOPEZ:** Had dogs and 3 cars

16    **LOPEZ:** Yes chp

17    **LOPEZ:** They didn't belong there either

18    **EVERSOLE:** Undercovers too?

19    **LOPEZ:** No no undercovers

20    **LOPEZ:** I was talking to her now she's freaking out that she lost so much but I'm trying to

21    reassure her she's ok

22    **EVERSOLE:** Yeah, not her fault

23    **LOPEZ:** Homie in LA and paisas paranoid now don't wanna do any drops pickups cuz this

24    never happened before and chp throwing them off

25    **EVERSOLE:** I would be super careful

26    **LOPEZ:** They shouldn't have been in the city

27    **LOPEZ:** They looked into it and said they're not OC chp uniforms

28    

**LOPEZ:** I'm nervous now…our drivers were diff circles no one knew I would work w you or your people…but both our girls get hit

**EVERSOLE:** I don't even know bro

**LOPEZ:** Homie don't want me to send anyone down there

**EVERSOLE:** Just be careful bro

**LOPEZ:** we gotta recover our losses and b careful at same time

51.     Based on my knowledge of the investigation from March 27-28, 2020, I know that the conversation between **LOPEZ** and **EVERSOLE** is pertaining to the vehicle stop of CI1 and CI2 due to the specific nature of the information provided and the photographs sent to **EVERSOLE** as directed by CI1.  I also believe, based on the connection between **LOPEZ** and ▇▇▇▇ as referenced above, and the timing of ▇▇▇▇ traffic stop, where narcotics were recovered, and the above text conversation, **LOPEZ** is referring to ▇▇▇▇ when he said, "my girl got cracked the day before".  Based on the facts presented above there is cause to believe that **EVERSOLE, LOPEZ** and ▇▇▇▇ participated in a conspiracy to distribute 50 grams and more of methamphetamine and 500 grams and more of a mixture containing a detectable amount of methamphetamine in violation of Title 21, United States Code, Sections 846 and 841(a)(1)(A), Conspiracy to Distribute Methamphetamine.

**B.      APRIL 29, 2020 CONTROLLED PURCHASE OF TWO AR-15 PISTOLS INVOLVING EVERSOLE BROOMALL AND** ▇▇▇▇▇▇▇▇

52.      On or about April 13, 2020, CI1 received text messages from **EVERSOLE** including pictures of several firearms that **EVERSOLE** said he was selling.  CI1 provided the photographs to the investigative team, however stated that **EVERSOLE** had stopped utilizing him/her since the methamphetamine had been lost in the Anaheim vehicle stop.  CI1 stated that he/she was not sure that **EVERSOLE** completely trusted either CI1 or CI2, and had started utilizing a female identified as Regina "G" **BROOMALL** as a secretary.  CI1 stated that **BROOMALL** appeared to be responsible for all of the things **EVERSOLE** needed done outside of the prison including online banking, drug transportation and brokering firearms deals.[14]

53.      Members of the investigative team directed CI1 to try and purchase firearms from **EVERSOLE**.  CI1 followed instructions, and contacted **EVERSOLE** through the Signal App. **EVERSOLE** told CI1 that he had sold all of the firearms except two AR-style firearms.  The following are excerpts of the text messages received by CI1 from **EVERSOLE** pertaining to the firearms sale:

**April 28, 2020**

CI1: My boy wants to know if you'll sell both??

**EVERSOLE**: I already had one sold but let me see

CI1: He has money.  Tomorrow he said so when I get off work I can go

**EVERSOLE**: It's not about the money babe.  I could sell 10 of them right now

CI1: I know babe I just thought you might like the $$ too lol.  He has $3600 and told me to see if I could work a deal with you.  If not I understand

**EVERSOLE:** Hmmmmm…if I'm offered that much… I could be enticed[15]

---

[14] CI1 informed the investigative team that **EVERSOLE** regularly engaged in firearms trafficking and drug trafficking as a means to illicitly make money, but since the seizure of the methamphetamine in Anaheim possessed by CI1, **EVERSOLE** had been relying on **BROOMALL** to facilitate these transactions.

[15] Based on my experience in conducting numerous controlled purchases of firearms, AR-style rifles and pistols often sell on the street in California for prices from $1,500-$2,200 depending on the accessories on the firearm.

Affidavit                                                                24

CI1: I thought you might like that number I might even get him to go a lil more

**EVERSOLE:** Broker the best deal you can babe.  Actually 36 is good

CI1: I owe you $300.  So $3800 and take $200 off my debt.

**EVERSOLE:** Okay…but take 300 off

**EVERSOLE:** When will the funds be available

**EVERSOLE:** So G has those toys[16]

CI1: Are you selling both to him or just the one? And do you want me to give g the cash??

**EVERSOLE:** 8058061070

**EVERSOLE:** G. Just coordinate with her

**April 29, 2020**

**EVERSOLE:** Are we on for later?

CI1: Yes I called g a lil while ago to confirm.  630ish

**EVERSOLE:** Can I have someone else meet you? I need G to go do something for me.

CI1: So you have g working for you again…? It's fine you don't have to tell me

**EVERSOLE:** Limited.  I'm out of people Babe

54.     Based on my knowledge of the investigation and common firearms trafficking principles, I know this conversation to be indicative of **EVERSOLE** agreeing to sell two firearms to CI1 for $3600 through **BROOMALL**, who **EVERSOLE** refers to as "G".  CI1 provided several text messages with **BROOMALL** to the investigative team pertaining to the sale of the AR-style firearms.  The following are excerpts from their conversation:

**April 28, 2020**

**BROOMALL**: Tomorrow correct

CI1**:** yes ma'am

---

[16] I know based on training and experience that people who traffic firearms illegally often utilize code words to try and avoid law enforcement detection in their communications.  "Toys" is a common code word used by gang members for firearms.

**BROOMALL:** 630 Tomorrow I'll send you location by this evening

CI1: Ok cool.  I'm meeting you right?

**BROOMALL:** I don't send any one else for deals it's me or my partner who isn't affiliated in anything and safer but don't put him in any situation where he's seen or compromised so yeah it'll be me

CI1: Okay

**April 29, 2020**

**BROOMALL:** 1662 Oxford Santa Maria Ca. 93458

**BROOMALL:** You good. Got any questions or anything

CI1: Am I still going to the same address?

**BROOMALL:** Yes that never changed

55.     On April 29, 2020, members of the investigative team met with CI1 and CI2 and provided them with an audio transmitting/recording device.  Both informants and their vehicles were searched and they were given $3800 in buy funds.  Surveillance maintained constant observation of both informants to and from the deal location.  At approximately 1830 hours, CI1 contacted **BROOMALL** who requested that CI1 "call video when u get there".

56.     Surveillance units followed CI1 and CI2 to the address provided by **BROOMALL**, of 1662 Oxford Avenue, Santa Maria.  Surveillance units observed a male later identified as ▓▓▓ ▓▓▓▓▓ walk out into the front yard of the house, and place a cardboard box near the front door of the residence.  During a later debrief of CI1, he/she stated that as ▓▓▓▓▓ approached the vehicle ▓▓▓▓▓ then called **BROOMALL** on a video chat application, as instructed in the above text.  CI1 recognized **BROOMALL** on the phone (from prior knowledge) and handed the money to ▓▓▓▓▓ who counted the money in front of **BROOMALL** on the video chat application.  Once the money was determined to be the appropriate amount, ▓▓▓▓▓ walked back to the front porch and returned with a large cardboard box which he placed in the backseat of CI1's vehicle.

57.     Surveillance units followed CI1 and CI2 back to the meeting location and obtained the box from the back of their vehicle.  The box was a "Palmetto State Armory" box.  Inside the box, I located two unknown make/model, AR-style pistols with no serial numbers, one loaded extended magazine[17] that contained three (3) live rounds of Winchester .223 caliber ammunition and a second empty extended magazine.  The items were later booked into ATF Property.  I spoke with ATF Interstate Nexus Expert SA Eric Penman who confirmed that the Winchester, .223 caliber ammunition was not manufactured in the state of California and traveled in interstate commerce.  Further, I confirmed through ATF databases that ███████ **BROOMALL** nor **EVERSOLE** possess a Federal Firearms License allowing them to sell firearms.

58.     After the deal was completed, CI1 sent a text message to **BROOMALL** requesting **BROOMALL** notify him/her once all of the money had been received.  **BROOMALL** replied "I'll get it all it's as safe in his hands as it is in the bank".

59.     Based on the facts presented above, there is probable cause to believe that Regina **BROOMALL**, Robert **EVERSOLE** and ███████ conspired to sell two AR-15 pistols with ammunition in violation of Title 18, United States Code, Sections 371 and 922(a)(1)(A), Conspiracy to Deal and Dealing Firearms without a License.

## C.   ATF UC PURCHASE OF MULTIPLE FIREARMS FROM GEOFFREY GUESS AND REGINA BROOMALL, JUNE 12, 2020

60.     On or about June 7, 2020, CI1 contacted members of the Investigative Team, and informed them that **EVERSOLE** was again offering firearms for sale.  CI1 stated that **EVERSOLE** has several firearms for sale and was offering all of them.  The Investigative Team directed CI1 to get details of what was being offered for sale and to begin negotiating for the purchase of the firearms.

61.     As part of that conversation, CI1 received a text message picture from **EVERSOLE** of the firearms, which appeared to be three pistols and an AR-style rifle.  In one of the photographs, a

---

[17] In this case, the "extended magazine" referenced was capable of holding 30 rounds of ammunition.

white male adult with distinctive tattoos on his forearms can be seen holding two of the pistols with extended magazines inserted.  One of the tattoos appeared to be a clown face tattooed on the left forearm of the male.  The male's face is not visible in the photograph.

62.     On or about June 11, 2020, CI1 notified the investigative team that the firearms were being offered for a total of $4000, and that **BROOMALL** would again be facilitating the deal on behalf of **EVERSOLE.  EVERSOLE** told CI1 that the firearms were still located in Fresno and would be delivered to Paso Robles, California (to meet the CI) after the runners went back to their hotel.  Later in the evening, **EVERSOLE** contacted CI1 and stated the firearms would be delivered the next day, on June 12, 2020.

63.     On or about June 12, 2020, **EVERSOLE** initiated a conversation on the Signal application with CI1 and stated that CI1 could meet with "G" (**BROOMALL**), who would be "middle manning" the deal.  **EVERSOLE** stated he would have **BROOMALL** contact CI1 later in the day to arrange for the exchange of the money for guns.

64.     **BROOMALL** later requested to meet CI1 at the Target parking lot located at 223 Betteravia Road, Santa Maria, California.  **BROOMALL** stated she was in a "small grey" vehicle and wished for CI1 to meet the sellers on the side of Target, near a Burger King, a bank and a Little Caesar's Pizza.  The investigative team made arrangements for an ATF undercover agent (referred to hereinafter as "UC") to conduct the controlled purchase with CI1.

65.     The UC accompanied CI1 to the meet location.  The UC was equipped with an audio/video recording device and an audio transmitter.  Members of the Investigative Team conducted a search of CI1 and did not locate any items of contraband prior to the controlled purchase.

66.     At approximately 1700 hours, the UC and CI1 arrived to the Target and parked on the west side of the store.  CI1 contacted **BROOMALL** and advised her of their arrival.  **BROOMALL** told them she was inside the store and would be out shortly.  Moments later, the UC observed **BROOMALL** exit the store and walk towards a grey Toyota Corolla (ID-IA048EL).  Moments later, Geoffrey **GUESS**[18] walked out to the vehicle.

---

[18] **GUESS** was initially unidentified by the investigative team.  Members of the investigative

67.     CI1 and the UC observed **GUESS** remove bags from the trunk of their vehicle and place them inside a nearby shopping cart.  The UC retrieved the cart and pushed it towards his vehicle and examined the items inside the bag.  The UC was able to identify an AR-15 type rifle inside a soft rifle bag, two boxes that each contained a pistol, and a plastic handgun case that contained a third pistol.  The UC also located a grey plastic bag inside that contained 9mm ammunition, 9mm magazines and AR-type magazines.  After observing the items inside the cart, The UC handed **GUESS** $4000 in pre-recorded buy funds and said the items looked good.  The UC asked **GUESS** to count the money and ensure it was good.  **GUESS** counted the money and gave a thumbs-up from inside the vehicle, before the suspects drove away.

68.     At the conclusion of the deal, The UC transported the purchased items to the ATF Santa Maria Satellite Office.  The following items were booked into ATF property:

- Item 1 – Radical Firearms LLC (AR-15 type rifle) model RF-15, serial number (s/n) RD08023
- Item 2 – Canik55 model TP-9 Elite SC 9mm pistol s/n 20CB04401 (Importer – Century Arms).
- Item 3 – 2 Canik magazines purchased with Canik55 pistol.
- Item 4 – Canik55 TP9 pistol case and holster.
- Item 5 – 68 rounds of Aguila 9mm ammunition.
- Item 6 – One 30 round 223-caliber magazine and two 30 round 9mm magazines.
- Item 7 – Taurus PT111G2A 9mm pistol s/n ABD501012.
- Item 8 – Two 10 round magazines for Taurus PT111G2A pistol.
- Item 9 – Pistol box for Taurus PT111G2A pistol.
- Item 10 – Taurus PT111G2A 9mm pistol s/n ABD526425.

---

team reviewed surveillance video made available by Target and from the video recorder provided by SA Moore.  From the video, Detective Phelps positively identified **GUESS** from prior contacts as being the man who walked out to the vehicle and conducted the transaction.  In addition, prior booking photographs showed that **GUESS** had matching tattoos on his forearms to the ones originally seen by CI-28693 in the text message photographs holding two pistols.  **GUESS** is a previously convicted felon in the state of California.

- Item 11 – Two 10 round magazines for second Taurus PT111G2A pistol
- Item 12 – Pistol Box for second Taurus PT111G2A pistol.
- Item 13 – Save Mart and Foot Locker bags used to carry/conceal firearms/ammunition obtained from GUESS.

69.     Immediately following the deal, CI1 began receiving text messages on Signal from EVERSOLE pertaining to the deal.  The following are excerpts from their conversation:

CI1: Just got them

**EVERSOLE:** Grrrrr….

CI1: What

CI1: I only had to wait for her like 5 min.  my guy was lagging

**EVERSOLE**: No more

**EVERSOLE:** That is over

CI1: Why

CI1: What happened

**EVERSOLE:** Everything about that was hinky as fuck

CI1: What do you mean?

**EVERSOLE:** Tell your guy that was the last one

**EVERSOLE:** I don't know him

CI1: Okay….

**EVERSOLE:** He should not have been there

**EVERSOLE:** He had nothing to do with the deal

**EVERSOLE:** He did a hand to hand transaction

CI1: I'm sorry, you didn't say not to bring him? He wanted to go just because it kept getting pushed and he was hesitant to give me the $$ again

CI1: Sorry babe

**EVERSOLE:** Is what it is…he won't get anything else

**EVERSOLE:** Look at it from this perspective

**EVERSOLE:** If you were introduced to this guy and he's a cop, he just met my people

CI1: And look at it from my perspective I didn't bring [CI2] which I thought you would be happy about.  You're okay sending me to a deal by myself to meet people I don't know but Gina can show up with people I thought I was just meeting Gina

**EVERSOLE:** I KNOW all of my people

Based on my knowledge of the operation and investigation, in conjunction with the timing of the above messages, it is my belief that these messages are referencing the fact that CI1, brought The UC to the firearms deal and **EVERSOLE** was upset that an unknown individual was just introduced to his "people".

70.    I know based on training and experience, including in this investigation that members and associates of the Aryan Brotherhood take extraordinary measures to protect themselves from law enforcement detection.  Part of that philosophy includes abstaining from narcotics and firearms deals with people they do not personally know, or cannot be "vouched"[19] for by one of the participants of the deal.  In this particular instance, it is known by the investigative team, through this investigation, that **EVERSOLE** knows **GUESS** because **GUESS** is in a romantic relationship with **EVERSOLE'S** daughter.

71.    I reviewed Fresno County Superior Court records which showed **GUESS** had the following felony convictions:

---

[19] "Vouched" is street vernacular for a trusted member of the gang ensuring that an unknown individual involved in an illicit transaction is trustworthy.  I know based on training and experience that if a participant of the transaction is vouched for, the person who vouched for them is responsible if something goes wrong with the deal or the vouched for individual is law enforcement.

Affidavit                                                                 31

a.      A March 2015 felony conviction for violating California Penal Code, Section 245(c), assault with a deadly weapon on a peace officer, for which he was sentenced four years in prison.

b.      A March 2015 felony conviction for violating California Penal Code, Section 496d(a), possession of a stolen vehicle, for which he was sentenced two years in prison.

c.      A March 2015 felony conviction for violating California Penal Code, Section 487(a), grand theft, for which he was sentenced two years in prison.

72.      Based on the facts presented above, there is cause to believe that **EVERSOLE** conspired with **GUESS** and **BROOMALL**, to traffic firearms to CI1 and The UC in violation of Title 18, United States Code, Sections 371 and 922(a)(1)(A).  In addition, there is probable cause to believe **GUESS,** a previously convicted felon, violated Title 18, United States Code, Section 922(g)(1), Possession of a Firearm by a Convicted Felon.  As a part of this investigation, ATF Interstate Nexus Expert SA Eric Penman reviewed the firearms sold by GUESS and determined that the Canik 55 pistols, the Taurus PT111G2A and the Radical RF-15 all traveled in interstate commerce and were not manufactured in the state of California.

D.      **CONTROLLED PURCHASE OF HEROIN, June 30-July 1, 2020**

73.      On or about June 25, 2020, CI1 notified me that **EVERSOLE** was offering to sell heroin to CI1 at a price of $700 per ounce, and that he had 20 ounces for sale.  I directed CI1 to arrange to purchase four ounces of heroin from **EVERSOLE** for $2800.  CI1 requested the heroin be delivered to Bakersfield, California.

74.      On June 30, 2020, members of the investigative team met with CI1 at a confidential location in Bakersfield, California.  CI1 stated that **EVERSOLE** had agreed to the deal and an unknown individual would be delivering the heroin at some point that evening.  CI1 and members of the Investigative Team went to the parking lot on the northwest corner of Coffee Road and Rosedale

Affidavit                                                          32

1    Highway in Bakersfield, California to await further instructions from **EVERSOLE.**  CI1 told

2    **EVERSOLE** that he/she would be waiting in the parking lot to complete the transaction.

3        75.    Based on training, experience and my knowledge of this investigation, I know that

4    **EVERSOLE'S** regular business practices included waiting until the last minute to notify CI1 of who

5    was bringing any illegal items, and sometimes where it was going to be delivered to likely in order to

6    confuse and disrupt any potential law enforcement operations or investigations.

7        76.    At approximately 2000 hours, CI1 received a Signal text message from **EVERSOLE,**

8    stating the delivery driver was approximately 45 minutes away and would be coming from Atascadero,

9    California.  **EVERSOLE** additionally asked if the "FoodsCo" in the parking lot we were located in was

10    open.  This observation by **EVERSOLE** was notable, given the investigative team was not aware there

11    was even a FoodsCo in the shopping center, and was indicative of **EVERSOLE'S** monitoring of the

12    transaction, even from inside North Kern State Prison.  **EVERSOLE** stated that he wanted the deal done

13    inside the FoodsCo.  CI1 was searched by members of the investigative team and provided with an audio

14    recording/transmitting device and $2800 in pre-recorded buy funds.

15        77.    At approximately 2030 hours,   CI1 went inside the FoodsCo after telling **EVERSOLE**

16    that they would be waiting in the frozen foods aisle to complete the deal.  Members of the Investigative

17    Team maintained visual surveillance on CI1, who entered the FoodsCo to await **EVERSOLE'S**

18    delivery.

19        78.    At approximately 2230 hours, CI1 advised the investigative team that **EVERSOLE** had

20    sent a text through Signal stating the delivery driver was arriving to FoodsCo and would be waiting in

21    the parking lot.  At this same time, members of the surveillance team observed a white Toyota truck

22    (CA-61538F1) arrive to the parking lot.  A records check of the license plate revealed that the truck was

23    registered to Emma Lou Brown, at 8200 Casitas Road, Atascadero, California.  CI1 stated the driver of

24    the truck requested he/she walk outside and place the buy money in a shopping cart in exchange for the

25    heroin.

26        79.    CI1 walked outside as surveillance members observed an unidentified male get out of the

27    truck and place a "wine bag" inside a nearby shopping cart.  Surveillance identified the male as wearing

28    Affidavit                      33

a plaid shirt and backwards hat.  The male collected the buy funds from CI1, and CI1 retrieved the "wine bag" from the shopping cart.

80.    At the conclusion of the transaction, surveillance team members followed the truck to the 7-11 convenience store located at 7600 Brimhall Road, Bakersfield.  Surveillance video was obtained from the convenience store that showed the male in the plaid shirt that had conducted the transaction with CI1.

81.    Members of the investigative team conducted further database checks and located ███████ residing at 8200 Casitas Road.  CI1 positively identified ███████ as being the person who dropped off the package of heroin.  In addition, the surveillance video obtained from 7-11 confirmed that ███████ was responsible for the heroin delivery.

82.    While surveillance team members continued to follow ███████ Detective Phelps and I met with CI1 who provided the purchased heroin.  The heroin was vacuum-sealed in four sections, weighing one ounce each.  While the evidence was collected, CI1 received a phone call from **EVERSOLE**.  Detective Phelps and I requested the call be put on speaker phone and monitored the call.  **EVERSOLE** confirmed that there were no problems with the transaction and apologized for the confusion regarding the delivery, stating that he had very few people he could trust.  **EVERSOLE** stated that ███████ and a second unidentified individual in the truck (not observed by the surveillance team) worked for "Gina" (**BROOMALL**).  **EVERSOLE** asked CI1 if he/she was going to make any money on the deal and after discussing profit, ended the conversation.

83.    Based on the facts presented above, there is probable cause to believe that **EVERSOLE** and ███████ through **BROOMALL**, conspired to distribute four ounces of heroin, in violation of Title 21, United States Code, Sections 846 and 841(a)(1)(B), Conspiracy to Distribute and Distribution of Heroin (100 grams and more).

Affidavit                                                                    34

### E.   CONSPIRACY TO DISTRIBUTE METHAMPHETAMINE BY KENNETH BASH AND CO-CONSPIRATORS

84.   Between September 1, 2020 and November 16, 2020, **Kenneth BASH** conspired with **Stephanie MADSEN, Todd MORGAN,** ▮▮▮▮▮▮▮▮▮▮ **Marlon PALMER, Joseph MCWILLIAMS, Samantha BOOTH,** and **Jacob RENSHAW,** to possess with intent to distribute methamphetamine, as laid out further below.

85.   I believe that **Kenneth BASH**, **Stephanie MADSEN**, and ▮▮▮▮▮▮▮▮▮▮ assisted in the preparation and/or transportation of seven pounds of methamphetamine from **Stephanie MADSEN**'s **(MADSEN)** residence in Torrance, CA to S.R.'s residence in Fresno, CA.

86.   From that seven-pound shipment, I believe that **Todd MORGAN**, **Marlon PALMER, aka "P-Nut," Kenneth BASH**, and **Joseph MCWILLIAMS**, assisted in the preparation and/or transportation of methamphetamine for distribution from S.R.'s residence in Fresno, CA to Salinas Valley State Prison in Soledad, CA.

87.   Also from that initial seven-pound shipment, I believe that ▮▮▮▮▮▮▮▮▮▮ nd **Samantha BOOTH** assisted in the preparation of approximately 58 grams of methamphetamine, and attempted to send it through the United States Postal Service to Dutch Harbor, Alaska.

88.   Also from that initial seven-pound shipment, as well as several more pounds obtained from **MADSEN's** Torrance, CA residence, I believe that **Jacob RENSHAW, aka "Shredder," MADSEN**, and **Kenneth BASH** assisted in the preparation of approximately 6.6 pounds of methamphetamine for transport from **MADSEN's** residence in Torrance, CA with the intended destination of the state of Montana.

89.   Unless otherwise indicated below, all calls/ text messages in which it is indicated that a phone user as noted in the table below called, received a call from, sent a text message to, or received a text message from another individual, that user was utilizing the noted phone number which was subject to a court-ordered wire and/or electronic intercept as noted in the table.

Affidavit                                      35

| Target Telephone | User | Court Order | Phone Identification |
|---|---|---|---|
| TT#21 | ██████████ | 9/23/20, Fresno County Superior Court Judge Alvin M. Harrell | Numerous calls and texts intercepted on TT#21 indicate that this phone belongs to ████████. First, numerous █ f TT#21 call the user ████ n both calls and texts. Additionally, the surveillance team has observed ████████ in multiple locations consistent with where the user of TT#21 would be based on intercepted calls and texts (one example of this is the probable cause set out below in this affidavit). |
| TT#9; (831) 744-9535 | Kenneth BASH | 9/18/20, Fresno County Superior Court Judge Alvin M. Harrell | Numerous intercepted communications which confirm that this is the case. On September 17, 2020 at approximately 07:16 hours, a phone known by the investigative team to be used by K.B. – BASH's wife – sent a text message to TT#9 which showed a screen shot from a third party who wanted K.B. to show it to "Kenny." Later that day, at approximately 20:55 hours, Stephanie MADSEN (MADSEN), using TT#7, called TT#9, used by BASH. MADSEN is known by the investigative team to be BASH's paramour, and called the male who answered "Kenny." Additionally, many of the individuals who have been intercepted on TT#9's wiretap are known associates of BASH's. |
| TT#9537; (559) 790-9537 | Samantha BOOTH | N/A | In texts from the user of TT#9537, the user sends a "selfie" picture of herself and the picture is of BOOTH.  In numerous calls and texts the user of TT#9537 is referred to as "Sam" and "Samantha".  In a call with TT#11, the user of TT#9537 is identified as "Samantha BOOTH".  Based on all these facts I am confident the user of TT#9537 is BOOTH. |
| TT#45; (559) 417-3835 | Amanda GOURLEY | 10/14/20, Fresno County Superior Court Judge Alvin M. Harrell | Numerous intercepted communications referred to the user of TT#45 as "Amanda."  In addition, numerous calls and texts to TT#45 identified the user as |

| | | | |
|---|---|---|---|
| | | | "Biggy". Based on my knowledge of the investigation I know that the moniker for GOURLEY is "Biggy". On October 13, 2020 members of the investigative team witnessed GOURLEY using TT#45. Based on these facts, I am confident that the user of TT#45 is Amanda GOURLEY. |
| TT#5211 (559) 446-5211 | ▮▮▮▮▮ | N/A | In calls and texts from TT#15, TT#23 and TT#27, the user of TT#5211 was identified as ▮▮▮▮▮ Based on my knowledge of the investigation including the arrest of ▮▮▮▮ in relation to the intercepted calls, I am confident the user of TT#5211 is ▮▮▮▮ |
| TT#37 (530) 602-9845 | ▮▮▮▮▮▮ | 10/6/20, Fresno County Superior Court Judge Alvin M. Harrell | In numerous calls and texts, the user of TT#37 is identified by BASH as ▮▮▮▮ BASH also references ▮▮▮▮ living in ▮▮▮▮ Based on Tehama County Superior Court records I know that ▮▮▮▮ resides in ▮▮▮▮ Based on my knowledge of the investigation, including the arrest of ▮▮▮▮ in relation to the intercepts, I am confident that the user of TT#37 is ▮▮▮▮ |
| TT#11; (559) 573-6003 | Joseph McWILLIAMS | 9/18/20, Fresno County Superior Court Judge Alvin M. Harrell | MCWILLIAMS previously used this number to contact the police during a domestic dispute in Clovis, CA. Additionally, the user of TT#11 was identified as "Joey" in a text message sent to TT#11 on September 18, 2020, and has been referred to as "Janky" numerous times on multiple other intercepted lines. Based on my knowledge of the investigation, I know that "Janky" is MCWILLIAMS' street moniker. |
| TT#19; (831) 292-7526 | Todd MORGAN | 9/21/20, Fresno County Superior Court Judge Alvin M. Harrell | The context of the intercepted calls and text messages to and from TT#19 make it very clear that the user of the phone is in prison, that the user is an Aryan Brotherhood criminal prison gang member, and that the user's name is "Todd." Based on all of those facts, I am confident that the user of the phone is MORGAN. |

Affidavit                                37

| TT7100;<br>(831) 261-7100 | Marlon PALMER | N/A | The user of TT# 7100 sent a message with "Marlon.Cunard" in the body. Additionally, the user of TT# 7100 has been referred to as some variant of "P-Nut" numerous times in calls and texts intercepted on various lines. Based on my knowledge of the investigation, I know that "P-Nut" is the street moniker of PALMER. |
|---|---|---|---|
| TT9581;<br>(209) 570-9581 | David ZACHOCKI | N/A | The user of TT# 9581 was referenced by Kenneth BASH as "Lil David Z" and Kenneth BASH'S "old celly". A records check of CDCR records revealed that BASH'S old cellmate was ZACHOCKI. In a call between MORGAN and BASH, the user of TT# 9581 is identified as "David ZACHOCKI" by BASH. Based on all of these facts, I am confident the user of the phone is ZACHOCKI. |

90. All times set out below are approximate unless otherwise indicated.

**F. BASH, MORGAN, and PALMER agree to smuggle narcotics into Salinas Valley State Prison**

91. On September 19, 2020, at 00:00 hours, **PALMER** sent **BASH** several text messages which, when strung together, read, "It's good bro. I plan on lining up a play over there as soon as I get this pack but now I'm in need of a half p white and 4 zips blk how much that run price that for me when u can." Several minutes later, at 00:38 hours, **BASH** sent a text message to **MORGAN** which read, "PNUT just got at me about a few things." Toll records evidenced that **BASH** and **MORGAN** subsequently spoke that night in calls which were not intercepted by the investigative team.

92. Based on my training and experience, I know that it is common in gang communities to use the word "play" to refer to an illegal activity. I also know that it is common in drug dealing and drug trafficking communities to use the letter "P" to refer to a pound of illicit narcotics, the word "white" to refer to cocaine or methamphetamine, and the word "black" to refer to heroin. I also know that the same communities use the word "zip" to refer to ounces of an illicit narcotic. Finally, based on my knowledge

of the investigation, I know that "P-Nut" is a street moniker for **PALMER**. Here, based in part on subsequent events, I believe that **PALMER** informed **BASH** that **PALMER** wanted to obtain one-half pound of methamphetamine and four ounces of heroin, and that **PALMER** was planning an operation to smuggle those narcotics into Salinas Valley State Prison. I also believe that **BASH** then reported that contact to **MORGAN** and eventually spoke with **MORGAN** about **PALMER**'s idea.

93.     Later that morning, **MORGAN** responded to **BASH** with several text messages which, when strung together, read, "N.e way we're good on run we talked bout last night. Trying to line up a runner now just in case needed. I'll get p let him know we're good on that no wo rries just let me know exactly where." Accordingly, later that evening **MORGAN** sent another text message to **BASH** which indicated that **MORGAN** "got at nut."

94.     Based on my training and experience, I know that drug dealers and drug traffickers commonly use individuals to transport and/or deliver their narcotics, and that those individuals are referred to as "runners." Here, based on the context of the above information and subsequent events, I believe that **MORGAN** is giving **BASH** the authority to conduct the smuggling operation with **PALMER**, and that **MORGAN** was also going to line up someone to deliver the drugs to the prison just in case it was needed.

95.     On September 19, 2020, at 21:44 hours, **PALMER** sent another text message to **BASH** which read, "Wsp bro any word on price." **BASH** responded with a text message 11 minutes later which read, "I'm waiting for a 2nd Quote RN." Based on my training and experience, I know that "RN" is an acronym commonly used to stand for the phrase "right now." Based on the context of **PALMER**'s previous texts and subsequent events, I believe **PALMER** is checking with **BASH** to see if **BASH** had received quoted prices for heroin and methamphetamine which could be smuggled into the prison, and **BASH** is saying that he is obtaining a second quote at that moment. Based on subsequent calls, I believe **BASH** had spoken with D.S. in an attempt to acquire narcotics.

96.     On September 19, 2020, beginning at 22:00, **BASH** and **MORGAN** exchanged a series of text messages, the pertinent portions of which are set out below:

    **MORGAN:** No way this gets pulled off by Monday

**BASH:** If Me and Pup did it I'm sure we can..

**MORGAN:** No it can be done.  But getting to many moving parts to work sux.  Only trying to get a carrier.

**MORGAN:** I looked at maps.  Etc know the whole get down just where to drop it.

97.      Based on my knowledge of the investigation, I know that "Pup" is a street moniker for D.S., and I believe that "it" is referring to the illicit narcotics which D.S. and **MCWILLIAMS** would later attempt, as described more fully below, to bring to the northwest fence of Salinas Valley State Prison. Based on my training and experience, I know that it is common to refer to a smuggling operation into a prison as a "drop." Here, I believe that **MORGAN** is expressing doubt that the operation will be conducted by the following Monday (which would have been September 21, 2020). **BASH** responded by stating that he and D.S. could accomplish it, and that **BASH** has looked at maps and knows just where to smuggle the narcotics into the prison.

98.      On September 19, 2020 at approximately 22:14 hours, the investigative team lawfully intercepted a call between **BASH** on TT9 and **MORGAN** on TT19.  During the call, **BASH** told **MORGAN** that "Peanut" (**PALMER**) was asking about the prices of "black" and wanted "it all done" by Monday.  Additionally, **BASH** specified that **PALMER** was asking for a "half pound of white" and four ounces of "black".

99.      I know based on training and experience that people who buy and sell drugs often use innocuous terms as a method to disguise their conversations pertaining to drugs and drug trafficking.  I know based on training and experience the term "white" is street vernacular for methamphetamine and the term "black" is street vernacular for heroin.  Based on my knowledge of this investigation, I believe when **PALMER** said he wanted "it all done", he was specifically referring to having the drugs smuggled into Salinas Valley State Prison.

**G.      MADSEN obtains methamphetamine at BASH's direction, and ▮▮▮▮▮ and V.P. obtain and transport methamphetamine to S.R.'s house at BASH's direction**

September 18, 2020

100.    Prior to speaking with **PALMER** on September 19, 2020, **BASH** had already begun to arrange to transport methamphetamine to the Fresno, CA area. The day before he spoke with **PALMER**, on September 18, 2020, at 12:02 hours, **BASH** called **MADSEN**. The following is a transcript of the pertinent portions of the call:

> **MADSEN:** Also, is, uh, what's-his-name going to meet me this weekend?
>
> **BASH:** Who?
>
> **MADSEN:** Um, ▮▮▮▮
>
> **BASH:** ▮▮▮ Yeah, if not ▮▮▮ we could have someone else.  Um, but he said, yeah, he would.
>
> **MADSEN:** Okay, that way I could just start packing it up, you know?
>
> **BASH:** I know.  I-I'll try to get them on the road today.
>
> **MADSEN:** That would be great.
>
> **BASH:** I will.

101.    Based on my knowledge of the investigation and subsequent events and intercepted calls,[20] I believe that **MADSEN** and **BASH** are referring to ▮▮▮▮▮ when they speak about ▮▮▮ Additionally, when **MADSEN** and **BASH** speak about **MADSEN** meeting "▮▮▮ about **MADSEN** "packing it up," and about **BASH** attempting to tell "▮▮▮ to "get on the road," I believe they are referring to a plan – which subsequently plays out as set out below – in which ▮▮▮▮ is to meet **MADSEN** in Torrance, CA in order to transport ten pounds of methamphetamine.

102.    On September 18, 2020, at approximately 19:34 hours, **BASH** called ▮▮▮▮▮ to ask if V.P. would be going with ▮▮▮▮▮▮▮ responded that he did not know, but

---

[20] For example, on September 18, 2020, at 18:22 hours, ▮▮▮▮▮ sent a text message to **BASH** which read, "I fell asleep what u want me to do drive to la." Approximately twenty minutes later, BASH responded, "I want you to get sleep then go to LA thought that was plan after fix tire and tint windows."

Affidavit                                        41

1  that V.P. had said that she would go. At 21:59 hours, **BASH**, using TT9, called (559) 859-4742, used by

2  V.P. The following is a transcription of the pertinent portions of that call:

3  **BASH:** [UI] Um, what was I gonna tell you? Uh, oh, oh. You gonna roll with ▇▇▇▇▇

4  down fuckin' south so he ain't got to fuckin' drive alone?

5  V.P.**:** Uh, yeah, I was thinking about it.

6  **BASH:** Can you please? It's only one day.  [OV]

7  V.P.**:** [OV] Eh, yeah.

8  **BASH:** It's only there and back. [OV]

9  V.P.**:** Since you asked me to.  Yeah.

10  **BASH:** Oh, he already asked you to?

11  V.P.**:** No, I said, "Since you asked me to."

12  **BASH:** Oh yeah, please?

13  V.P.**:** Yeah.

14  **BASH:** It's all on a roll, fucking, [UI], fucking, uh he'll be more, uh, it'll be ea-easier f--,

15  yeah, you know [OV].

16  V.P.**:** [OV] Yeah

17  **BASH:** I am gonna try to fucking send some, uh [cough], some more back, uh, of solid

18  stuff for you guys.  I'll look out for you separately.

19  V.P.**:** Mm-hm.

20  **BASH:** That way you've got a little shit you know?

21  V.P.**:** Yeah.

22  **BASH:** So.

23  V.P.**:** Um, what-so, uh, how-uh, what is it going to be, just us- [OV]

24  **BASH:** No I am just going down- really just need to drop those books off.  Probably go

25  down and uh, I was-honestly, I was thinking maybe you guys go down there and spend a

26  day.

27  V.P.**:** Yeah?

28  Affidavit                                                     42

**BASH:** Yeah, that's what I was- like, spend a day and then come back tonight- or when- whenever you guys want, but- but nothin'…ain't nothin' important, uh, uh…Steph, she's just packaging the books and shit, like, [OV] tryin' to put the shit in the spine, and- [OV] like that, you know?

V.P.**:** Yeah.

103.     Based on my training and experience, I know that drug dealers and drug traffickers will typically use innocuous and innocent-sounding words when speaking about illicit narcotics in order to attempt to confuse law enforcement and thwart possible law enforcement interference. Based on subsequent events and my knowledge of the investigation, I believe that when **BASH** uses the words "some" and "shit" in this call, he is actually referring to methamphetamine. Additionally, I believe that **BASH** is asking V.P. if she will be travelling with ▮▮▮▮▮▮ to Los Angeles, CA, that the trip with ▮▮▮▮▮▮ will only take one day, and that **BASH** is planning on having ▮▮▮▮▮▮ and V.P. transport more methamphetamine back to the Fresno, CA area when they return. Additionally, I believe **BASH** tells V.P. that **BASH** will repay ▮▮▮▮▮ and V.P. by giving them illicit narcotics, which is corroborated by subsequent events as set out below.  I know based on training and experience that inmates in prisons smuggle drugs into the prison through various mediums.  One of these mediums includes packing the spines of books with drugs to avoid law enforcement detection, which are then mailed to the inmate inside the prison.

104.     The same day, at approximately 19:58 hours, **BASH** called **MADSEN**. The following is a transcript of the pertinent portion of that conversation:

**MADSEN**: Hello? Hi. Hi, baby.

**BASH**: [UI]

**MADSEN**: Oh, just relaxing a little.  I was, uh, I took down some of the stuff and started pounding it out.

**BASH:** [UI]

**MADSEN**: I love—What did you say?

**BASH**: I said, what was it?

**MADSEN:** The white.

. . .

**BASH:** Um, I was gonna meet with "G" tomorrow.  G's sister tomorrow.

**MADSEN:** For what?

**BASH:** Uh, get the books and that thing ready, and… uh, we'll need to drop off fuckin'- we'll need to drop off some type of money-

**MADSEN:** [OV] How mu—

**BASH:** So I need to get out fuckin'-

**MADSEN:** Yeah, like, we're running out of the money.

**BASH:** No shit, right? And we're picking up ten pounds. Um, yeah. [UI]. Do you have any—[UI]…

**MADSEN:** We're doing this tomorrow?

**BASH:** Huh?

**MADSEN:** You said we're doing this tomorrow?

**BASH:** Yeah.

**MADSEN:** Okay.  After—

**BASH:** [OV] Yeah, we're just—

**MADSEN:** [OV] After twelve, though, because—

**BASH:** [OV] Yup, yeah, [UI].

. . .

**MADSEN:** I'm plugging in the burner so it will be charged.

. . .

105.    As set out above, I know that drug dealers and drug traffickers use innocent-sounding words such as "white" and "stuff" to refer to illicit narcotics. Additionally, based on my training and experience, I know that they commonly refer to quantities of narcotics without explicitly stating the narcotic being discussed.[21] I also know that individuals in the same communities frequently use cheap, pre-paid phones when conducting illegal activity in order to attempt to insulate themselves from criminal culpability, and that these phones are frequently referred to as "burner phones" or "burners" because they can be "burned" – in other words, thrown away – easily. Based on subsequent events, I

---

[21] For example, it is common to hear a drug dealer ask if a buyer wants "two," instead of asking if he or she wants "two ounces of methamphetamine."

believe that here **MADSEN** uses "stuff" and **BASH** uses "white" to refer to methamphetamine.

Additionally, based on the calls set out above, I believe that "G's sister" is an unidentified female (UF),

who is also an associate of R.L., aka "G", who the investigative team has learned through this

investigation is a supplier of narcotics to **MADSEN** and **BASH** Here, I believe that **BASH** is telling

**MADSEN** that **BASH** has arranged for **MADSEN** to meet with UF, and – based on subsequent events –

that **MADSEN** is going to obtain ten pounds of methamphetamine from her. Also, based on **MADSEN**

use of TT#17 set out below and my knowledge of the investigation, I believe that when **MADSEN** is

indicates to **BASH** that she is charging her "burner" that she is referring to TT#17.

<u>September 19, 2020</u>

106.    The following day, September 19, 2020, beginning at 16:38 hours and continuing until

20:30 hours, **MADSEN**, using (206) 465-7482 (TT#17),[22] sent text messages to and received text

messages from **BASH**, R.L.,[23] using (323) 336-6133 (TT#16),[24] and UF.[25] Based on prior calls and

subsequent events, I believe **MADSEN** obtained ten pounds of methamphetamine from UF at

approximately 20:00 hours on September 19, 2020

107.    At approximately 21:36 hours, **BASH** called ▬▬▬▬▬▬▬ The following is a

transcript of the pertinent portions of that conversation:

> **BASH:** I'm gonna double-check right now, um… ah. They found a route- we got a way to get that shit in here, though.
>
> ▬▬▬▬▬▬   Huh? Oh, okay.

---

[22] The investigative team subsequently obtained toll records through administrative subpoenas to obtain this information. **MADSEN** was identified as the user of TT#17 based on voice recognition by members of the investigative team, as well as the fact that the user of TT#17 identified herself as "Stephanie" in a call made to an associate of **MADSEN's** on September 26, 2020.

[23] According to CDCR records, R.L., also known as "G", is an inmate currently incarcerated at Salinas Valley State Prison.

[24] R.L. was identified as the user of TT#16 based on the fact that a previous search of a phone seized from **BASH**'s cell identified TT#16 as belonging to "G" and/or "Ugly," and the fact that the user of TT#16 identified himself as "G" in a text to TT#17 on October 2, 2020.

[25] This was determined based on the context of the previous calls. UF remains unidentified.

Affidavit                                          45

**BASH:** [UI] has a way and he needs my help, right? So, um... Yeah so [UI] probably going to be, uh… a little extra. A little extra  here [UI] you know?

███████████ Alright.

**BASH:** But uh, just phones and shit really though. [UI] fuck with that shit though. [UI]

108.     As stated above, I know that drug traffickers and drug dealers commonly used words such as "shit" instead of saying the name of an illicit narcotic. Based on subsequent events and my knowledge of the investigation, I believe that **BASH** is telling ███████████ that **BASH** and his co-conspirators found a "route" to smuggle contraband – specifically methamphetamine – into Salinas Valley State Prison.

109.     On September 19, 2020, the investigative team intercepted a text message exchange between **BASH** and **MADSEN**. Between approximately 00:40 hours and 00:41 hours, **BASH** sent a text message which read, "Got caught up With Pnut and Todd now guess they have way to get shit in," to which **MADSEN** responded, "Awesome [new line] Get shit in? [new line] Like inside?" Approximately 11 minutes later, at 00:52 hours, **BASH**, using TT#9, sent another text message to TT#7, used by **MADSEN**, which read, "Yes I'll explain to you."

110.     As stated above, I know that drug dealers and drug traffickers commonly use the word "shit" to refer to illicit narcotics. Based on my knowledge of the investigation and previous calls set out above, I know that **Marlon PALMER**'s street moniker is "P-Nut" and that both **PALMER** and **Todd MORGAN** are associates of **BASH**, incarcerated with **BASH** at Salinas Valley State Prison, and previously spoke with **BASH** about smuggling contraband into Salinas Valley State Prison. Finally, based on my training and experience, I know it is common in many criminal communities to refer to the area within a prison's or jail's walls as being "inside." Here, I believe **BASH** is telling **MADSEN** that **BASH** spoke with **MORGAN** and **PALMER**, and that **BASH**, **MORGAN**, and **PALMER** were conspiring to smuggle illicit narcotics into Salinas Valley State Prison.

111.     At approximately 16:22 hours, **BASH** sent a text message to **MADSEN** which read, "Text G sis that your Almost done doing what you had to today set up meet." Here, I believe **BASH** is

telling **MADSEN** to text UF to set up the meeting where **MADSEN** will obtain methamphetamine from UF.

112.     At 16:36 hours, **MADSEN** called **BASH** to tell him that she had just turned on her "burner," and that she would "text her from the burner.[26]" Two minutes later, at approximately 16:38 hours, **MADSEN**, using TT#17, sent a text message to (323) 602-8757 (TT#8757), which I believe to be used by **UF** based on the context of this call.

113.     Approximately four minutes later, at 16:42 hours, **BASH** and **MADSEN** spoke again. The following is a transcription of the pertinent portions of that call:

> **BASH:** Hey uh with that eight uh whatever that is right there, that's um strictly the money from out of state right?
>
> **MADSEN:** Uh, I guess
>
> **BASH:** Huh?
>
> **MADSEN:** Yeah
>
> **BASH:** Why are you saying it like that babe, like like you don't know what I'm say-I'm saying is that money from from dope or do you have the like money from like EDD and all that bullshit to the side or what?
>
> **MADSEN**: That's the dope money, what do you mean EDD money from?
>
> **BASH:** Ok that…(breathing heavy) can you hear me?  Ok, the money from Preston's card, from fuckin' uh uh psh uh my brother's card all that shit everything…all that's out of the way right? Ok, that's that's what I was asking. Um uhhh, we need to pull we need to put we need to make it ten grand even if we pull out the [U/I] in cards fuckin' uh, go drop it to G and pick these ten up.
>
> **MADSEN:** Oh.
>
> **BASH:** Huh?

---

[26] I know based on training and experience that "burner" is street vernacular for a second cellular phone that is kept active in order to conduct criminal business on, in an attempt to avoid law enforcement detection.

Affidavit                                                    47

**MADSEN:** Nothing. We uh then we have nothing.

**BASH:** What are we supposed to do?  Like we we have the…we have that money right there with Jake in Montana.  Plus we're owed all that other shit out there.  So yeah, if we can do that and go grab ten, then we need to get on Jake to send that money.  Let me see if he has…I'm gonna write everything down.  I'm gonna writing down every fuckin' thing right now.

**MADSEN:** When you write it, take a picture and that way I can keep it.  That way you don't have to keep it in your cell, you know what I mean?

**BASH:** Yep.

**MADSEN:** But did he ever answer your call?  Did uh what's his face ever answer your call? Jake?

**BASH:** What?

**MADSEN:** Uh

**BASH:** No, I-I didn't even get a chance cuz fuckin' uh, literally fuckin' back to back calls from Lil' Bro still texting me.  Fuckin' and then I'm gonna blow him up right now and [U/I]

**MADSEN:** Jake? Ok. Alright well we um-then we'll have ten.  Um I checked with her already I'm just waiting for her to text me back.  Um if we're gonna do it and she's gonna give me ten the way that she does it and everything, I'd rather do it when it gets a little darker because she does everything in the open.

**BASH:** [U/I] Alright that's fine.  Alright, hit up G right?Um…hit up G and like uh like [U/I] trying to set up uh a set a time with his sister, uh…I don't know just be like hey [U/I] this is Steph fuckin' when you get this get back at me.

114.     As set out above, I know that drug dealers and drug traffickers commonly use lone numbers like "ten" to refer to quantities of narcotics. Additionally, I know it is common for drug dealers to conduct illegal business after dark in order to attempt to evade identification by law enforcement.

Here, I believe **MADSEN** is stating that she believes that UF will give her the ten pounds of methamphetamine in an open area, and so would like to wait until after dark to obtain it. **BASH** then tells **MADSEN** to call R.L. and set up a time after nightfall.

115.    During the previous call with **BASH**, at approximately 16:43 and 16:45 hours, **MADSEN** received two text messages on TT#17 from TT#8757, used by UF. When **MADSEN** got off the phone with **BASH**, she sent a text message to TT#8757, and two more text messages to TT#16, used by R.L, at approximately 16:51 and 16:52 hours. Finally, **MADSEN** sent two additional text messages to TT#8757, used by UF.

116.    Accordingly, at 16:53, after she sent the last text message to UF on TT#8757, **MADSEN**, still using TT#17, sent two text messages to **BASH**, using TT9, which read "Sent G the text" and "His sis got back at me, meeting her at 8." Based on the above text messages and calls, I believe that **MADSEN** was informing **BASH** that she was going to meet UF at 20:00 hours to receive the illicit narcotics.

117.    That same night – September 19, 2020 – beginning at approximately 19:04 hours and continuing until 20:30 hours, TT#17, used by **MADSEN**, received 20 text messages and sent 7 text messages to TT#8757, used by UF. It should be noted that 23 of those text messages were sent before 20:00 hours and four of them were sent between 20:24 hours and 20:30 hours. Based on the previous conversations between **MADSEN**, **BASH**, and R.L, I believe that these text messages were sent before and after the meeting between **MADSEN** and UF, and that **MADSEN** and UF did in fact meet at that approximate time to conduct the illegal drug transaction.

118.    At approximately 21:15 hours, **BASH** called **MADSEN** to tell her that "███████ had slept all day, but was ready to go. **MADSEN** told **BASH** that she had an appointment in the morning, so if ███████ go there in the morning, she would not be there. Additionally, the parties had a conversation regarding the "ten pounds" **MADSEN** received. The pertinent portions of that conversation follows:

> **BASH:** You got the ten pounds and shit? You weigh 'em out?
>
> **MADSEN**: I never went.

**BASH:** Did you weigh 'em out? [UI] Yeah you did, you lie.

**MADSEN:** [laughter]

**BASH:** Fucker.

**MADSEN:** [laughter]

**BASH:** I knew you were full of shit, 'cause you would have been all- you would have been texting me and shit.

**MADSEN:** [laughter] Um, yeah, and then, uh… she gave me the book, but… I gotta figure out how to give 'em the book a different way because whenever it comes back, it's always bent and I have to re-bend it.

119.    As set out above, I know that drug dealers and drug traffickers will commonly discuss illicit narcotics without explicitly naming them, such as by saying "ten pounds" to refer to ten pounds of methamphetamine. Here, based on previous calls, I believe **BASH** is confirming that **MADSEN** received the ten pounds of methamphetamine from UF and that R.L. would have contacted **BASH** if the deal had not occurred. This – and the fact that **MADSEN** refers to the individual at the deal as "she" – further corroborates my belief that **MADSEN** received the ten pounds of methamphetamine from UF at approximately 20:00 hours earlier that night.

120.    Several hours later, at approximately 23:10 hours, **BASH** called ▮▮▮▮▮▮. The following is a transcript of the pertinent portions of that conversation:

**BASH:** Well, oh, no, I am [UI]. I know, I am trying a whole fucking uh--

▮▮▮▮▮▮ [OV] [Chuckle]

**BASH:** --I am on a whole another route, like I'm tryin to- I will determine, like I gotta, I gotta, make a drop here bro, to the prison. I have to get shit in here.

▮▮▮▮▮▮ Yeah. And you said you got a way to do that right?

**BASH:** Yeah dog, fucking, Peanut does black—

▮▮▮▮▮▮ [OV] Oh yeah yeah yeah

Affidavit                                    50

**BASH:** --and uh, they already did it and it went through. We are all like 'Oh man,' so he let me fucking, i-if I, if I, if I do it, if I do the whole route, I get like, if I bring this, like, basically if I make it happen, he's got the way. If I give the will, then we split it.

███████████  Yeah.

**BASH:** So, that-that's what I got goin' on uh--

███████████ **:** [OV] Alright.

**BASH:** --the, I know, everything is [UI], one gram of black is five hundred dollars.

███████████  One what?

**BASH:** One gram of black--

███████████ [OV] God damn!

**BASH:** -- is five hundred dollars. Yeah..

███████████ I don't ev—I don't even kn-

**BASH:** Let me-uh--

███████████ **:** [OV] --know how you compute that math.

121.    Based on **BASH**'s previous calls with ███████████ and **PALMER**, as well as **BASH**'s statement about making a "drop here, to the prison," I believe that **BASH** is speaking about a "route" for smuggling contraband into Salinas Valley State Prison, and that when **BASH** is speaking about "P-Nut," that he is speaking about **PALMER**. Based on my training and experience, I know that "black" is a word used by drug dealers and drug traffickers to refer to heroin. Specifically, I believe that **BASH** is telling ███████████ that **PALMER** will assist **BASH** in getting the illicit narcotics into the prison, distributing them, and splitting the profits from their sale. Based on subsequent events, I believe **BASH** also told ███████████ that **PALMER** deals heroin in the prison.

<u>September 20, 2020</u>

122.    The next day, September 20, 2020, members of the investigative team conducted surveillance at **MADSEN'S** residence located at 21014 Reynolds Drive, Torrance, California.

123.    At approximately 09:34 hours, ███████████ sent a text message to **MADSEN** which read, "What's your address so I can put in GPS." Approximately 22 minutes later, at 09:56 hours, **MADSEN** responded with a text message which read, "21014 Reynolds Dr Torrance." At

Affidavit                                          51

1  approximately 10:22 hours, **MADSEN** sent a text message to ▮▮▮▮▮▮▮ which read, "What's

2  your eta." Three minutes later, **MADSEN** called ▮▮▮▮▮▮. During the conversation,

3  ▮▮▮▮▮▮ told **MADSEN** that his estimated time of arrival was 12:53 p.m.

4      124.    At approximately 14:06 hours, investigators observed a black Chevrolet Malibu (CA-

5  BB83T31) arrive to the residence.  A records check of the license plate revealed the registered owner of

6  the car was V.P.  The male driver and female passenger were positively identified from California

7  Department of Motor Vehicles pictures, as ▮▮▮▮▮▮▮▮ and V.P**.**  Investigators observed

8  ▮▮▮▮▮▮▮ get out of the vehicle and retrieve a weighted backpack and a cardboard box from the

9  back seat of the vehicle.  V.P. and ▮▮▮▮▮▮▮ were then seen walking into the apartment complex.

10                                      <u>September 21, 2020</u>

11      125.    On the morning of September 21, 2020, ▮▮▮▮▮▮▮ and V.P. went to **MADSEN's**

12  residence. Beginning at approximately 09:09 hours and continuing until approximately 10:43 hours,

13  **MADSEN** and ▮▮▮▮▮▮▮ had the following text message conversation:

14              ▮▮▮▮▮▮▮**:** Hey your off today right lol

15              **MADSEN:** Uhh no lol

16              ▮▮▮▮▮▮▮ Dammit

17              **MADSEN:** But! Don't leave yet

18              ▮▮▮▮▮▮▮ Yeah…can I do laundry.?

19              **MADSEN:** Yes

20              **MADSEN:** The key is on top of the fire extinguisher by my front door

21              **MADSEN:** Fuck

22              **MADSEN:** The lady isn't answering to put the key up there

23              ▮▮▮▮▮▮▮ Who is it grandma

24              **MADSEN:** She answered

25              **MADSEN:** They key should be there

26              ▮▮▮▮▮▮▮ Ok cool thank u steph

27

28  Affidavit                                    52

126.    Additionally, in a call with **BASH** at approximately 12:28 hours, ▮▮▮▮▮

informed **BASH** that ▮▮▮▮▮ and V.P. would be heading over to "Stephanie's" shortly. Based

on the previous calls and subsequent observations of the surveillance team, I believe that

▮▮▮▮▮ was referring to **MADSEN**. Accordingly, **BASH** then used TT#10 to call **MADSEN**

on TT#7; during the conversation, **BASH** states that ▮▮▮▮ and V.P. are the individuals coming to

**MADSEN's** location. Based on my knowledge of the investigation and the context of this and the other

calls set out, I believe **BASH** is referring to ▮▮▮▮▮ and V.P.

127.    At approximately 12:57 hours, **MADSEN** called **BASH**. The following is a transcript of

the pertinent portions of that conversation:

> **BASH**: Alright um I'm getting [UI] there's money in Fresno that I was trying to get to fucking, uh, to ▮▮▮▮ I'm trying to basically stop fucking, uh, Ash or fucking, uh, Melissa or one of them from coming down, uh, to fuckin', uh, to pick up right those ten, either we can dump those ten or fucking uh…I don't, I don't know what we should do. Like, either we fucking- we buy out like half of them which we don't have the fucking money right now, we could have Jake [UI] he's trying to [UI] with the dealer cause I already told G that I, that there was a certain amount in him, right. Which- which there is but, uh, half of it or so is in fucking Fresno with [UI]. Um, so I don't, I don't know. Steve is trying to figure it out so it's just one [UI] one [UI] fucking [UI] you know.

> **MADSEN:** Uh yeah.

> **BASH**: [OV] [UI]

> **MADSEN:** Yeah I'm trying to process what you just said 'cause it was very confusing.

> **BASH:** I'm trying. We're on this fucking stupid phone again. Um I'm trying to fucking keep my word to G is what I'm trying to do.

> **MADSEN:** Uh huh.

> **BASH:** Because I was trying to open [UI] and grab the fucking bread or I tried to grab the dope without fucking having the bread [UI] it took too long. Whatever, we'll fucking, uh, [UI] resort to plan b that I had lined up [UI] work right and, uh, yeah [UI] Andy fucking picking up some and us thinking like honestly [UI].

> **MADSEN:** Three?

> **BASH**: Yeah three. But I think he has 17 up front or some shit but I'm [UI] like I could take two grand [UI] so we don't have to cash app shit. [UI] take two grand to her or her pick it up and just take it back out of my brothers money put it you know what I mean. And then I could [UI] 25 G that's direct which is those are both [UI] shit uhm cash app another 15 you know what I mean? I was just trying to fuckin-

Affidavit                                                53

**MADSEN**: Yeah.

**BASH:** Figure it out and then catch a ride back with [redacted] so [UI] like it's not a fucking-a waiting game for more people to come down on some more shit dude [UI]. I was honestly thinking about shooting majority of well, I don't know how you [UI] the one that we already had, that we took [UI] on back shooting that shit and then keeping the shit we just got from G cause there was comp- there was some complaints on that shit.

**MADSEN:** Keeping though are the [UI].

**BASH:** [OV] The- the fresh ones that we just got from G and exchanging them for the one that we took to Fresno and brought back.

**MADSEN:** Yeah, yeah.

**BASH:** Basically exchanging them out.

**MADSEN:** [UI] You can find them in my spot my hiding spot in the closet.

**BASH:** No I know but I, that's what I'm saying, I, I'm just, I'm just, I'm just, I, just thinking about all that like a [UI].

**MADSEN:** Yeah processing.

**BASH:** [OV] [UI] Yeah that's all.

**MADSEN:** Okay. Uhm,

**BASH**: Um, I was just trying to fucking keep, hopefully keep track of, uh, keep track of it you know what I mean? We're fucking-

**MADSEN:** Yeah. Uhm.

**BASH**: Cause basically if [UI]. Yeah I don't know. I could keep three, three of the props back, cause, cause he's got 17 I could keep three of the [UI] back [UI] like that too much.

**MADSEN:** Mmm.

**BASH:** I don't know pretty unreal. What I-

**MADSEN:** [OV] [UI]

**BASH**: [OV] Instead of three grand I was thinking keep, keep three pounds back, take all the money he has right so basically he has, he has whatever so we'll take out those three pou-he'll owe ten grand if he says something we'll owe ten grand. Well I'll, so but I would give him fucking yeah no that's not, I don't know. 17-

**MADSEN:** [OV] How much are selling to him for?

**BASH**: Three.

**MADSEN:** Three?

**BASH**: Three. Well I was thinking is if I kept three back [UI] we'll get six a piece for those three, instead of three grand we'll make six grand. You know what I mean? That's, that's my I was thinking about on that but.

**MADSEN:** How much should we pay for these, 27?

**BASH**: We haven't paid [UI] we don't have the money to pay for them.

**MADSEN:** How much are we paying for these, 27?

**BASH**: [UI]

**MADSEN:** 27. And he's taking seven of them?

**BASH**: [OV] [UI] I was gonna shoot him a ten just to fucking- just to make- to put three grand. [UI] That's what I was planning on doing, I was thinking if I just, if I shoot him that, just shoot him what he has money for and take the other ones, take the whatever, whatever he has money for, give to G, and then make him wait on the rest [UI] like three out, out of state out of those ten and make fucking five or six per- you know what I mean? We'll, we'll come up but it's just like more risk and more risk and I'd rather just probably just do straight across and make the three grand.

**MADSEN:** [OV] Because-

**BASH**: Just put that shit aside dude.

**MADSEN:** If he has 17,000, if he has 17,000 right? Are we giving it to him for three, then that would only be like five and half pounds. Six if you want to round up.

**BASH**: [UI] giving him ten for $30,000.

**MADSEN**: I know baby but you're just give him.

**BASH**: No, no.

**MADSEN:** Babe you said give him.

**BASH**: [OV] [UI] I know, I, I that's why I  [UI] said it and then I was just like yo that aint going to work.

**MADSEN**: Oh okay.

**BASH**: Talking out loud but [UI] just send it and make the quick three grand dude. You know what I'm saying like straight across instead of him like oh okay we'll pick these and do this and do like and then it's running all kinds of fucking shit. Hopefully they make it out of state and if not the fucking [UI] fuckin fuck that.

**MADSEN:** Okay.
**BASH**: Just take the quick profit and put it to the side. And yeah.

**MADSEN:** Okay.

Affidavit                                                  55

128.     Based on my training and experience, I know that drug dealers and drug traffickers commonly avoid referring to their narcotics and prices by name, and intentionally use innocuous and innocent-sounding language in order to thwart law enforcement interference. Additionally, I know that the same individuals commonly misstate prices for their narcotics for the same reason. Furthermore, I know that $2,700 is roughly consistent with the price of methamphetamine in the Central Valley of California during this period. Based on my knowledge of the investigation and subsequent events, I believe when **BASH** speaks about having other individuals "go down" to "pick up" "those ten," he is referring to the ten pounds of methamphetamine that I believe UF would later provide to **MADSEN** on September 20, 2020. Additionally, when **BASH** speaks to **MADSEN** about trying to adjust the situation such that "it" could "catch a ride back" with "███████ so that it was not a waiting game," I believe he was referring to his desire to have █████████████ transport the methamphetamine back from Torrance, CA, as I know that **BASH** already wanted █████████████ to transport a book press to **MADSEN**. Furthermore, based on subsequent events and the above information, I believe that **MADSEN** confirmed that she and **BASH** were obtaining pounds of methamphetamine from **LOPEZ** for $2,700 per pound when she confirmed that they were paying "27" for "these." Finally, based on my knowledge of the investigation, I believe that **BASH** is thinking out loud with **MADSEN** about how he is going to pay R.L. ("G") for the narcotics, and what he wishes to do with them, as well.[27]

129.     Later that night, at approximately 19:59 hours, **BASH** called █████████████ During the call, the parties speak about █████████████ giving **MADSEN** money. At the end of the conversation, █████████████ asked **BASH** if **BASH** wanted █████████████ to "take anything back." **BASH** responded, "Uh, yeah. You're gonna take back, uh- here, I'm gonna call her and tell her. You're probably gonna take back the full, uh, the full ten." **BASH** then stated, "Whatever she gives you, that's what you're taking back."

---

[27] It should also be noted that, based on my knowledge of the investigation, I believe that when **BASH** is speaking about taking the narcotics "out of state," he is actually referencing taking them to Montana.

130.     Based on my training and experience, I know that drug dealers commonly avoid using phrases for narcotics and their prices in order to attempt to confuse law enforcement and avoid law enforcement interference. Based on my knowledge of the investigation and subsequent events, I believe that **BASH** is using the phrase "the full ten" to refer to the ten pounds of methamphetamine that **MADSEN** had recently obtained. Here, I believe **BASH** is telling ███████████ that he will likely instruct ██████████ to transport ten pounds of methamphetamine from **MADSEN** house in Torrance, CA to Fresno, CA.

131.     Accordingly, **BASH**, using TT#10, immediately called **MADSEN** at 20:01 hours. The following is a transcript of the pertinent portions of that conversation:

**BASH:** Is the shit packaged right? Did you weigh 'em all, or no? Did you get a chance to?

**MADSEN:** Did I weigh it?

**BASH**: Yes.

**MADSEN:** Yeah.
. . .
**BASH:** [UI] I love you babe. Um, send ██████ with, uh… [UI] eight. How many do we have of our own, babe?

**MADSEN:** How many do we have left?

**BASH:** [UI] yeah.

**MADSEN**: Um… I'll have to… look.

**MADSEN:** But then- I'm gonna look right now but Tyler said, Tyler said "Nah, that's not true" he goes, he goes "they do really well together with their situation that they have, that they're in right now. I look up to those two."

**BASH**: [UI]

**MADSEN:** I have one, two, three, four, five, six.

**BASH**: Six?

**MADSEN**: Yeah.

**BASH**: Yeah [UI]. Send him with seven.

**MADSEN:** Send him with seven?

**BASH**: Yeah. [UI] I would just- I'd wrap 'em up. Wrap 'em up good, and uh… just- just hand them off to him.

Affidavit                                                57

1      **MADSEN**: Wrap 'em real good.

2          132.    Based on my training and experience, I know that drug dealers and traffickers commonly

3      use the word "shit" to reference narcotics. I also know that they will typically weigh narcotics

4      immediately after receiving them to avoid being cheated by the seller and will sometimes re-package the

5      narcotics, as well. Additionally, I know that they will often attempt to avoid speaking directly about

6      narcotics and will instead refer to quantities of narcotics by number only. Finally, I believe that the

7      parties are referring to ▓▓▓▓▓▓▓ when they referred to ▓▓▓' Here, I believe **BASH** asked

8      **MADSEN** if she weighed and packaged the methamphetamine she received from UF, and then – based

9      on my knowledge of the investigation and subsequent events – asked her how many pounds of

10     methamphetamine she had that had not just come from R.L. and UF. **MADSEN** then counted and

11     indicated that she had seven pounds. Finally, based on prior calls and subsequent events, I believe that

12     **BASH** instructed **MADSEN** to give ▓▓▓▓▓▓ seven pounds of methamphetamine to transport to

13     Fresno, CA.

14                                    September 22, 2020

15         133.    The next day, on September 22, 2020, at approximately 01:28 hours, ▓▓▓▓▓▓

16     sent a text message to **MADSEN** which read, "Hey I know your prob asleep but before u go to work can

17     I come get some black off u she has none left and I cant have her withdrawing tomorrow on way home."

18     Later that morning, at approximately 07:43 hours, **MADSEN** sent a text message to ▓▓▓▓▓▓

19     which read, "I left some under my doormat." The same minute, **MADSEN** sent another text message to

20     (559) 859-4742, used by V.P., which read, "Left you something under my doormat." ▓▓▓▓▓▓

21     responded at approximately 11:12 hours by sending a text message which read, "Thank you so much."

22     V.P. used (559) 859-4742 to respond at approximately 12:01 hours by sending a text message to

23     **MADSEN** which read, "Awesome! Thank you so much [heart emoji] your the best. Thank you again for

24     having us yesterday. Have a good day."[28]

25     _____

26     [28] Subsequent calls also confirm this hypothesis. On September 22, 2020, at approximately 16:04 hours,
       **BASH**, using TT10, called ▓▓▓▓▓▓▓ using TT21. During the call, **BASH** asked ▓▓▓▓▓▓▓

27     how V.P. was doing. ▓▓▓▓▓▓ said she was fine, and that "Steph left, uh- left something under
       the mat for her."

28     Affidavit                                    58

134.   ████████ and V.P. left **MADSEN'S** residence on September 22, 2020 and traveled to Fresno, CA. At approximately 11:59 hours on September 22, 2020, ████████ sent a text message to **BASH** which read, "Getting ready to leave."

135.   That day, at approximately 13:17 hours, ████████ called D.S. During the call, D.S. and ████████ spoke about ████████ communicating with "Bash" and how ████████ had what he was "supposed to have." Additionally, D.S. asked if ████████ was headed "back over here," and ████████ indicated that he was, and that he was by "Stephanie's house."

136.   Based on my knowledge of the investigation and the calls set out above, I believe ████████ is affirming that ████████ was transporting cargo to the Fresno, CA area, which was D.S.'s location at the time of the call,[29] at **BASH**'s direction.

137.   Several hours later, at approximately 16:51 hours, ████████ and D.S. spoke again. During the call, ████████ asked D.S. if D.S. would be at S.R.'s and asked D.S. to text ████████ the address. D.S. then told ████████ to go to D.S.'s house near Clinton and Marks and that D.S. would send ████████ the address. Several minutes later, TT6, used by D.S., sent two text messages to TT21, used by ████████, which read, "2212 marks ave apt 155 Villa Martinez apartments" and "Its in the back left corner by the basket ball courts."

## H.   D.S., MCWILLIAMS, BOOTH, and S.R. prepare a pound of methamphetamine

138.   **PALMER** had told **BASH** in the early morning hours of September 20, 2020 that **PALMER** would speak with **BASH** the following day about packaging the narcotics. Accordingly, in the early morning hours of September 21, 2020, at 00:00 hours, **BASH** sent a text message to **PALMER** which read, "How you going to want this shit package." Four minutes later, **PALMER** responded, "Vacuum sealed 4 zip white wit 2 blk in each halfs of that half p all the phns together.." At 00:20 hours, **BASH** responded, "2 phone's face to face as 1

---

[29] Precision location data for TT6, used by D.S., was also authorized by the Honorable Fresno County Superior Court Judge Alvin M. Harrell on September 16, 2020. At the time of the above-referenced call, precision location data for TT6 indicated that it was on the northwest side of Fresno, CA near the intersection of Clinton and Marks. The radius for the "ping" covers the apartment complex where D.S. is believed to reside and where he later told ████████ e would be.

Affidavit                                                     59

with saran wrap cord's and Box to the back?" One minute later, **PALMER** responded, "Sounds good.. Im gonna hit u tomorrow."

139.    Based on my training and experience, I know that drug dealers and drug traffickers commonly use the phrase "shit" to refer to narcotics, "white" to refer to cocaine or methamphetamine, "black" to refer to heroin, and "zip" to refer to an ounce of illicit narcotics. Based on the context of the conversation, I believe **PALMER** meant for "wit" to be read as "with," for "blk" to be read as "black" (and therefore "heroin"), and for "phns" to be read as "phones." Additionally, I believe **BASH** meant for "package" to be read as "packaged." Based on subsequent events, I believe the parties used the word "white" to refer specifically to methamphetamine. Here, I believe **BASH** asked **PALMER** how **PALMER** wanted the contraband packaged for smuggling into the prison. **PALMER** responded that he wanted the narcotics vacuum-sealed, that he wanted four ounces of methamphetamine set aside, that he wanted two ounces of heroin packaged with each half pound of methamphetamine, and that he wanted all of the phones packaged together. **BASH** responded by attempting to clarify how the phones should be packaged, and **PALMER** indicated that he would contact **BASH** the following day.

140.    Later that afternoon, at 16:28 hours, D.S. called **BASH** to ask if they were still "doing that tomorrow." **BASH** clarified that D.S. was talking about "the drop" and then said that "it was supposed to be today." **BASH** then assured D.S. that they were still doing "it," but that they were going to "push it until- probably until Wednesday."

141.    Several hours later, **BASH** spoke with **PALMER**, as well. During the conversation, **BASH** indicated that he had received **PALMER**'s text messages, but asked **PALMER** to be more specific. **PALMER** indicated that he would send more information, and then asked when **BASH** thought "would be the best time." **BASH** suggested Wednesday, and **PALMER** agreed and said he would "put all that together for" **BASH**.

142.    Based on my training and experience, I know that inmates commonly refer to the act of smuggling contraband into a detention facility as a "drop." Based on my knowledge of the investigation, I know that at the time this call was made, the following Wednesday would have been September 23, 2020. Here, I believe that the parties essentially coordinated for the smuggling operation to take place

the following Wednesday, September 23, 2020, and that **PALMER** meant to indicate that he would send **BASH** more information about packaging the illicit narcotics when he said he would "put all that together" for **BASH**.

143.   At 10:43 hours, **PALMER** sent a text message to **BASH**, which read, "dHä36°28'34.8"N 121°22'55.7"W [new line] Soledad Unified, CA [new line] https://goo.gl/maps." When I typed "36°28'34.8"N 121°22'55.7"W" into the input prompt on Google Maps, the website indicated that those coordinates were for a point just outside the northwest fence of Salinas Valley State Prison, midway down the fence. A team member employed by CDCR indicated that this spot would be optimal to throw a package over the fence, as there was only one 12-foot fence, and the area inside the fence was a minimum-security facility with lowered security measures employed.

144.   On September 22, 2020 at approximately 11:21 hours, **BASH** made a call to **PALMER.** The following are excerpts of their conversation:

> **PALMER:** Hello
>
> **BASH:** [U/I]
>
> **PALMER:** Nah, what I was gonna tell you was uh we gonna we gonna be on 3-way, know what I'm sayin', with the boy that's gonna be running it in, he gonna coach him in and we gonna be havin' people on this end watchin'.
>
> **BASH**: That's why I was telling you I was gonna link up locations wit'em and [U/I] you know what I mean?
>
> **PALMER**: Yeah, all the shit, you don't even have to do that, I got it, that was a rough, that was a rough picture.  You know what I'm sayin'…motherfuckers wanna strike around that time cuz that's when the police be all laxed and shit ready to go home and all that shit you feel me over there?

145.   Based on my knowledge of this investigation, I believe that this call is pertaining to **BASH** making arrangements with **PALMER,** who offers to "coach" the runner in, to have an inmate associate of **PALMER'S** ready to receive the contraband inside the prison.  In response, **PALMER** can

be heard reassuring **BASH** that not only is the location ideal, but the timing of the prison staff getting ready to end their shift is also ideal.

146.    During a call with **BASH** later that day at 14:56 hours, D.S. told **BASH** that he obtained the vacuum sealed bags and plastic wrap. **BASH** then told D.S. to tell S.R. that D.S. had obtained the bags, as S.R. had been previously instructed to purchase food sealer or plastic wrap. After **BASH** told D.S. to wrap the cellular phones separate from "the product," the parties had an extended conversation about wrapping cellular phones as well as other contraband.[30]

147.    Beginning at approximately 19:28 hours and continuing for several minutes on the same day (September 22, 2020), D.S. sent several multimedia messages to **BASH**, which contained pictures of two bags containing a white crystalline substance, two pictures of a plastic baggies containing a white crystalline substance on a digital scale which read "112.0" and "115.9" respectively, and several other pictures of various forms of prison contraband.

148.    Based on my training and experience, I know that the white crystalline substance pictured in the above-referenced multimedia messages is consistent with the appearance of methamphetamine.

149.    Later calls confirmed that both S.R. and **BOOTH** were present at D.S.'s apartment on September 22, 2020, and that they both[31] helped package the illicit narcotics.

---

[30] It should be noted that the parties had discussed smuggling cellular phones and various other contraband into the prison several times before this point, as well. In a call between **BASH** and **PALMER** on September 22, 2020 at 16:45 hours, 9/23 1645 Bash and Pnut: these phones will pay off the dope debt

[31] In a call on September 25, 2020 at 15:38 in which **BASH** called S.R., **BASH** asked if there were 5 ½ pounds with S.R. and asked S.R. to vacuum seal them. S.R. responded that he was not exactly sure of the quantity, but that there was "a shit load," and that he had "vacuum sealed them already." Based on the context of the calls previously set out, I believe that S.R. was referring to the 5 ½ pounds of methamphetamine that were left from the seven-pound load ▓▓▓▓▓ transported from **MADSEN's** home in Torrance, CA to S.R.'s residence in Fresno, CA.  Additionally, on September 28, 2020 at 15:02, **BOOTH** called **BASH**. During the call – which **BASH** accused **BOOTH** of stealing methamphetamine from the safe at S.R.'s house – **BASH** said that S.R. vacuum sealed "5 ½ pounds," to which **BOOTH** responded, "I helped him do it."

Affidavit                                                              62

**I.**     <u>**D.S. and MCWILLIAMS transport methamphetamine to Soledad, CA at BASH's direction, and BASH, PALMER, MORGAN, D.S., and MCWILLIAMS conspire to smuggle methamphetamine into Salinas Valley State Prison**</u>

150.    On September 22, 2020, **BASH** called **PALMER** at 20:41 hours. The parties spoke about "the 101," about the place where "he jumps out to run," and about someone throwing "it" over a gate. Additionally, **PALMER** states that "he" will not be seen because of the vineyards, and to hold until **PALMER**'s associate indicates that it is time to "go." Based on my knowledge of the investigation, I know that Highway 101 runs past Salinas Valley State Prison, that there are vineyards next to the prison, and – as set out above – **PALMER** previously sent **BASH** precision location coordinates to a spot directly next to the northwest fence of the prison.

151.    Approximately a half hour later, beginning at 21:09 hours and continuing until 21:25 hours, **BASH** and **PALMER** exchanged a series of text messages.[32] The following is a transcript of the pertinent portions of that text message conversation:

> **BASH**: Question
>
> **PALMER**: Yes sir
>
> **BASH:** If your paying so much to get it in why don't you Run a full Pound of W.
>
> **PALMER:** U want 2 add it Run it . I got some other shit coming as well
>
> **PALMER:** Was trying to save room for its not like he's gonna be able to get all this shit to me at once . I'll have to pay for that too the bigger the bag the more I pay but it's gopd
>
> **PALMER**: Good*
>
> **PALMER:** Dudes not trying to sit by and not feel as if they putting hands in but now get it up here I'll work put the rest . I got phns and wax tobaocco as well phns specifically being sold to pay dude he knows it's good . you want to put it go ahead or it can wait until the next run .
>
> **BASH**: I don't mind throwing a whole P. In I'll put it in Qp 's and vacuum seal with black that as 1 put 8 in a stack of 4 with cord's box and security bitts  as 1 then whatever else you send as 1 wdy think
>
> **PALMER**: All right

---

[32] It should be noted that the longer text messages were divided into smaller messages; they have been pieced together for this affidavit for ease of use.

Affidavit                                             63

| **PALMER:** Make each the size of get it down to the size of 2 by 4

152.   As stated above, I know that drug dealers and drug traffickers commonly use "white" to refer to cocaine or methamphetamine, "black" to refer to heroin, "P" to refer to a pound of an illicit narcotic, "Q.P." to refer to a quarter pound of an illicit narcotic, and "shit" to refer to illicit narcotics generally. Based on my knowledge of the case and subsequent events, I believe **BASH** is using "W" here to refer to the word "white," which I am aware the ORGANIZATION uses to refer to methamphetamine. I also believe that he is using "phns" as shorthand for the word "phones." Here, I believe **BASH** asked **PALMER** why **PALMER** is not bringing more methamphetamine – specifically, one pound – into the prison, as each drop is so costly. **PALMER** responds by indicating that he was fine with that idea if **BASH** agreed to it as well. **BASH** replied that he would not mind "throwing in" a pound of methamphetamine, and that he would divide it into quarter pounds portions and would vacuum seal them.

153.   At approximately 2150 hours, **BASH**, using TT#9, contacted D.S., using TT#6. **BASH** then contacted **MORGAN** and initiated a three-way call between them.  The three discussed the plan to smuggle the drugs and contraband into the prison.  During the call, **BASH** explained to **MORGAN** the location where he will be sending D.S. to drop off the contraband.  **MORGAN** then made suggestions about D.S. driving down "Gloria Road", and that they would just need to turn their lights off.  D.S. replied to both **BASH** and **MORGAN** that he did not mind walking a mile to get to them.  As **BASH** described the last drop that had occurred and they further discussed the plans for the drop to occur that evening around 20:00 hours, D.S. listened.  **BASH** further explained that once D.S. got to the barn, they would get **PALMER** on three-way calling so that the recipient would be available on the prison side of the fence.  **BASH** explained to **MORGAN** that the package contained "eight phones, a full pound of white and fuckin uh four ounces of black" plus security bits and wrenches.  **MORGAN** then told **BASH** that everything being thrown over the fence would be split in half.  **MORGAN** explicitly directed **BASH** to confirm what was inside the package, so they could ensure they were getting half of what was thrown.  After discussing the specifics of how each package inside the drop would be smuggled, the call concluded.

154.    Based on my knowledge of this case and the Aryan Brotherhood, I believe this call was **BASH** contacting **MORGAN** to explain the specifics of the drop in order to properly include **MORGAN** in the operation, including in the profits of the pending sale of the contraband.  Based on my training and experience, I believe that **BASH** completing the operation successfully would curry favor with **MORGAN** and increase **BASH'S** status within the Aryan Brotherhood.  Based on my training and experience I know that the terms "white" and "black" are synonymous with methamphetamine and heroin.  Based on earlier intercepted calls, and my knowledge of this case, I believe the security bits and wrenches being referenced are tools that **BASH** requested from D.S. to include in the package.

155.    **BASH** and **MORGAN** continued to send text messages to each other. At 23:30, **BASH** sent a multimedia message to **MORGAN** which included a satellite image of the prison and the land around it, with a red pin on a spot of land directly west of the prison, across Highway 101. Immediately after sending **MORGAN** that image, **BASH** sent another text message to **MORGAN** which read, "Ok can you please forward those to P. My phone won't send and I'll walk him through it." **MORGAN** immediately sent a text message back to **BASH** asking for "P's" number, and then attempted to send the image to that number. Based on my knowledge of the investigation, I believe that "P" stood for "Pup," and that **BASH** and **MORGAN** were attempting to send the image to D.S.[33]

156.    Accordingly, D.S. sent a text message to **PALMER** at 23:52 hours which read, "Hey peanut this is bashes boi P I never received those pictures can you please resend them thanks." **PALMER** responded, "Okay doing now" at 23:57 hours. **PALMER** then sent several images to D.S. via multimedia message over the next several minutes. The first was a satellite image of Salinas Valley State Prison with a blue line drawn through the vineyards directly west of the prison from Highway 101 to a red "ME" with a circle around it (and which was located within the prison fence). The second was a closer image of the area between the prison and a barn located northwest of the prison; a red circle was drawn around the barn and a green arrow was drawn from the barn to the prison fence, with green

---

[33] When **MORGAN** asked for "P's" number, **BASH** responded with a text message that read, "559 394 1143." Based on my knowledge of the investigation, I know that TT6's number is (559) 385-1143; based on the similarity of the two phone numbers, I believe **BASH** meant to send TT6's number to **MORGAN** and mistakenly sent the wrong number.

handwriting which read, "Hold up til I say go" written next to the arrow. Finally, the third image appears to be a photo of a white barn in a vineyard; it appears that the picture was taken through a dirty lens or from behind a dirty window. Based on the context of the previous conversations, I believe **PALMER** is sending instructions to D.S. to bring the illicit narcotics to the barn, and to wait until **PALMER** told him to approach the fence. Based on the poor quality of the image, I believe that **PALMER** sent an image of the barn taken by an inmate inside Salinas Valley State Prison. Finally, I believe **PALMER** did all this in preparation for the planned smuggling operation.

157.    The following morning, **BASH** enlisted **MCWILLIAMS**' help. In a call at 09:07 hours, **BASH** told **MCWILLIAMS** that his affairs were "going to shit." When **MCWILLIAMS** asked if **BASH** needed something, **BASH** responded that "Pup" was "lagging" and "didn't want to go," that "it had to be through Google," and that "one person has to walk and some more shit." **MCWILLIAMS** said, "Tell me, bro. I got time, bro." **BASH** affirmed that it could be done in one day, and had to be done between "seven" and "eight-thirty" that evening. **BASH** further stated that **MCWILLIAMS** would have to leave within the next two hours and that **BASH** would get them a room so they could "wait until we do the drop." When **MCWILLIAMS** asked who would go with him, **BASH** said, "Pup." **MCWILLIAMS** said, "Okay." **BASH** then said, "If you want to go. . . . Literally, all you gotta do is drive this fool, bro." **BASH** then added that **MCWILLIAMS** may have to "re-package," and said that he would send **MCWILLIAMS** some images. At 09:30 hours, **BASH** sent **MCWILLIAMS** several images contained in multimedia messages which depicted the images described above involving Salinas Valley State Prison, a barn, and colored arrows.

158.    Several minutes later, **BASH** called (559) 725-7330, used by S.M., and D.S. answered the phone.[34] **BASH** told D.S. that **BASH** had spoken with "Janky," and that Janky had said, "Absolutely, I'll fuckin' go right now;" **BASH** then outlined the other things he had spoken with **MCWILLIAMS** about. D.S. indicated that he would contact Janky. Based on my knowledge of the investigation, I know that "Janky" is a street moniker for **MCWILLIAMS**. Based on that information

---

[34] I believe this based on having previously listened to several of hours of D. S.'s voice, and based on the context of the conversation.

and the previous call, I believe **BASH** was informing D.S. that **MCWILLIAMS** would accompany D.S. on the smuggling operation.

159.    Accordingly, at 12:21 hours, **BASH** called **MCWILLIAMS** at 12:21 hours. When **BASH** requested that **MCWILLIAMS** put money into an account, **MCWILLIAMS** indicated that he was driving with D.S., and that the vehicle was near "Kerman." The parties then had a conversation about zip-tying **MCWILLIAMS**' firearm and "the dope" to the underside of the dashboard of the vehicle, and about how law enforcement would not be able to search the vehicle because **MCWILLIAMS** was a licensed driver and neither **MCWILLIAMS** nor D.S. was on probation or parole.

160.    Based on my knowledge of the state of California and information received from the surveillance team, I know that Kerman, CA is located on Highway 180 approximately 16 miles west of Fresno, CA. Based on my training and experience, I know that it is common in drug trafficking and firearms trafficking communities to tie contraband to the underside of a vehicle's dashboard in order to conceal it from law enforcement. I also know that it is common in drug dealing and drug trafficking communities to refer to various kinds of illicit narcotics as "dope." Here, I believe **MCWILLIAMS** informed **BASH** that **MCWILLIAMS** and D.S. were driving to Soledad, CA to initiate the smuggling operation. I also believe that **BASH** was offering advice to **MCWILLIAMS** and D.S. regarding the concealment of contraband in case the parties were pulled over on their way to the prison. The statement about neither party being on parole or probation corroborates my belief, as these facts would make it harder for a law enforcement officer to obtain legal authority to search the vehicle.

161.    At approximately 18:02 hours, **PALMER** called D.S.; **PALMER** immediately said that he was going to "merge [D.S.] in with Bash." Seconds later, a voice I recognized as belonging to **BASH** began to speak with **PALMER** and D.S. Specifically, **PALMER** and **BASH** told D.S. to be at "the barn" at "around seven-fifteen." After the call with **PALMER** ended, **BASH** spoke to D.S., in a private call, about how to package the contraband, and then reached out to the other half of the smuggling crew by sending a text message to **MCWILLIAMS** at 18:09 hours which read, "Got to be at the Barn at 7:15." Based on the context of the previous calls and the satellite images sent, I believe that the parties

Affidavit                                                   67

were telling D.S. and **MCWILLIAMS** to be at the barn located on private property west of Salinas Valley State Prison at 19:15 hours to commence the smuggling operation of the illicit narcotics into the prison.

162.    It should be noted that while **BASH** was attempting to orchestrate this operation with **PALMER**, D.S., and **MCWILLIAMS**, he also contacted both **MORGAN**[35] and **MADSEN**,[36] and spoke and/or exchanged text messages with them both about the operation.

163.    **BASH** then spoke with D.S. again. In a call at 18:56 hours, D.S. requested that **BASH** stay on the phone with him so that **BASH** could guide D.S. to the correct location. **BASH** responded that **MCWILLIAMS** would have to drive D.S. to "the barn" because D.S. and **MCWILLIAMS** were "too far out." D.S. confirmed that the barn was on private property, and then concurred with **BASH**'s plan. Based on prior images sent by **PALMER**, as well as observations made by the surveillance team, I believe that "the barn" was meant to reference a barn located on private property within eyesight of the northwestern fence of Salinas Valley State Prison.

164.    **BASH** then called **PALMER** at 19:02 hours to ask **PALMER** to have his "man" "turn his location on." **PALMER** indicated that he would, at which point **BASH** asked how they would get that location "to them." **PALMER** responded that **PALMER** would send it. The next minute, **BASH** attempted several times to call D.S. without success. **BASH** then called **MCWILLIAMS**, who picked up the phone. During that call, **MCWILLIAMS** said that "Pup" was looking up the location. **BASH** responded that "they" were going to share their location with **MCWILLIAMS**, and then told **MCWILLIAMS** to tell D.S. to call P-Nut. **BASH** ended the call by telling **MCWILLIAMS** that **MCWILLIAMS** was eight miles "from there."

---

[35] At approximately 18:44 hours, **BASH** sent a text message to **MORGAN** which read, "There [sic] in hotel last min shit gotta be there at 7:30." **MORGAN** responded by asking what "they" were doing and indicated that if they were waiting for "his" (likely **PALMER**'s) people, that they should not wait any longer.

[36] **BASH** communicated with **MADSEN** both at this point and – as is set out below – while they were attempting to guide D.S. and **MCWILLIAMS** to the prison fence. At 18:15 hours, **MADSEN** called **BASH**, who picked up the phone to tell **MADSEN** he would call her back, as D.S. was "in the field." **BASH** also contacted **MADSEN** several times during the actual operation and attempted to use her laptop to locate D.S.'s phone.

Affidavit                                                                68

165.   Based on the context of previous calls and subsequent events, I believe that **BASH** asked **PALMER** to have **PALMER**'s associate – who was standing by in the lowered-security facility – turn on the precision location feature on his cellular phone so that D.S. could find the location where he was supposed to throw the bag over the fence. **BASH** then called **MCWILLIAMS** to coordinate D.S. and **MCWILLIAMS** arriving at the correct location by attempting to have **PALMER**'s associate, D.S., and **MCWILLIAMS** sharing their locations with each other.

166.   Beginning at 19:09 hours, and for the next one hour and six minutes, D.S., using TT#6 was on the phone with **PALMER** attempting to conduct the drop they had been planning.  D.S. initially called **PALMER**, who began giving detailed instructions of where D.S. should go in the vineyards to the north of the prison.  **PALMER** additionally called a UM in the "dorms"[37] on three-way to try and assist D.S. in navigating his way through the vineyard and farm roads to the north of the prison.  As this was being done, surveillance units in an airplane who had been assisting ground surveillance units, monitored D.S.**'S** progress and relayed photographic updates to the investigative team.  I know from these real time updates, as well as GPS precise location data, that D.S. and **MCWILLIAMS** were in fact walking through the vineyards north of Salinas Valley State Prison in an attempt to throw the contraband over the fence into the prison.  During the call, **PALMER** relayed specific instructions for D.S. to not pass a large bright light inside the prison yard and that an inmate only identified as "Wiggles" would be obtaining the contraband from him.

167.   Based on the observations of the surveillance team, the monitored call and my knowledge of the investigation I know that D.S. was attempting to complete the contraband drop to the prison with **MCWILLIAMS'** assistance.

168.   While D.S. was speaking with **PALMER**, **BASH** called **MCWILLIAMS** at approximately 19:12 to ask **MCWILLIAMS** to send him **MCWILLIAMS**'s location. **MCWILLIAMS** responded that he had already shared it with **BASH**; **BASH** replied that he still had

---

[37] Based on my knowledge of Salinas Valley State Prison, I know there is a Level 1 facility located near where **PALMER** was directing D.S. to go.  The Level 1 facility is the lowest-level security at the institution and offers a dorm-style setting for lower-risk inmates.

Affidavit                                                                        69

not received it. **BASH** then told **MCWILLIAMS** to share his location with **PALMER** instead, and told **MCWILLIAMS** that **PALMER**'s number was TT 7100.

169.    At approximately 19:23 hours, **PALMER** initiated a three-way call with **BASH** and merged **BASH** into the conversation already taking place between **PALMER** and D.S. In summary, the call consisted of **BASH**, **PALMER**, and an un-charged co-conspirator attempting to ascertain how to guide D.S. and **MCWILLIAMS** to the location outside the prison fence. During the call, the parties discussed "the prison," "the grapevines," "the barn," and various streets surrounding Salinas Valley State Prison.

170.    At 19:40 hours, **BASH** called **MADSEN** to ask her how to share a location with an iPhone. **MADSEN** attempted to describe the process, and indicated that she would share her location with **BASH** so **BASH** could attempt to determine if he could obtain someone's location if he initially shared his location with him or her. Based on the context of prior calls and my knowledge of the investigation, I believe **BASH** was attempting to ascertain **MCWILLIAMS**' location, but was having trouble doing so. Because of this, I believe he called **MADSEN** to ascertain if another method would work: if **BASH** shared his location with **MCWILLIAMS**, **MCWILLIAMS** may be able to share his location back as a function of the iPhone.

171.    Accordingly, **BASH** called **MCWILLIAMS** again one minute later to ask if **MCWILLIAMS** "found it." **MCWILLIAMS** said that he was not sure if he found "it," but that they were "walking toward something." **BASH** then asked if **MCWILLIAMS** had the "Find My Device" feature on **MCWILLIAMS**' phone, as **MCWILLIAMS** could use that feature to share his location with **BASH**, and **BASH** could "literally guide [him] where [he] need[s] to go." After a period of silence, **MCWILLIAMS** told **BASH** that his phone was indicating that it was already sharing its location with **BASH**, that they were "walking up to the vineyard right now," and that there was a gate to the vineyard that was open so they were going to walk through it. **BASH** told **MCWILLIAMS** that he had sent **MCWILLIAMS** a number, that **MCWILLIAMS** should share his location with "them," and that "they have their laptop out, everything's ready." **BASH** then said, "She's got an iPhone, as well."

**MCWILLIAMS** said he would share "it" with her. During that call, the investigative team intercepted a text message from **BASH** to **MCWILLIAMS** which contained TT7, the number used by **MADSEN**.[38]

172.   At 20:10 hours, **BASH** called **MADSEN** a final time to attempt to ascertain how to locate D.S. and **MCWILLIAMS**. The following is a pertinent portion of that conversation:

> **MADSEN**: Hello?
>
> **BASH**: Hello. Um, his name is Joseph McWilliams, in messenger, can you try to look it up please?  Maybe with his number or something? This is driving me crazy, baby, I ain't got I ain't even got Messenger on my phone you follow me? [UI]—these fools have been sending me location, pictures and all kinds of [UI]—and I ain't got none of em.  But, pictures that I was like, "I just got your picture of this, of this [UI]," he goes, 'Man I sent that yesterday.' Oh my goodness.
>
> **MADSEN:** Joseph, Joseph what?
>
> **BASH**: McWilliams.  You can't search it by the number?
>
> **MADSEN:** I found it.  He's black?
>
> **BASH**: No he's not.
>
> **MADSEN:** That's what pops up. [NOISE] What's the phone number?
>
> **BASH**: Uhhh..five, five, nine [NOISE] [UI]
>
> **MADSEN:** Ask him if he has a black guy for a picture cuz that's [UI] what, anyways go ahead.
>
> **BASH**: He looks sorta friendly [UI], his Facebook profile right, is from Fresno?
>
> **MADSEN**: I don't have Facebook, I just—
>
> **BASH**: [OV] Oh yeah.
>
> **MADSEN**: --have Facebook messenger. [Noise]
>
> . . .
>
> **MADSEN:** What's the number?
>
> **BASH**: Huh?
>
> **MADSEN:** What's the number?
>
> **BASH**: Five, five, nine…

---

[38] Subsequent calls corroborate **MADSEN** involvement, as well as other texts in which, for example, **BASH** asks **MADSEN** at 20:37 hours to "Ping there [sic] location from iPhone."

**MADSEN:** Ya.. [Noise]

**BASH:** Uh…[Noise] Two…uh…five, seven, three, six, zero, zero, three.

**MADSEN:** [Noise] Six, six, zero, three?

**BASH**: Six, zero, zero, three.

**MADSEN:** Oh.

[Noise].

**BASH**: No. [Pause] That doesn't, nothing pops up.

[Noise]

**BASH**: [Noise] Hold on…

173.    At a certain point, **BASH** indicated he would call **MADSEN** later and terminated the call. Based on **BASH** using **MCWILLIAMS**' name and giving **MADSEN** TT11, which is used by **MCWILLIAMS** as was set out above, I believe **BASH** and **MADSEN** were attempting to ascertain how to locate TT11, as that would allow **BASH** to locate **MCWILLIAMS** and to guide **MCWILLIAMS** and D.S. into position to complete the smuggling operation. Accordingly, **BASH** then called D.S. at 20:17 hours to tell him that **BASH** had been trying to get "him" to "link his location with Stephanie on messenger . . . . so that she could walk you guys right to it . . ."

174.    Based on all of the above information, I believe that **MADSEN** knew that she was assisting with the smuggling of illicit narcotics into Salinas Valley State Prison, and that she was doing so at **BASH**'s direction.

175.    At 20:24 hours, **BASH** and **PALMER** regrouped. During the conversation, **PALMER** stated that yard time at the prison was still in effect, and that if there were "an issue" they would have ended it. **BASH** then asked **PALMER** to call D.S. However, before **PALMER** could get ahold of D.S., D.S. called **PALMER** at 20:25 hours. During the call, D.S. told **PALMER** that D.S. and **MCWILLIAMS** were having trouble reaching "this spot," and that "B" wanted to know if they could "try this tomorrow." **PALMER** responded, "Okay, if we have to, let's do it. . . .  Safety first bro." D.S.

then told **PALMER** that in the morning he would drive by and get "the layout." The parties continued to speak about the drop location with an un-charged co-conspirator who was on the line with **PALMER**[39].

176.     **PALMER** then sent a text message to both **BASH** and D.S. at 21:33 hours which read, "They saying let's just run it tomorrow bro safety first . not guaranteed if the co there leaves early." Based on my training and experience, I know it is very common for prison inmates to refer to correctional officers as "C.O.s." I therefore believe that **PALMER** is confirming with **BASH** and D.S. that the parties will try to smuggle the contraband the following day.

177.     **BASH** and D.S. then spoke about the evening's events. At 22:18 hours, D.S. called **BASH**, told him that D.S. knew a different route, and that the next time D.S. would just drive straight there. **BASH** then told D.S. to leave "all the felonies at the motel room," and to just take the other contraband on the next attempt. The parties then discussed the failed attempt and how they would package the contraband differently. **BASH** then told D.S. that they should leave "the dope" and "the pistol" back at the motel room, and "go back out there right now."

178.     As stated above, I believe "dope" is commonly used by drug dealers and traffickers to refer to illicit narcotics. Based on my knowledge of the investigation, I believe **BASH** is attempting to tell D.S. to attempt the smuggling operation again right away, but without the illicit narcotics and any firearms.

179.     Accordingly, at 22:49 hours, **PALMER** sent a text message to D.S. which read, "Marlon.Cunard." Based on the previous conversation, I believe this was the messenger handle **PALMER** wished D.S. to use to contact him.

180.     Two minutes later, D.S. responded to **PALMER** with an image contained in a multimedia message which depicted an individual I know to be D.S. wearing a tactical vest and holding

---

[39] The next morning, in a call between **BASH** and **MCWILLIAMS**, **MCWILLIAMS** confirmed that he possessed a firearm and buried it in the field during the smuggling operation. During that conversation, **MCWILLIAMS** indicated that D.S. was upset with **MCWILLIAMS** because **MCWILLIAMS** "buried that shit in the dirt last night . . . . I dropped that bag right there next to that little well. You know, by that white little well thing? 'Cause, I mean- [UI] Dropped it, buried the gun right there, and booked it."

Affidavit                                      73

a firearm to his own head. Based on observations made by the surveillance team, I believe this to be the clothing worn by D.S. during the smuggling operation. The parties then had a text message conversation regarding the firearm.

181.   At 23:00 hours, **PALMER** (and **BASH**, approximately 20 minutes later) sent an image contained in a multimedia message to D.S. The image appeared to depict a screenshot of a text message conversation on a cellular phone in which the parties were discussing how the first shift – that is, night shift – correctional officers were the "real cops," and how the best time to smuggle narcotics into the prison was between 18:30 hours and 20:30 hours. Based on prior events, I believe that **PALMER** had a conversation with another individual about the optimal time to smuggle contraband through the prison fence, and then conveyed that conversation to D.S. **PALMER** later followed up with D.S. in a call at 23:09 hours in which **PALMER** essentially re-conveyed the essence of that conversation, and D.S. said that he would be in touch.

182.   **BASH** then exchanged text messages with **MORGAN** and **PALMER**, in which the parties spoke about how D.S. and **MCWILLIAMS** would stay the night and come out to the prison early the next day to try again.

**J.**     **The next day, D.S. and MCWILLIAMS again attempt to smuggle contraband into Salinas Valley State Prison at the direction of BASH, PALMER, and MORGAN**

183.   On September 24, 2020, **BASH** checked in with **MORGAN**. At 17:44 hours, **BASH** sent a text message to **MORGAN** which read, "Likewise Bro ... getting ready to make it happen." **MORGAN** responded with a text message at 17:45 hours, which read, "Oh boy here we go. Ha ha ok. Keep me up. It is daylight. But hey yall got it figfered out." Based on the context of the calls set out above and my knowledge of the investigation, I believe **BASH** was informing **MORGAN** that he, **PALMER**, D.S., and **MCWILLIAMS** were going to attempt again to smuggle illicit narcotics into the prison.

184.   At 17:55 hours, D.S. called **PALMER**. During the conversation, **PALMER** told D.S. that D.S. would only be "throwing it over," and that "it isn't that big." D.S. told **PALMER** that D.S.

was wearing the security vest again, and that **PALMER** should call **PALMER**'s associates, as D.S. would be pulling up to "the barn" shortly. **PALMER** indicated that he would do so "right now."

185.    Based on my knowledge of the investigation, I believe that **PALMER** spoke about D.S. throwing contraband over the fence at Salinas Valley State Prison. I also believe that D.S. told **PALMER** about how he was going to attempt to disguise himself as a security guard in order to avoid detection by law enforcement. Finally, I believe that D.S. was speaking about the barn a short distance west of the prison – mentioned above – and that **PALMER**'s associates would be the ones coordinating sending an inmate out of the prison to retrieve the contraband.

186.    Several minutes later, at 18:07 hours, **BASH** called **MCWILLIAMS**. During the call, **MCWILLIAMS** put the phone on speakerphone and a male who I believe to be D.S., based on several hours spent listening to his voice during the course of this investigation, began speaking with **BASH**. D.S. indicated that he were parked "a ways back" and were waiting for "you guys" to tell D.S. and **MCWILLIAMS** that it was time to begin the operation. Based on the following call, I believe D.S. could be heard conversing with **PALMER** in the background of this call.

187.    **PALMER** had called D.S. at 18:08 hours. During the call, **PALMER** and D.S. are heard discussing D.S.'s location in relation to where **PALMER'S** runner was inside the prison fence line on a three-way call with a UM.  After several minutes of directions, **PALMER** and D.S. are heard saying that they see each other.  **PALMER** then directed D.S. to leave the bag near a dead tree and he would have someone jump over the fence to obtain the bag.  **PALMER** then confirmed that the prison staff did not appear suspicious and confirmed that "bottles" were in the bag to which D.S. replied, "Yeah, tobacco the big Jack, your Patron"[40].  After the bag is left, **PALMER** concludes the conversation with D.S. who left on foot before returning to his vehicle.

188.    As the interception on TT#6 was occurring, surveillance units both on the ground and in the air maintained physical surveillance on both D.S. and the vehicle.  Air surveillance was able to

---

[40] Based on my training and experience I believe "Jack" to be a reference to Jack Daniels whiskey and "Patron" to be a reference to Patron tequila.

1  physically observe D.S. navigating through the vineyard toward the prison, and corroborate D.S.**'S**

2  actions with that being heard on TT#6 in real time.

3      189.    Based on my knowledge of the investigation and the observations made by the

4  surveillance team, I believe that this call records D.S. coordinating with **PALMER** to throw the bag of

5  contraband over the prison wall. At a certain point, UM indicated that D.S. should just put the bag on the

6  ground next to a tree, and that someone would come out to get the bag. Based on **PALMER** saying that

7  he "hung up on him," I believe **PALMER** had an associate on another phone, and had that phone on

8  speakerphone in order to communicate with both D.S. and **PALMER**'s associate. As stated above,

9  based on the context of the call and UM's statements, I believe UM was standing just inside the

10  northwest fence of the prison.

11      190.    While **PALMER** was on the phone with D.S., **BASH** called **MCWILLIAMS** at 18:14

12  hours; D.S. can be heard in the background. **MCWILLIAMS** started the call by saying, "We're in

13  motion" and "We're coming up on it, dog." **MCWILLIAMS** and **BASH** conversed for several minutes

14  about the field workers in the field next to the prison, and ended the call approximately 45 seconds after

15  **MCWILLIAMS** told **BASH** that they were driving "right up to the goddamn prison, bro."

16      191.    At 18:34 hours, D.S. called (559) 790-9537, used by **Samantha BOOTH**, after he had

17  told her he would call her back in a call approximately 30 minutes earlier. During the call, D.S. told

18  **BOOTH** that he was in the middle of "doing that drop" when she called earlier, and that he was right by

19  "the tower that looked over the prison." At the end of the conversation, D.S. told **BOOTH** that he and

20  **MCWILLIAMS** were in "Monterray" and that they were "two and a half hours" away. Based on that

21  call, I believe **BOOTH** was aware of D.S. and **MCWILLIAMS**' mission and had previously spoken

22  with D.S. about it. I therefore believe that **BOOTH** knew about the final destination of a portion of the

23  seven pounds of methamphetamine which was delivered to S.R.'s house by ▓▓▓▓▓▓▓ and which

24  was prepared for distribution by S.R., D.S., and **BOOTH** on September 22, 2020.

25      192.    At 18:35 hours, **BASH** sent a text message to **MCWILLIAMS** which read, "Was it

26  tossed over the fence?" At 18:45, **PALMER** sent a text message to **BASH** which read, "There [sic]

27  about to go get it .. I'm gonna have them take pics." Based on previous calls and my knowledge of the

28  Affidavit

investigation, I believe **BASH** was asking if the contraband had gotten into the prison, and **PALMER** told **BASH** that **PALMER**'s associate was about to go over the fence to get it.

193.    Air surveillance continued to observe the fence line at Salinas Valley State Prison and observed an inmate scale the northern fence line and retrieving the bag from near the dead tree.  The inmate then returned over the fence before running into one of the dorms.[41]

194.    At 19:02 hours, **MCWILLIAMS** sent a text message to **BASH** which read, "Not over the fence," and followed it with another several seconds later which read, "But ol boy said put it next to a log." Based on my training and experience, I know that the phrase "Ol' Boy" is very commonly used in gang communities to refer to a male known to the two parties having a conversation; it is frequently used when speaking on the phone in order to avoid naming gang members with specificity. Here, based on previous calls and my knowledge of the investigation, I believe **MCWILLIAMS** told **BASH** that the contraband had not made it into the prison yet, and that **PALMER** had told **MCWILLIAMS** and D.S. to tuck the bag of contraband under a nearby log.

195.    At 19:18 hours, **PALMER** called **BASH** directly. During the call, **PALMER** told **BASH** that he was "waitin' on them" and that "they" were "waiting for that opportunity" to "get it." Based on previous calls and my knowledge of the investigation, I believe **PALMER** told **BASH** that **PALMER**'s associates were ready to retrieve the package of contraband, but were waiting for an opportunity when they could retrieve it from **MCWILLIAMS** and D.S.'s hiding spot in the field west of the prison without being detected by correctional officers.

196.    Finally, at 19:51 hours, **BASH** called **PALMER**. **PALMER** told **BASH** that **PALMER** was "waiting on word right now," that **PALMER** knew "they're good," that they "got it right in the spot where he said it was safe." **PALMER** speculated that his associate had already "grabbed it" and was probably "tucking it" at that point. Based on my training and experience, I know it is very common for

---

[41] At 20:45 hours, **MCWILLIAMS** sent an image in a multimedia message to D.S. Based on my knowledge of the investigation, as well as images sent by D.S. to **PALMER**, I believe that what is depicted in the image is D.S. kneeling in a vineyard with a security vest on. Based on my knowledge of the investigation, I believe buildings in the background to be facilities inside of Salinas Valley State Prison.

Affidavit                                                        77

inmates to attempt to hide contraband by tucking the illegal items into their clothing or even their bodies. Based on my knowledge of the investigation and previous calls, I believe that **PALMER** told **BASH** that **PALMER** was just waiting to hear confirmation of the package's safe passage from **PALMER**'s associate, that the associate had already gotten the package, and that the associate was probably concealing the contraband as they spoke.

197.     According to CDCR reports, Investigative Services Unit members maintained surveillance inside the facility while the above stated events took place.  After the inmate returned with the bag, which was identified as a pillow case, they ran into the dorms where they were confronted by prison staff.  The inmates tried to conceal the bag and were resistant to orders issued by staff.  The bag was recovered by staff and was found to contain the following items:

- Twenty (20) cellular phones
- One (1) hot spot
- Eight (8) earphones
- Five (5) USB chargers
- One (1) charging device
- Fourteen (14) charging cables
- Two (2) crescent wrenches
- Twenty-eight (28) security bits
- Two (2) SIM cards
- Five (5) packs of Bugler rolling papers
- 360ml of alcohol
- 85.06 grams of tobacco

After the items were collected as evidence, they were photographed and booked into property at the institution.

### K. **D.S. and MCWILLIAMS arrested with methamphetamine**

198.     At 21:13 hours, **MORGAN** checked in with **BASH**. Over the next several minutes, the parties had a text message conversation in which **BASH** told **MORGAN** that **BASH** was "still waiting." At 21:47 hours, D.S. sent a text message to **MORGAN** which read, "I send mines heres a picture of your boi wearing a security vest doing what I do best. Let Kenny and myself know when the next drop is. Have a good night." The next minute, D.S. sent an image contained in a multimedia message which I recognized as the image **MCWILLIAMS** previously sent **BASH** of D.S.

199.     It should be noted that the surveillance team previously observed D.S. and **MCWILLIAMS** get back into **MCWILLIAMS**'s vehicle and begin to drive back toward Fresno, CA. At approximately 22:03 hours, a member of the investigative team conducted a traffic stop on the vehicle in Fresno County, and the vehicle was searched pursuant to the investigative team's knowledge of intercepted communication which indicated that **MCWILLIAMS** was still carrying the firearm. Officers recovered approximately 1.08 pounds of a white crystalline substance resembling methamphetamine, a Glock 26 9mm handgun, and nine live 9mm rounds in the vehicle. D.S. was initially taken into custody due to an active felony warrant for his arrest. **MCWILLIAMS** is a previously convicted felons. **MCWILLIAMS** has a 2018 felony conviction for infliction of corporal injury on a spouse or cohabitant. He was ultimately sentenced to 2 years imprisonment after violating parole. As part of this investigation, I contacted ATF Interstate Nexus Expert SA Eric Penman, who confirmed that the Glock, Model 26, 9mm, pistol traveled in interstate commerce and was not manufactured in the state of California.

200.     At 22:20, the conspirators became aware that their plan had failed. **PALMER** sent a series of text messages to **BASH** which read, "Call real quick," "Talking to ok boy," and "He got hit." As stated above, I know that "Ol' Boy" is a common term used in gang communities to refer to a commonly-known party; based on that information, I believe **PALMER** likely meant to type "ol boy" and that he was actually speaking about his associate. Additionally, I know that the verb "hit" is commonly used in the same communities when referring to a party being stopped and searched by law

Affidavit                                                            79

enforcement. I believe **PALMER** was essentially conveying to **BASH** that the contraband had been seized and that the operation was ultimately unsuccessful.

201.    **BASH** reported the evening's events to **MORGAN**. Just after midnight on September 25, 2020, at 00:002 hours, **BASH** sent a text message to **MORGAN** which read, "All bad. Got him." Based on previous events and **MORGAN**'s role in planning the operation, I believe **BASH** was informing **MORGAN** that the operation had failed.

### L.   SAMANTHA BOOTH SELLS METHAMPHETAMINE TO RAISE FUNDS FOR D.S.'S BAIL

202.    On September 28, 2020, at approximately 1:51pm, **BASH**, using TT#9, received a text message from (559) 349-5210 (TT5210)[42] which said, "We have a problem!!!" Directly after the text, **BASH**, using TT#9, called TT5210 and had the following conversation:

> S.R.: Hey
>
> **BASH**: [UI] I don't like problems.
>
> S.R.: Neither do I. So I get home.
>
> **BASH**: Yeah I know.
>
> S.R.: Samantha took the dope out of the safe. Only two people have the code right, me and Derek. So she said she sold it, some of it to help get Derek out. Two, two thousand more.
>
> **BASH**: Bitch I'm gonna kill you.
>
> S.R.: Two thousand dollar's worth. Okay how much was in there? Do you know? I, I just cause I-
>
> **BASH**: Five and a half pounds.
>
> S.R.: Okay there's-
>
> **BASH**: [OV] Let me call you back.

[42] The user of TT5210 was determined to be S.R. based on several interceptions in which callers referred the user of TT5210 as S.R.'s first name. For example, on September 19, 2020, **BASH**, using TT9, called S.R., using TT5210 and called the speaker by the speaker's first name. Additionally, on September 23, 2020, **BASH**, using TT9, asked S.R. to set up a Bank of America using his information. S.R. sent **BASH** a text message reply at approximately 3:00pm, which said, "S.R. 1038 Palo Alto Clovis 93612 DOB 11/13/82". Based on the reply, I believe the user of TT5210 is S.R.

S.R.: Okay.

**BASH**: [OV] Let me call you back.

S.R.: Okay.

203.     Based on the call, I believe S.R. was relaying that **BOOTH** took methamphetamine, which was owned by **BASH,** and the AB criminal organization by extension, and sold it to raise funds to secure D.S.'s release. Based on my training and experience, I know that the term "dope" is a common slang term for methamphetamine. When the S.R. said, "Only two people had the code right, me and Derek", I believe S.R. was referring to D.S., a known associate of **BASH**. When S.R. said the methamphetamine was taken by "Samantha" and that "she said she sold some of it to help get Derek out, 2,000 worth" I believe S.R. was referring to **BOOTH**, who was actively working to secure D.S.'s release as described above. Based on the call and the facts described at length above, I believe **BOOTH** possessed and distributed methamphetamine that was being stored in the safe at S.R.'s house, and that this methamphetamine was part of the 7 pounds brought to Fresno from **MADSEN's** house by ▮▮▮▮▮▮▮ and V.P.

204.     Directly after the call, On September 28, 2020, at approximately 1:52pm, **BASH**, using TT9, sent a text message to **BOOTH**, using TT9537 that said, "Bitch I'm going to kill u." I believe the text confirmed that the "Samantha" that S.R. was referring to was **BOOTH**.

205.     On September 28, 2020, at approximately 3:02pm, **BOOTH**, using TT9537, called **BASH**, using TT9. **BASH** and **BOOTH** had the following conversation:

**BASH**: Yeah.

**BOOTH**: So I stole five pounds from you?

**BASH**: Four pounds. There's, there's a pound and a half there.

**BOOTH**: [OV] [UI] **BASH**

**BASH**: [OV] There's, there's.

**BOOTH**: [OV] I sold

**BASH**: [OV] [UI] There's five and a half pounds, there was five and half pounds there. Steve vacuum sealed everything on one of them.

Affidavit                                                           81

1   **BOOTH**: I helped him do it, there was not it was two and two and then one. I brought you

2   back, I sold him that 2 g's for you. What-

3   **BASH**: [OV] Hold on, listen. Hold on wa-wait a minute, wait a minute, wait a minute, wait

4   a minute, you said

5   **BOOTH**: [OV] [UI]

6   **BASH**: [OV] You said, you said there, you said there was two and two and one.

7   **BOOTH**: And [UI] one single one, I sold, what I sold two pounds, two thousand dollars

8   for you dude what do you mean I-

9   **BASH**: [OV] What, what are you talking about Sam, pounds go for three-

10   **BOOTH**: [OV] [UI] [Yelling]

11   **BASH**: -Grand. Pounds, pounds go for three thousand dollars bro.

12   **BOOTH**: I mean [UI], I sold one for two dude what the fuck [UI] out right now

13   **BASH**: [OV] Okay listen, listen. Pounds go for three grand. $2,700 is what I pay for a

14   pound. Okay that's nor here nor there fool, one pound I'll, I'll eat the $700.

15   **BOOTH**: [OV] I'll give you the $700-

16   **BASH**: [OV] Whatever.

17   . . .

18   **BASH**: You took, you took, how much dope did you sell Sam? How much dope did you

19   take out, how much did you take out of the fucking safe?

20   **BOOTH**: [UI] Whatever I took out of there I sold a pound of and I brought the rest back

21   and I have the two thousand dollars dude. I didn't steal no dope from you **BASH**.

22   **BASH**: How much dope-

23   **BOOTH**: [OV] [UI]

24   **BASH**: How—[UI] I don't understand fool, I don't get it, I don't understand why.

25   **BOOTH**: [OV] I don't know how much, I didn't, I don't know how much who took those

26   either dude. I had no clue, all I know is that I was-

27   **BASH**: [OV] Listen [UI]

28   Affidavit                                                      82

1   **BOOTH**: [OV] [UI] All I did, I have two grand I still have. I didn't steal shit from you, I

2   don't need to steal shit from you dude.

3   **BASH**: [OV] Listen

4   **BOOTH**: [OV] Never have.

5   **BASH**: You, you, I, That's what I don't understand before I offered to give the cash.

6   **BOOTH**: Yeah **BASH** that was, that was okay-

7   **BASH**: [OV] I offered you to [UI] I offered to pay you to break my dope down dude you

8   said no.

9   **BOOTH**: Well I was sleeping when Derek woke me up to do that.

10  **BASH**: I understand that, I get that, that's fine but that's my dope.

11  . . .

12  **BASH**: -how much packages did you, you, you bagged up two and two and one. That's

13  five pounds Sam.

14  **BOOTH**: They weren't, there wasn't, they weren't even weighed out like, it was not like

15  that. I've seen how uneven it was, the, the bagging. It wasn't like that it was like

16  **BASH**: [OV] Steve, Steve is saying there is one pound and 344, 344 grams there dude.

17  **BOOTH**: No it should be [UI] I don't know how much there should be but left there I

18  know I sold a pound that I weighed out [UI] sold that dude. That's it. I don't know what

19  Derek-

20  **BASH**: [OV] How, how many, how much, how many packages, vacuum sealed packages

21  are in the safe when you, when you put the shit back.

22  **BOOTH**: [OV] I remember, how many packages when I put the shit back, I put it in [UI]

23  room in a black bag. What do you mean?

24  **BASH**: [OV] How much, how much did you put there?

25  **BOOTH**: Uh whatever I, I don't know I [UI] I didn't weigh it before I put it in there. I

26  didn't-

27

28  Affidavit                                         83

**BASH**: [OV] Alright I'm not asking weighing it fool how much dope did, how many vacuumed, were they still vacuumed?

**BOOTH**: [OV] [UI] No, no they weren't vacuumed sealed, I had to open it to fucking unvacuum seal it, what do you mean? To weigh out a pound. I don't know what you're, what you're [UI]

**BASH**: [OV] They were, they were, they were weighed in to pounds fool.

**BOOTH**: No they weren't because when I opened one that wasn't a pound. I swear it was not. I'm [UI] that I freaking [UI] to bank pull out money out of my account. I'm gonna be at the house right now, I don't know who's there waiting for me whatever the fuck is going on. I didn't steal anything from you **BASH** and I didn't do you dirty dude. [UI] Known me for way to many fucking years dude. I'm not-

. . .

**BOOTH**: [OV] [UI] About me cause-

**BASH**[OV] I don't give a fuck, I'm taking all Steve's shit, I'll , I'll, if you say you didn't, I'm taking all his shit fool. I clippin this fucking fool.

**BOOTH**: I'm the who [UI] knowing I sold it dude. Steve-

**BASH**: [OV] I don't care.

**BOOTH**: [OV] –didn't know that.

. . .

**BASH**: [OV] ▓▓▓▓▓▓▓▓ brought the shit from LA, ▓▓▓▓ knows exactly how much dope was there. One pound of it, one pound of it came to the fucking run dude. The remainder of it, the remainder, hold on fuck, [UI] right now.

206.    Based on the conversation, I believe **BOOTH** confirmed that she possessed methamphetamine and distributed it for money. Based on my training and experience, I know that narcotics traffickers often secure large quantities of narcotics in vacuumed sealed packages. When **BASH** asked **BOOTH**, "how many packages, vacuum sealed packages are in the safe when you, when you put the shit back", I believe **BASH** was referring to individual pounds of methamphetamine that

1   were packaged in vacuumed sealed bags. This was confirmed in the conversation when **BASH** asked

2   **BOOTH** if she opened a vacuumed sealed package and then told **BOOTH**, "They were weighed in to

3   pounds fool."

4         207.    When **BOOTH** replied that "I helped him do it", I believe **BOOTH** was relaying to

5   **BASH** that she helped package the narcotics. When **BOOTH** continued and said, "I brought two back, I

6   sold one, I have two g's for you", I believe **BOOTH** affirmed that she sold the methamphetamine they

7   were discussing and sold one pound. I know based on my training and experience that "two g's" is a

8   common expression which refers to $2,000. Based on the fact that **BOOTH** said she "sold one" and had

9   "two g's", I believe **BOOTH** was relaying to **BASH** that she sold one pound of methamphetamine for

10   $2,000. When **BASH** replied that, "pounds go for $3,000 bro", I believe **BASH** confirmed that he and

11   **BOOTH** were discussing the sale of methamphetamine. Based on my training and experience, and

12   conversations with other law enforcement officers, I know that $3,000 is consistent with the price of a

13   pound of methamphetamine in the Central Valley of California. When **BOOTH** stated that "she

14   weighed out a pound, sold that", I believe she again confirmed that she possessed and sold a pound of

15   methamphetamine.

16   ### M.    DISTRIBUTION OF METHAMPHETAMINE TO ALASKA, SEPTEMBER 22, 2020

17

18         208.    On September 22, 2020, the investigative team intercepted[43] a call from (559) 798-4427

19   (TT#10), used by Kenneth **BASH**[44], to (559) 214-7253 (TT#21), used by ▬▬▬▬▬▬

20   [43] On September 18, 2020, the Honorable Fresno County Superior Court Judge Alvin M. Harrell III

21   authorized the interception of wire and electronic communication to and from (559) 798-4427 (TT#10) (FSO 20-018).

22   [44] Numerous intercepted texts and calls indicate that **BASH** is one of the users of TT#10, though the

23   phone is occasionally passed to a different inmate. Contacts of TT#10 refer to the user of TT#10 as "B" and "Kenny" – both of which are known monikers used by **BASH** – and in one instance where the user

24   of TT#10 had given the phone to another inmate, the new user contacted (559) 547-7728 (TT#8), used by K.B. – **BASH's** wife – to inform her of the switch in users. The interception of communication over

25   TT8 was authorized by the Honorable Fresno County Superior Court Judge Alvin M. Harrell on September 16, 2020.

26   [45] Numerous calls and texts intercepted on TT#21 indicate that this phone begins to ▬▬▬▬▬.

27   First, numerous contacts of TT#21 call the user "▬▬▬ in both calls and texts. Additionally, the surveillance team has observed ▬▬▬▬▬ in multiple locations consistent with where the user of TT#21 would be based on intercepted calls and texts (one example of this is the probable cause set out

28   Affidavit

While discussing how **BASH** wanted ▮▮▮▮▮▮▮▮ o take two or three grams of "black" and several pounds of "white" to a mutual associate, **BASH** asked ▮▮▮▮▮▮▮▮ if ▮▮▮▮▮▮▮▮ wanted "any of that." In response, ▮▮▮▮▮▮▮▮ stated that he would, and that he just got "eight hundred CashApp'd to [him] today from that- that fool Danny. [voices overlap] From Alaska." **BASH** then agrees to give ▮▮▮▮▮▮▮▮ a "QP" for $1,000 and another "QP" in consideration for "bringing 'em down."

209.    Based on my training and experience, I know it is very common for drug traffickers and drug dealers to use coded language to refer to narcotics. Accordingly, I also know that it is common in those same communities to use the word "black" to refer to black tar heroin and "white" to refer to cocaine or methamphetamine. I also know that it is common for drug dealers to sell narcotics, receive physical currency in return, and then use that same currency to purchase more narcotics. Finally, I also know that "QP" is a common term used in those same communities to refer to the "quarter-pound" unit of measurement. Here, I believe that **BASH** is telling ▮▮▮▮▮▮▮▮ to take black tar heroin and cocaine or methamphetamine to their mutual associate, and asks if ▮▮▮▮▮▮▮▮ would like any of those narcotics. ▮▮▮▮▮▮▮▮ responds in the affirmative, and states that he has "eight hundred." **BASH** then tells ▮▮▮▮▮▮▮▮ that he is willing to give ▮▮▮▮▮▮▮▮ a "quarter-pound"[46] for $1,000 and then another "quarter-pound" in consideration for ▮▮▮▮▮▮▮▮ transporting the narcotics for **BASH**. Based on the fact that ▮▮▮▮▮▮▮▮ told **BASH** that ▮▮▮▮▮▮▮▮ had received money from "Danny" "from Alaska" when **BASH** asked ▮▮▮▮▮▮▮▮ if ▮▮▮▮▮▮▮▮ wanted some of **BASH's** narcotics, I believe it is likely that ▮▮▮▮▮▮▮▮ received proceeds from at least one narcotics sale from "Danny" and was going to use that money to buy the "QP" from **BASH.**

---

below in this affidavit).

[46] Based on this unit of measurement, I believe it is likely that the parties are talking about methamphetamine; a quarter-pound of heroin is worth much more than $1,000 and cocaine is typically measured in kilograms.

210.    On September 24, 2020, the investigative team intercepted[47] a text message conversation between (907) 359-4705 (TT4705), used by an unidentified individual (U291), and TT#21, used by ▆▆▆▆▆▆▆ The following is a transcript of the pertinent portions of that conversation:

▆▆▆▆▆▆▆▆▆ Just waking up but he good to go I'm gonna jump in the shower and take this thing to the post office.

TT4705: Good lookn bro for real pls jus be safe

▆▆▆▆▆▆▆: For sure….who's name you want me to ship it in

TT4705: Do mine again n

▆▆▆▆▆▆▆ Alight

TT4705: Same everything

▆▆▆▆▆▆ Cool

TT4705: ????

▆▆▆▆▆▆▆ Going now bro my bad

TT4705: K

TT4705: Come on man!! I need that already like 2 days ago

▆▆▆▆▆▆: I'm sorry bro it will ship today

TT4705: K

TT4705: Post office

TT4705: USPS

▆▆▆▆▆▆: Yes Danny I'm a procrastinator not a fucking retard

▆▆▆▆▆: Yup should be there by Monday

▆▆▆▆▆▆ That's 300$

▆▆▆▆▆▆▆ When you want the next one that shit was hella easy

TT4705: I got u plus the next 1

---

[47] On September 23, 2020, the Honorable Fresno County Superior Court Judge Alvin M. Harrell III authorized the interception of wire and electronic communication to and from TT#21 (FSO 20-021).

211.    Based on my training and experience, I know that drug dealers and drug traffickers will commonly avoid naming the illicit narcotics in which they deal. Instead, they prefer to use innocuous, vague, and innocent-sounding words to refer to the narcotics. Here, I believe that ██████████ is using the word "this" and U291 is using the word "that" to refer to the item ██████████ is sending. Based on the texts referencing "Post office" and "USPS," I believe that ██████████ used the United States Postal Service to send the package. Based on the information set out below, I believe that ██████████ sent U291 illicit narcotics on September 24, 2020.

212.    On September 27, 2020, U291, using TT4705, sent two text messages to TT#21, used by ██████████, both of which read: "What's good??" On the following day, September 28, 2020, members of the investigative team intercepted several text messages between ██████████ using TT#21, and TT4705. Starting at approximately 1:07pm, ██████████ and TT4705 had the following conversation:

> TT4705: Make sure n send that 2day bro
>
> ██████████: Yeah
>
> TT4705: 2 of em
>
> ██████████: Yeah I know
>
> TT4705: Aight my nigga
>
> ██████████: I'm seeing it up now Ill pay for express shipping I been hella busy trying to get a couple fools outta jail
>
> ██████████ Sewing

213.    Based on the conversation, members of the investigative team believed that the user of TT4705 was requesting that ██████████ send drugs through the use of the postal service. Based on my training experience, I know that drug customers and drug traffickers will often use vague terms to describe narcotics in an effort to hide the illegal activity from law enforcement. In this case, when the user of TT4705 asked for "2 of em" I believe he/she was asking ██████████ to send two of a pre-determined weight of drugs. When ██████████ said he was "seeing it up now", and later corrected

Affidavit                                                     88

it to "sewing" I believe ▮▮▮▮▮▮▮▮ was relaying that he was packaging the drugs inside a sewed

material, so the contraband would be hard to detect by law enforcement.

214.    On September 29, 2020, at approximately 1:51pm, **BOOTH**, using TT9537, called

▮▮▮▮▮▮▮▮, using TT#21. The call was intercepted as part of the ongoing investigation and

monitored by members of the investigative team. The call went as follows (only the pertinent parts were

transcribed):

▮▮▮▮▮▮▮▮: Hello.

**BOOTH**: What's up?

▮▮▮▮▮▮▮▮: Are you coming over here or what?

**BOOTH**: What?

▮▮▮▮▮▮▮▮ Are you coming this day or no?

**BOOTH**: Yah where you at?

▮▮▮▮▮▮▮▮: My room.

**BOOTH**: Yeah I'm at this store in the mall yeah I'm coming.

▮▮▮▮▮▮▮▮: Ok 'cause I need you to do something for me.

**BOOTH**: What?

▮▮▮▮▮▮▮▮ Sew.

**BOOTH**: What?

▮▮▮▮▮▮▮▮: Sew.

**BOOTH**: Oh ok.

▮▮▮▮▮▮▮▮: I got to get it out by five.

**BOOTH**: Ok what time is it?

▮▮▮▮▮▮▮▮: It's two.

**BOOTH**: Oh god [inaudible]. It really doesn't take that long.

▮▮▮▮▮▮▮▮ I know well it's going to take me that long so please just try to hurry

and get here.

**BOOTH**: Sew an arm?

Affidavit                                          89

1      ██████████ uh?

2      **BOOTH**: To sew an arm?

3      ██████████ No no no no no you have to sew his asshole back together.

4      **BOOTH**: [inaudible] either way I sure do now. Why that part?

5      ██████████ Because I am sending two ounces.

6      **BOOTH**: Alright I'll be there what room is it?

7      ██████████: 308.

8      **BOOTH**: Ok.

9      215.   Based on the conversation, I believe ██████████ confirmed that he was packaging

10    drugs with the intention of shipping the package to the user of TT4705, and that **BOOTH** participated in

11    the packaging of the narcotics. When ██████████ asked **BOOTH** to "sew" I believe he was

12    referencing the previous call with TT4705 when he relayed that he was sewing up the package and

13    would use express shipping. I also believe when **BOOTH** agreed to "sew" and said "oh ok" to the

14    request, she knew that ██████████ intended her to sew a package containing drugs. This was

15    evident when **BOOTH** asked ██████████ why she had to sew the part specified by

16    ██████████ and he replied, "Because I'm sending two ounces". Based on my training and

17    experience, I know that "two ounces" would be a common weight a drug trafficker would prepare for

18    distribution. When **BOOTH** continued to agree to help with the request, I believe she again confirmed

19    that she knew ██████████ intended for **BOOTH** to help him package narcotics.

20    216.   ██████████, using TT#21, received a text message from the user of TT4705 at

21    3:07pm that said, "send it". ██████████ replied to the text message at 3:11pm and said, "It sewed

22    up I just gotta take it to post office it will be done goday". TT4705 responded and said, "K". Based on

23    the exchanged, I believe TT4705 was asking ██████████ to send the two ounces of narcotics, and

24    ██████████ affirmed that the drugs were within the package sewed by **BOOTH** as described above.

25    217.   On September 29, 2020, at approximately 4:00pm, members of the investigative team

26    located and observed Samantha **BOOTH** and ██████████ nter a black 2020 Chevrolet

27    Malibu with California license BB83T31. ██████████ entered the driver's side door of the Malibu

1   and **BOOTH** entered the passenger side. The vehicle was followed and surveilled by members of the

2   investigative team.

3       218.    At approximately 4:09pm, agents observed the vehicle arrive at the US Post Office

4   located at 655 Minnewawa Ave, Clovis, CA. Agents observed ▆▆▆▆▆▆▆ enter the post office

5   carrying a medium size light blue gift bag. Agents followed ▆▆▆▆▆▆ inside the post office and

6   observed ▆▆▆▆▆▆ take a large box up to the counter along with the blue gift bag to be packaged.

7   The gift bag was packaged and ▆▆▆▆▆▆ paid for the box to be shipped. Agents then observed

8   ▆▆▆▆▆▆ return to the Malibu and leave the area with **BOOTH**.

9       219.    Members of the investigative team remained at the Post Office and met with US Postal

10  Inspector Chris Morgan. Postal Inspector Morgan reviewed security footage and confirmed which

11  package ▆▆▆▆▆▆ was attempting to ship. Postal Inspector Morgan took custody of the package

12  while a search warrant was drafted for the contents. The package was addressed to "Danny Stalling" at

13  "88 Salmon Way Bldg 114, Dutch Harbor, AK, 99692.  The return address on the package was to

14  "Chase Roles" at "1635 E. Bulldog Ln #213, Fresno, CA, 93710".

15      220.    At 4:37 hours, ▆▆▆▆▆▆, using TT21, exchanged the following messages with the

16  user of TT4705:

17      ▆▆▆▆▆▆ There u go bud when u want the next one I'm gonna go buy the fucking

18      shit now and do it tonight…..this one was double wrapped and I put coffee up in it

19      **TT4705:** Ur the man

20      **TT4705:** Lil Danny sends his n says great sew job!!!

21      ▆▆▆▆▆▆**:** When u gonna shoot the payment cause I got prob enough for another

22      one?

23      **TT4705:** Shoot u something when I get off wk

24      221.    I believe the above exchange confirmed that the package ▆▆▆▆▆▆ attempted to

25  ship from the post office located at 655 Minnewawa Ave, Clovis, CA was the package that **BOOTH**

26  helped sew, and that the package contained narcotics. Based on my training and experience, I know that

27  narcotics traffickers attempt to hide drugs by using excessive packaging and potent scents in an effort to

28  Affidavit                                    91

hide the contraband from law enforcement and narcotic detecting dogs. This was evident when ████████████ told TT4705 "this one was double wrapped and I put coffee up in it". Additionally, when TT4705 responded and relayed that "Lil Danny" said "great sew job", he confirmed that the package contained the same item that **BOOTH** helped ████████████ sew.

222.    On September 30, 2020, a search warrant for the contents of the package shipped by ████████████ was signed by the Honorable Sheila K. Oberto, United States Magistrate Judge for the Eastern District of California. The search warrant was executed by members of the investigative team on October 1, 2020. Inside the package, agents discovered a blue gift bag with a stuffed teddy bear inside. Inside the bear, suspected methamphetamine was located and seized. The methamphetamine was later determined to weigh approximately 58 grams. .

223.    Based on the information above, I believe probable cause exists that Samantha **BOOTH** and ████████████ committed the following offenses: Conspiracy to Manufacture, Distribute, and Possession With Intent to Distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1); Manufacture, Distribution, and Possession With Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Section 841(a)(1); and Unlawful Use of A Communication Facility to Facilitate Drug Felony Violations, in violation of Title 21, United States Code, Section 843(b).

**N.    DISTRIBUTION OF METHAMPHETAMINE TO MONTANA, SEPTEMBER 19-30, 2020**

224.    Through a series of intercepted calls and texts made to and from TT#15, the investigative team was made aware that Jacob **RENSHAW** was in the Missoula, Montana area.

225.    On September 23, 2020, members of the investigative team intercepted text message communications between **BASH** on TT#9 and **RENSHAW** on TT#15.  In the messages, **BASH** tells **RENSHAW** "Picking up in Cali and going back".  **RENSHAW** then replies, "I should drive the charger there and come back with the doors packed…it's got insurance and clear".  **RENSHAW** then sent a text message photograph of a silver Dodge Charger with a distinctive push bumper on the front of the

Affidavit                                                                92

vehicle.  Based on my training, experience and knowledge of this investigation I believe that **BASH** was directing **RENSHAW** to drive to California to obtain drugs and drive the drugs back to Montana. Additionally, I believe **RENSHAW** was showing **BASH** the vehicle he would be driving for **BASH'S** approval.

226.    Later on September 23, 2020, members of the investigative team intercepted a three-way call between **BASH, MADSEN** and **RENSHAW**.  During the call, the three discuss having **RENSHAW** book a flight to Los Angeles to obtain a "package" from **MADSEN**, then drive it back to Montana.

227.    On September 24, 2020, members of the investigative team intercepted telephone calls between TT#9 (**BASH**), TT#7 (**MADSEN**) and TT#15 (**RENSHAW**) pertaining to **RENSHAW'S** trip from Montana to California.  Based on GPS locations for TT#15, **RENSHAW** was participating in these conversations while still in Montana.  The following are excerpts from a three-way conversation on September 24, 2020, between **BASH**, **MADSEN** and **RENSHAW**:

> **BASH:** Yo
>
> **RENSHAW:** Yes
>
> **BASH:** What's up sucka
>
> **RENSHAW:** What's up buddy?
>
> **BASH:** What are you doing? Where you at?
>
> **MADSEN:** What's up friend?
>
> **RENSHAW:** I am on the freeway.
>
> **BASH:** Where you going?
>
> **RENSHAW:** I'm going home.
>
> **BASH:** Alright.
>
> **MADSEN:** Wait, are you going to Fresno or you going to LA?
>
> **BASH:** He's going to LA.
>
> **RENSHAW:** Oh, ok, yeah.  I said, yeah, I said home, to Stephanie's house.
>
> **MADSEN:** Oh.

1   **BASH:** U/I

2   **RENSHAW:** Give me, give me uh at least 20 to 30 hours to get there.

3   **MADSEN:** Oh.

4   **BASH:** Yeah that's longer than the whole trip.

5   **MADSEN:** Yeah.

6   **RENSHAW:** Huh?

7   **BASH:** So you are barely leaving is what you are saying?

8   **RENSHAW:** Well yeah.

9   **BASH:** Have you left Montana yet?

10  **RENSHAW:** No.

11  **BASH:** What town are you in?

12  **RENSHAW:** Uh.  I'm gonna go through Idaho probably.  Let me see what my map says.

13  **BASH:** I didn't say where you are gonna go, are you on the freeway already left?

14  **RENSHAW:** No I'm getting onto it right now.

15  228.    Later on September 24, 2020, the investigative team intercepted text messages between

16  **MADSEN** on TT#7 and **RENSHAW** on TT#15, in which **RENSHAW** asks **MADSEN** for the name of

17  her street in Torrance, California.  **MADSEN** provided "Reynolds Drive Number 5" before providing

18  her full address "21014 Reynolds Drive Torrance 90503".  Based on multiple surveillance and my

19  knowledge of this investigation, I know Stephanie **MADSEN** to reside at 21014 Reynolds Drive #5,

20  Torrance, California.

21  229.    On September 26, 2020, members of the investigative team intercepted calls between

22  **RENSHAW** and **MADSEN** in which **RENSHAW** stated he was in the Los Angeles area and was

23  involved in a minor traffic collision.  Shortly after, calls were intercepted between **BASH** and

24  **MADSEN** pertaining to **RENSHAW** traveling to Fresno once he met with **MADSEN** at her residence.

25  The following are excerpts from that call:

26      **MADSEN:** So am I Cashapp'ing that?

27

28  Affidavit                                    94

**BASH:** Yeah U/I need to.  Either that or just give it to Jake because he is gonna to Fresno anyways.

**MADSEN:** Ok.  What is he going to Fresno for?

**BASH:** He is gonna take those pills, he's gonna take uh possibly possibly the gun, um…but I kinda want to take all the guns from him there because we don't want him driving with the guns and with the dope.

**MADSEN:** Oh, we are taking the dope down there to…to Fresno?  Or up there I mean?

**BASH:** Well, either way he's gonna go to Fresno.

**MADSEN:** I know, I'm just asking are…are we sending the white up there?

**BASH:** Well we're not U/I…he's taking it because he's gotta go…he's gotta go that way anyways.

**MADSEN:** Ok.

**MADSEN:** I have um…to go to Kohl's so I can pick something up to to put all that stuff in.

**BASH:** Uh…we need to put it in the car so…in the motherfucking door panels.

**MADSEN:** Ok.

230.     Based on my training and experience I know that people who buy and sell methamphetamine often refer to it as "white".  Based on my knowledge of this investigation, I believe that **MADSEN** and **BASH** are having a conversation about their plan to send methamphetamine to Fresno with **RENSHAW** on his way to Montana.  I also believe based on their conversation that they planned to hide the methamphetamine in the door panels of **RENSHAW'S** vehicle.

231.     On September 27, 2020, members of the investigative team intercepted a call from **RENSHAW** on TT#15 to **MADSEN** on TT#7.  In the call, **RENSHAW** told **MADSEN** that he was stopped in Riverdale where he was visiting family but would be leaving to Fresno.  **MADSEN** then received a message from **BASH** on TT#9 asking her to track **RENSHAW'S** location.  **MADSEN** told **BASH** that **RENSHAW** was on "the 41 driving toward Fresno".  Based on my training and experience and knowledge of this investigation, I believe these communications were **BASH** and **MADSEN**

monitoring the location of their load of methamphetamine.  According to **RENSHAW'S** GPS location for TT#15, he arrived in Fresno later that night.

232.    On the morning of September 28, 2020, members of the investigative team intercepted a text message from **BASH** on TT#9 to **RENSHAW** on TT#15.  The message stated "You got more dope to pick up Dawgie".  Based on my training and experience, I believe this message meant that **RENSHAW** was being ordered by **BASH** to pick up more methamphetamine for delivery to Montana.  **RENSHAW** replies "From?"  Later in the day, **BASH** contacted **RENSHAW** and directed him to the residence of S.R. at 1038 Palo Alto Avenue, Clovis, California.[48]  Based on the aforementioned intercepted calls[49] investigators believed that S.R. was in possession of methamphetamine that **BASH** had moved through **MADSEN** from Torrance to Fresno.

233.    On September 29, 2020, members of the investigative team initiated surveillance on **RENSHAW** in Fresno, California.  At approximately 11:11 hours, the investigative team intercepted a call from **BASH** on TT#9 to **RENSHAW** on TT#15.  During the call, **RENSHAW** told **BASH** that he would be leaving in a couple hours.  **BASH** was heard telling **RENSHAW** that he should leave before dark.

234.    Members of the investigative team continued surveillance on **RENSHAW** until he arrived to an unknown location in Ceres, California.  Due to a large perimeter on the GPS location for TT#15, surveillance units initially could not locate **RENSHAW**.  At approximately 0852, **RENSHAW** turned on TT#22, and a precise location was discovered to be at 7805 Monterey Avenue, Ceres, California.  Surveillance units initiated surveillance on **RENSHAW** in the same silver Dodge Charger as it traveled north on Highway 99, with a final destination of Montana.

235.    The California Highway Patrol-Turlock office was provided the vehicle information for **RENSHAW** and an enforcement stop was conducted on Highway 99 near Hammer Lane for violation of California Vehicle Code, Section 22349(a).  **RENSHAW** was issued a citation and released at the

---

[48] See paragraph 173 above.
[49] See paragraph 264 above.

scene, however the silver Dodge Charger was seized pursuant to a state of California search warrant[50]. The vehicle was transported to the Stockton California Highway Patrol office, where members of the investigative team from the California Highway Patrol conducted a search of the vehicle.  The following items were located inside the right front door panel:

- Sealed Ziploc bag containing 461.8 grams of suspected methamphetamine
- Sealed Ziploc bag containing 430.8 grams of suspected methamphetamine
- Sealed Ziploc bag containing 459.8 grams of suspected methamphetamine
- Sealed Ziploc bag containing 464.7 grams of suspected methamphetamine
- Sealed Ziploc bag containing 465 grams of suspected methamphetamine
- **Total weight of suspected methamphetamine: 2282.1 (5.02lbs)**

236.   Based on the above stated facts, there is cause to believe that **BASH**, **RENSHAW** and **MADSEN** conspired to transport methamphetamine to Montana for distribution, in violation of Title 21, United States Code, Section 846.

### O.   ZACHOCKI, AND ▮▮▮▮▮ ARE FELONS WHO POSSESSED A FIREARM

237.   ▮▮▮▮▮ and **ZACHOCKI** were in possession of a firearm on October 3, 2020. Both are felons.  Between October 2 and 3, 2020, a series of calls were intercepted between **MORGAN**, W.P.[51], **BASH**, **ZACHOCKI**, **MADSEN**, and ▮▮▮▮▮ discussing arrangements to get a gun or guns to ▮▮▮▮▮ to use in murdering C.W., who they suspected of sexually assaulting two minors who ▮▮▮▮▮ referred to as his sisters. .

238.   On October 2, 2020, **MORGAN** talked to **BASH** on the phone, and advised **BASH** that he should call ▮▮▮▮▮ **MORGAN** provided **BASH** with ▮▮▮▮▮ phone number, and told **BASH** that W.P. said that **BASH** knew ▮▮▮▮▮ **BASH** confirmed he knew

---

[50] On September 28, 2020, a member of the investigative team obtained a search warrant from the Fresno County Superior Court.  The search warrant for **RENSHAW'S** silver Dodge Charger was authorized by the Honorable Judge Alvin Harrell.

[51] The initials W.P. will be used throughout this affidavit to protect the identity of an individual not being charged in the affidavit.

Affidavit                                             97

1  **MORGAN** said that ▆▆▆▆ had a major problem and that **BASH** needed to call him right

2  away.  Minutes later, using the number **MORGAN** provided, **BASH** using TT#called ▆▆▆▆▆

3  The following are excerpts from that call**:**

4  ▆▆▆▆▆ Hello?

5  **BASH**: ▆▆▆▆ Sup bro.

6  ▆▆▆▆▆ **BASH** how you doing dog?

7  **BASH**: Alright how are you doing?

8  ▆▆▆▆ I'm alright I mean could be worse could be better you know.

9  **BASH**: What's going on?

10  ▆▆▆▆ Trying to find this fucking lame bro right now. I'm going to find him but

11  um..you already got the word? Pretty much? Probably? Waylon told you?

12  **BASH**:  No just that I was given your number and said that I needed to call you ASAP.

13  ▆▆▆▆ Alright well this fool supposedly touched my little sisters.

14  **BASH**: Oh really?

15  ▆▆▆▆ Yeah they're at the hospital right now you know what I mean?

16  **BASH**: Ok well who is it?

17  ▆▆▆▆ C.W[1].

18  **BASH**: Ok where is he at?

19  ▆▆▆▆ He's um I'm going to find him I'm just fucking I'm everywhere right now

20  trying to fucking figure out where he is I'm lurking um he's somewhere here in Red Bluff

21  right now so…

22  **BASH**: So what do you need?

23  ▆▆▆▆ Dog I need…I need…I need pretty much just something. Something you

24  know that…

25  **BASH**: Right

26  
27  _____
[1]The initials "C.W." are being used to protect the identity of the potential murder victim who is
not being charged in this affidavit.

28  Affidavit                                                                98

1      Yeah

2 **BASH**: Well I got people soon I'd send your way but they're literally at the bail bonds

3 trying to bail fuckin' my boy out right now though you know what I mean?

4      Right

5 **BASH**: And my other boy just got shot four times like three nights ago dog so um I could

6 find someone to send that way but if you need something?

7      Yeah I prefer that dog cause I'm trying to handle it bro you know like I am

8 going to.

9 **BASH**: Well when do you want to grab them?

10     Fuckin' right now you know what I mean? If I could bro.

11 **BASH**: Ok look…well come on down dog come get it.

12     Alright well where is that?

13 **BASH**: It's in LA right? It's in LA but I can probably get it to Fresno…tomorrow

14 morning.

15     That would be legit. Alright. Yeah that would be cool cause then I can just

16 uh I can have him fuckin' you know what I mean probably spotted by then.

17 **BASH**: Ok well um yeah

18     I can have my brother post up and fuckin' figure out where he's at.

19 **BASH**: Well I wouldn't talk or text about it.

20     No no never.

21 **BASH**: When are you going to head down?

22     Well I have to go pick up um pick up another car real fast and then I can

23 leave you know what I mean? But you think that you possibly could get it to that possibly

24 halfway?

25 **BASH**: Where to Fresno?

26     Yeah.

27 **BASH**: Yeah but not until tomorrow.

28 Affidavit         99

1     ██████████████ No that's cool.

2     **BASH**: Probably tomorrow afternoon or sometime.

3     ██████████████ Well I was going to say I'll head down there fucking like maybe you know

4     what I mean sometime tonight or around.

5     **BASH**: Do you have an ID?

6     ██████████████ Yeah but I got my girl…

7     **BASH**: Do you have an ID and shit?

8     ██████████████ Yeah

9     **BASH**: Look up..have you ever been on a plane?

10     ██████████████ Um no I haven't.

11     **BASH**: Look up flight to LA bro.

12     ██████████████ Alright. Alright. They're hella cheap right now too.

13     **BASH**: No they're starting to go back up dog but look up the flights to LA.

14     ██████████████ Alright.

15     **BASH**: Ok what's the major city that you're in?

16     ██████████████ Um I'm right by Chico.

17     **BASH**: You can start heading down whenever you want I just won't be able to get…the

18     guns are in LA you can go all the way there and get them tonight or um…look up the

19     flight.

20     ██████████████ Alright I'll look up the flight the airlines right now then fuckin' I'll get

21     back to you.

22     **BASH**: Alright bro later.

23     ██████████████ Alright I appreciate it.

24     239.     Based on my training and experience and knowledge of this investigation, I believe

25     ██████████ and **BASH** were making arrangements for **BASH** to get ██████████ a gun.  Following

26     this call, **BASH** engaged in a series of calls with **MORGAN**, **MADSEN**, and others in an effort to

Affidavit            100

secure a gun and get it to [REDACTED] Ultimately, as set forth in more detail below, **BASH** secured a

gun for [REDACTED] through **ZACHOCKI**.

240.     On October 2, 2020, at approximately 9:42pm, **BASH** sent a text message to Stephanie

**MADSEN**. The text message said, "Bbe reach out to Meghan right and get lil David # pls ASAP 911".

Based on my knowledge of the investigation and conversations with other members of the investigative

team, I know that "Lil David" is the moniker for David **ZACHOCKI**.

241.     On October 2, 2020, at approximately 9:56pm, **MORGAN** sent a text message to an

unknown party (UM242) using (530) 965-6314 (TT6314). **MORGAN** sent a message that said, "Germ

from sac? No.". TT6314 replied, "I MIGHT HAVE BEEN IN THE BAY W HIM BUT NOT SURE

BRO." **MORGAN** then sent a message that said, "Dam. Ok thank you. We got a stichuation with

waylons girl and need some one to take car parts from sac to red bluff or half way." Based on the text

message exchange, I believe when **MORGAN** told the user of TT6314 that "We" had a situation with

"waylons girl", **MORGAN** was relaying that the AB was dealing with a situation involving W.P.'s

girlfriend. Additionally, I know criminals use innocuous words to hide criminal activity. In this instance,

I believe **MORGAN** used the term "car parts" to represent "guns". When **MORGAN** said he needed

someone to take "car parts" to "red bluff" or halfway, I believe he was stating that he needed someone to

bring a gun to [REDACTED] near Red Bluff, CA.

242.     On October 2, 2020, at approximately 10:33pm, **MORGAN** received a call from

[REDACTED]. At the start of the call, [REDACTED] asked if this was "**BASH**". **MORGAN** replied that

this was, "Todd". **MORGAN** and [REDACTED] then had the following conversation (only the pertinent

portions were transcribed):

> **MORGAN**: Everybody's trying to get ahold of you. You need to answer your fuckin'
>
> phone, you need to answer your fuckin' texts.
>
> [REDACTED] I…I…that's my bad I fuckin' my phone was in my car and I was handling
>
> something you know like..it's my fault my bad.
>
> **MORGAN**: Yeah.  Check it out.  We get it right? Where are you at right now?
>
> [REDACTED] I'm fucking…I'm at home.  Close by.

**MORGAN**: Ok look check it out. Unless you know what the fuck you're doing right now you need to fuckin' just kick back and let us fuckin' take care of it right? 'Cause were trying to get something to you, you don't have nothing right now?

██████████ nah

**MORGAN**: Well we're working on getting this to you right? If we can't get ahold of you, and fuckin' find out where the fuck you are, how are we going to do it? You know what I mean? We're going to have a guy come from Sac to you somehow. You know what I mean?

██████████ Alright

243.     Based on the conversation, I believe **MORGAN** confirmed that the AB was actively working to supply a firearm to ██████████ to use in the murder of "C.W.". When **MORGAN** told ██████████ "Unless you know what the fuck you're doing right now you need to fuckin' just kick back and let us fuckin' take care of it right?", I believe **MORGAN** was telling ██████████ that if he could not handle planning and executing the murder, the AB would complete the murder another way. I also believe when **MORGAN** told ██████████ that, "We're going to have a guy come from Sac to you somehow", **MORGAN** was relaying that an AB associated gang member would meet him with a firearm to complete the murder. I also believe that by saying "let us" take care of it, **MORGAN** was referring to the AB and its members.

244.     On October 3, 2020, at approximately 10:49am, **BASH** received a call from **MADSEN**. During the call, **BASH** asked **MADSEN** if "Meghan" got "David's" number. **MADSEN** said she did not know who "David" was and **BASH** replied that he needed "David's" number from Stockton. Based on the prior conversation with **MADSEN** in which **BASH** told **MADSEN** to ask "Meghan" for "Lil David's" number, I believe **BASH** was referring to David **ZACHOCKI**, since "Lil David" is the moniker for **ZACHOCKI**. The conversation continued and **BASH** and **MADSEN** discussed bringing money up to Sacramento. **BASH** then said, "if we got this toy going all the way up towards Redding they're going to have to pass through Sacramento." Based on the comment, I believe **BASH** was

Affidavit                                             102

1  substituting the word "toy" for "gun". I believe based on **BASH**'s statement that he intended someone to

2  retrieve a firearm from **MADSEN** and transport it to ⬛⬛⬛⬛⬛ in northern California.

3      245.      On October 3, 2020, at approximately 11:08am, Stephanie **MADSEN** received a text

4  message from (406) 559-6128 (TT6128). The text message said, "Lil David Z Mobile  -(209) 570-

5  9581". Based on the text message, I believe (209) 570-9581 (TT9581) was the number for David

6  **ZACHOCKI**, since "Lil David" was **ZACHOCKI**'s moniker, and **BASH** had asked **MADSEN** to find

7  the number for "Lil David".

8      246.      On October 3, 2020, **BASH** called **ZACHOCKI** on TT9581. At the start of the

9  conversation, **ZACHOCKI** relayed that he was going to jail soon for charges related to "pistols" but he

10  was out on bail. **BASH** and **ZACHOCKI** then had the following conversation (only the pertinent

11  portions were transcribed):

12          **BASH**: They need a favor

13          **ZACHOCKI**: What's up?

14          **BASH**: Can you get your hands on any pistols? Do you have any pistols right now in

15          Stockton for sale? Do you have any you're willing to trade?

16          **ZACHOCKI**: Yeah

17          **BASH**: Ok. One of the brothers fuckin' um ah I don't know if you remember Beaver and

18          Waylon?

19          **ZACHOCKI**: Yeah

20          **BASH**: The ones that put me in the hat a long time ago you know when you had to

21          [inaudible]

22          **ZACHOCKI**: Yeah yup yeah

23          **BASH**: Waylon's daughters..he has two daughters and uh they got fuckin' ah they're like

24          13 or 14, 15 or 16 they got shot up with dope and fucked and raped and more shit bro

25          right

26          **ZACHOCKI**: Oooh

27

28  Affidavit                    103

**BASH**: Yeah dog one of those and this is up in Chico and Redding dog they need a pistol right well I got the shit coming I got pistols I got some nice ass bangers but they're in LA and I'm having issues getting them to Fresno.

**ZACHOCKI**: mmhm

**BASH** So I just need either I need to buy one pick one up and replace it or…I need to put something in someone's hand bro and they're willing to drive to get it which is Waylon's step-son.

**ZACHOCKI**: So there's an AR pistol for 13

**BASH**: What's it look like?

**ZACHOCKI**: It looks good it's an AR pistol it's not the regular it's the stock the looks like a bar you know what I mean the one that recoils?

. . .

**BASH**: I'll show you which one's I have right? And if we can do some time of trade. The thing is I'm trying to keep dude from having to drive all the way to Fresno bro you hear what I'm saying?

**ZACHOCKI**: Yeah.

**BASH**: But I'll show which ones I got and if it's fuckin'…I got some chunky shit right now bro. Like four of them bro. Extended…I got 30 round clips for nines.

**ZACHOCKI**: Right now I got a Glock 19 with a [inaudible] 30, 17 stock clips.

**BASH**: Ok which one do you care the least about bro?

**ZACHOCKI**: Right now I got one that's actually mine and the other one bro is my boys but I can get more you know what I mean?

**BASH**: Well I'll buy it I'm trying to go around spending the money dog because I got pistols bro.

**ZACHOCKI**: Yeah yeah

**BASH**: I ain't trying to pay fuckin' shit

**ZACHOCKI**: I know I already know. I paid a rack for every pistol with a clip.

Affidavit

104

**BASH**: Everyone is right now.

**ZACHOCKI**: They come out with fuckin' grips and clips so everyone's fuckin' taxing….

**BASH**: So with that being said bro with that right there basically that's like a huge favor that you're pulling off you know what I'm saying for sure.

**ZACHOCKI**: I'm going to go try and get one and talk to you.

247.    Based on the conversation, I believe **BASH** now intended to use **ZACHOCKI** as a source to get a firearm that ███████ I believe this because **BASH** described the situation as involving "W.P.'s daughters" and said he needed to "put something" in "someone's hand" and said it was for W.P.'s stepson, which I know is ███████ I know based on my training and experience that when **BASH** said he wanted to put "something" in "someone's hand" he meant he wanted to supply a gun to ██████.

248.    On October 3, 2020, at approximately 1:28pm, **BASH** contacted **MORGAN**. **BASH** and **MORGAN** discussed ██████ being on an ankle monitor.  **BASH** informs **MORGAN** that **BASH** called his "old cellie" "Lil' David", and that he was in Stockton and could get a gun.   **BASH** also tells **MORGAN** that he has "his girl" going up with a gun also.  **MORGAN** again mentions that ██████ is on an ankle monitor and asked **BASH** when **BASH** learned of this.  **BASH** says, "Late last night but I didn't want to fuckin' not bring those through just in case you had an alternate person."  **MORGAN** responds, "This is another one of those things like nice if you could fuckin' tell us the whole story."

249.    Based on the conversation, I believe **BASH** was actively working to supply a firearm to ██████.  When **BASH** explained that he did not want ██████ to come to Fresno, due to his ankle monitor, but wanted to check with **MORGAN** if there was an "alternate", I believe **BASH** was inquiring if they had an alternate person in line to carry out the murder.

250.    On October 3, 2020, at approximately 2:52pm, **BASH** received a text message from **ZACHOCKI** that said, "I got one for u but she a lil big thang lol .22 long has a clip." I know from my training and experience that in common text message shorthand, "u" means "you", and "lol" means laugh out loud. I also believe, based on my training and experience, that in the context of the other

conversations with **ZACHOCKI**, when he said he had a "lil big thang", **ZACHOCKI** was referring to a firearm. I also know, based on my training and experience, that a ".22" is a firearm that fires .22 caliber ammunition, and a "clip" is a magazine. Based on the text message, I believe **ZACHOCKI** told **BASH** that he has a .22 caliber pistol with a magazine available for **BASH**. **BASH** replied, "Show me", which indicated he was interested in acquiring the firearm. At 3:00pm, **ZACHOCKI** sent **BASH** a text message that said, "Ima go buy it now". Based on the message, I believe **ZACHOCKI** was relaying to **BASH** that he was going to purchase the firearm for **BASH** to use for ▇▇▇▇▇▇▇

251.      On October 3, 2020, at approximately 4:06pm, **BASH** sent a text message to **ZACHOCKI** that said, "how much". **ZACHOCKI** replied, "I got u". **BASH** then responded, "Thanks bro". **ZACHOCKI** then said, "It's a gift brother for wat you've done for me. I got it on my lap for u rn bro". Based on the exchange, in the context of **BASH**'s previous conversation with **ZACHOCKI**, I believe **ZACHOCKI** was relaying to **BASH** that he purchased the .22 caliber pistol and had it in his possession for **BASH**.

252.      On October 3, 2020, at approximately 5:29pm, **MORGAN** sent a text message to **BASH** that said, "Hes gonna call u now. Chanse". **BASH** replied, "Ok. I told him not to go no where. He was gonna go now to fresno." Based on the exchange, I believe **BASH** was relaying to **MORGAN** that ▇▇▇▇▇▇▇ was no longer going to come to Fresno to retrieve a firearm for the murder, as was also being coordinated by **BASH**, because now ▇▇▇▇▇▇▇ could meet **ZACHOCKI** in Stockton and retrieve the .22 caliber pistol from **ZACHOCKI**.

253.      On October 3, 2020, at approximately 5:56pm, **BASH** sent a message to **ZACHOCKI** that said, "Just told the BRO the assistance you provided today Bro". Based on my training and experience, I know that AB members refer to other members as "brothers". I believe in this message, **BASH** was relaying to **ZACHOCKI** that he told **MORGAN**, a validated AB member, that he contributed to the plot by supplying a firearm.  At 6:05pm, **BASH** sent a message to **ZACHOCKI** that said, "be ready to meet." Based on the message, I believe **BASH** was telling **ZACHOCKI** that he would meet with ▇▇▇▇▇▇▇ soon to deliver the gun.

Affidavit                                                106

254.     Seconds after **BASH** sent the text message to **ZACHOCKI**, **BASH** called ████████ During the call, **BASH** asked ████████ if he was "ready to hit the road" and ████████ affirmed that he needed to make one stop and then would be ready. **BASH** then asked ████████ how long it would take him to get to Stockton. ████████ said it would take a few hours and **BASH** said "that's where you need to be". ████████ said he would leave in approximately thirty minutes. Based on the call, I believe **BASH** confirmed that ████████ was going to Stockton to meet with **ZACHOCKI** and retrieve the firearm.

255.     Following the conversation, **BASH** arranged with **ZACHOCKI** a place to meet ████████ to retrieve the firearm. **ZACHOCKI** sent a text to **BASH** and said, "315 N 10th Street, Sacramento, CA 95811, USA". The text had a geo-location pin showing the address.

256.     On October 3, 2020, at approximately 7:35pm, **MORGAN** sent a text message to ████████ The message said, "Hey let us know when yall got it together. We got a guy ready to go to u now im not sending him on the way if u want going to meet him and let him know where to go." Based on the message, I believe **MORGAN** was in contact with **BASH** about the arrangement with **ZACHOCKI**, and **MORGAN** was an active participant in the plan to use **ZACHOCKI** to supply the firearm to ████████ I believe this is evident when **MORGAN** said, "We got a guy ready to go". I believe when **MORGAN** said "we" he was relaying to ████████ that the AB had arranged **ZACHOCKI** as a gun supplier for ████████

257.     On October 3, 2020 at approximately 8"45 pm, a call was intercepted in which **BASH** told the recipient of the call, "I called my boy in Stockton right my old cellie?" **BASH** then relayed to the recipient his conversation with **ZACHOCKI** and told him that **ZACHOCKI** was going back to prison soon. **BASH** told the caller that he told **ZACHOCKI** "the gist of what's going on" and that **ZACHOCKI** said they "definitely needed to do something" and that he would "rather do it out here than in there". Based on my knowledge of the investigation I believe that **ZACHOCKI** was agreeing he needed to provide ████████ with a gun.

258.     **BASH** continued and said, "He went out and bought the thing ████s coming to get. He went out and bought it tonight. I hit him up this morning he was like hey I'm going to make my

1   rounds, I'll pick something up. So he went out and picked it up and was like alright here." I believe

2   based on my training and experience, when **BASH** said that "he went out and bought the thing ████ is

3   coming to get", **BASH** was relaying that **ZACHOCKI** went out and acquired the firearm that was

4   intended for ████████

5       259.       On October 3, 2020, at approximately 11:38pm, **BASH** was contacted by ████████

6   During the call, ████████ told **BASH** that he was "here". **BASH** said he was just talking to

7   "Beaver", who I know is **WEAVER**. During the conversation, **ZACHOCKI** began speaking to **BASH**.

8   Members of the investigative team who are familiar with ZACHOCKI's voice from listening to other

9   calls that were being intercepted, recognized **ZACHOCKI**'s voice. Based on the fact that ████████

10   said he was "here" and was sharing the phone with **ZACHOCKI**, I believe ████████ and

11   **ZACHOCKI** met in order for ████████ to retrieve the firearm from **ZACHOCKI**. Later in the

12   conversation, **BASH** told **ZACHOCKI** to "send him with that one then bro. Send him with the .22"

13   **ZACHOCKI** agreed. Based on the fact that **BASH** told **ZACHOCKI** to "send him with that one" and

14   then clarified to send him with the ".22", I believe **BASH** was telling **ZACHOCKI** to give the .22

15   caliber firearm to ████████ Based on **ZACHOCKI**'s affirmation, I believe **ZACHOCKI** gave

16   ████████ the firearm.

17       260.       On October 4, 2020, at approximately 1:23am, **BASH** called ████████ **BASH** and

18   ████████ had the following conversation (only the pertinent portions were transcribed).

19       **BASH**: Hey that pistol right?

20       ████████ Yeah

21       **BASH**: Where do you got that thing at?

22       ████████ Uh it's in a little…a little fuckin' lock box fuckin' locked inside

23   the…inside the fuckin' dash thing.

24       **BASH**: Yeah alright. Woah in the glovebox or?

25       ████████ Hold up let me…I get all tripped out and shit with this little thing that I'm

26   wearing.

27       **BASH**: Yeah I didn't tell you put that thing up under behind the dash like…

28

1   ████████ Yeah.

2   **BASH**: Like it's not in the glovebox or nothing stupid right?

3   ████████ No.

4   **BASH**: Alright fool.

5   ████████ No it's in a little lock box thing.

6   **BASH**: Alright bro I was just checking.

7   ████████ Yeah I got you.

8   261.   Based on the conversation, I believe ████████ confirmed that he currently possessed

9   the pistol given to him by **ZACHOCKI**. When **BASH** asked ████████ where he had "that thing at"

10  and clarified that he was talking about the "pistol", I believe **BASH** confirmed that the pistol possessed

11  by ████████ was the same that was given to him by **ZACHOCKI**. I know based on my training and

12  experience, that criminals will often use innocuous sounding words in place of words describing illegal

13  activity to conceal their activities from law enforcement.

14  262.   Agents located ████████ vehicle based on a precise location ping, and at

15  approximately 12:39am, agents observed the vehicle pull into Jack in the Box restaurant located at 920

16  Hammer Lane, Stockton, CA. An agent on scene observed a female driver, and identified the male

17  passenger as ████████ Agents continued to observe the vehicle as it navigated away from Jack in

18  the Box. At approximately 1:28am, officers from Stockton Police Department (SPD) conducted a

19  prearranged enforcement stop on the vehicle occupied by ████████ During the stop, ████████

20  was positively identified and a vehicle search was conducted. A Phoenix Arms, Model 22, .22 caliber,

21  pistol with serial number 4133114 was recovered from inside the vehicle. The magazine that was

22  inserted into the firearm contained two live rounds of .22 caliber ammunition.

23  263.   A firearms trace was completed on the firearm possessed by **ZACHOCKI** and

24  ████████ and it was determined that the Phoenix Arms, Model 22, .22 caliber, pistol with serial

25  number 4133114 was manufactured in the state of California, however was first sold in the state of

26  Missouri and traveled in interstate commerce.

27

28  Affidavit                                    109

264.    I reviewed Tehama County Superior Court records, which showed that ▮▮▮▮▮▮▮ has the following felony conviction:

    a.    A July 2019 felony conviction for violating California Penal Code, Section 29820(b), unlawful firearms activity, which is punishable by up to five years in prison, for which he was sentenced to five years

265.    I reviewed San Joaquin County Superior Court records which showed that **ZACHOCKI** has the following prior felony convictions:

    b.    A February 2012 felony conviction for violating California Penal Code, Section 459, first degree burglary for which he was sentenced two years in prison.

    c.    A January 2013 felony conviction for violating California Health and Safety Code, Section 11378, possession of a controlled substance for sale, for which he was sentenced to 32 months in prison

    **d.**    A February 2016 felony conviction for violating California Health and Safety Code, Section 11378, possession of a controlled substance for sale, for which he was sentenced to 48 months in prison.

266.    Based on the above stated facts, I believe probable cause exists that David **ZACHOCKI** and ▮▮▮▮▮▮▮▮▮▮ each possessed a firearm in violation of Title 18, United States Code, Section 922(g)(1).

    **P.**    **Jacob RENSHAW, Amanda GOURLEY, and** ▮▮▮▮▮▮▮▮**CONSPIRE TO DISTRIBUTE METHAMPHETAMINE TO MONTANA, OCTOBER 12-15, 2020**

267.    Beginning on October 12, 2020, the investigative team intercepted several pertinent conversations, which detailed a conspiracy to distribute narcotics to Montana between Kenneth **BASH**, Jacob **RENSHAW**, Stephanie **MADSEN**, Amanda **GOURLEY**, and ▮▮▮▮▮▮▮

268.    On October 12, 2020, at approximately 8:15pm, **MADSEN**, using TT#41[52], received a

---

[52] On October 11, 2020, the Honorable Fresno County Superior Court Judge Alvin M. Harrell authorized the interception of wire and electronic communications to and from (406) 696-2685 (TT#41), used by Stephanie **MADSEN**. **MADSEN** was identified as the user of the phone after she called Verizon Wireless using TT#7 and identified herself as Stephanie **MADSEN** to set up the phone. An

1  call from **BASH**, using TT#42[53]. The following is a transcript of the conversation (only the pertinent

2  portions were transcribed):

3        **BASH**: Can we put that shit packed in a duffel bag ready to go in case –

4        **MADSEN**: In case I die?

5        **BASH**: No in case **GOURLEY**'s there and [inaudible] there. If they do can you get that

6        duffel bag [inaudible].

7        **MADSEN**: Are you sending people here?

8        **BASH**: It was supposed to be today but then they couldn't get the rental Amanda took the

9        –

10       **MADSEN**: Why are you coming to get it?

11       **BASH**: Cause we're going to Montana.

12       **MADSEN**: Oh. Who?

13       **BASH**: Amanda and fuckin' uh Amanda and Jake she's going to do uh –

14       **MADSEN**: Oh hell.

15       **BASH**: What?

16       **MADSEN**: Jake?

17       **BASH**: Amanda and Jake.

18

19  order authorizing the interception of communications regarding (310) 920-9611 (TT#7), used by
20  Stephanie **MADSEN**, was signed by the Honorable Alvin M. Harrell III, Judge of the Superior Court of
    the State of California, County of Fresno, on 9/16/2020. TT#7 was activated under **MADSEN**'s name
21  and address on 2/28/2020. The subscriber is listed as Stephanie **MADSEN**, at a listed address of 21014
    Reynolds Drive, Apartment #5, Torrance, California, 90503. Additionally, Stephanie **MADSEN** was
22  identified as a regular visitor to Kenneth **BASH** in Salinas Valley State Prison. Intelligence from CDCR
    indicated Stephanie **MADSEN** was the "secretary" for Kenneth **BASH**. Pen register data for TT#7
23  indicated several frequent contacts with other Fresneck/AB associated gang members who also
    communicated regularly with Kenneth **BASH**.

24       [53]On October 12, 2020, the Honorable Fresno County Superior Court Judge Alvin M. Harrell (TT#42),
    authorized the interception of wire and electronic communications to and from (559) 519-5180 (TT#42),
25  used by Kenneth **BASH**. **BASH** was identified as the user of the phone after contacting his wife, Kristen
    **BASH**, in addition to several other frequent contacts used by **BASH** on other lines. Additionally, several
26  subjects of the investigation referred to the user of TT#42 as "B", which was a common moniker
    associated with **BASH**.

27

28  Affidavit                                        111

1    **MADSEN**: Oh my god.

2    **BASH**: She takes control she's like this fool can't lollygag she know's she'll just call me

3    and be like hey this fools acting weird or this fools fuckin' [inaudible] you know what I

4    mean? I'll say hey motherfucker come on dude. She's trying to wake up like – she's

5    trying to leave at like three or four in the morning and be there at like ten or eleven at

6    night. Goodluck on that one but…you know? They should be able to – there's no reason

7    they shouldn't be able to do it fuckin' with ah two drivers.

8    **MADSEN**: Ok

9    ….

10   **MADSEN**: You're going to have to let me know beforehand so I know what to leave

11   cause when they get here I want to know what the fuck is going on.

12   **BASH**: I know that why I [inaudible] just pack the shit in a duffel bag [inaudible]

13   **MADSEN**: Alright can we trust this girl? Hello?

14   **BASH**: Hello. Alright listen I don't want to argue. This conversation like just figure out

15   what needs to be done.

16   **MADSEN**: I didn't hear you but ok.

17   ….

18   **MADSEN**: Ok can I take a little bit more out of it?

19   **BASH**: Yeah. How much?

20   **MADSEN**: Uh how much do you think for –

21   **BASH**: What's you're monthly [inaudible]

22   **MADSEN**: Alright how much do you think you like books and mail?

23   **BASH**: How much do we have exactly?

24   **MADSEN**: Seven pounds but I took out an ounce.

25   **BASH**: Seven or eight?

26   **MADSEN**: We had ten I gave him three.

27   **BASH**: Uhhh [inaudible]

28   Affidavit                                   112

1    **MADSEN**: Four

2    **BASH**: What?

3    **MADSEN**: There's four

4    **BASH**: How is there four. Double triple check.

5    **MADSEN**: There's only four

6    **BASH**: That's impossible.

7    269.     I know based on my training and experience that drug traffickers often refer to narcotics

8    by innocuous names to hide their illegal activity. When **BASH** told **MADSEN** to "put that shit packed

9    in a duffel bag", I believe **BASH** was asking **MADSEN** to pack narcotics in the bag. When **BASH**

10   continued to tell **MADSEN** that "**GOURLEY**" might go to meet **MADSEN** and later said that

11   "Amanda" was getting the rental car, I believe **BASH** was telling **MADSEN** that Amanda **GOURLEY**,

12   aka BIGGIE, a known Skinhead associate, was coming to pick up the narcotics. When **BASH** told

13   **MADSEN** that "were going to Montana", I believe **BASH** was relaying to **MADSEN** that the drugs

14   were meant to be transported to Montana. When **BASH** continued and said that "Amanda" and "Jake"

15   were coming to pick up the narcotics, I believe **BASH** was referring to **GOURLEY** and Jacob

16   **RENSHAW**. **RENSHAW** was a known Fresneck associate who was previously intercepted during the

17   ongoing investigation, had several pertinent conversations with **BASH** regarding narcotics, and was

18   known to distribute narcotics on behalf of **BASH** in Montana[54]. When **BASH** told **MADSEN**, "there's

19   no reason they shouldn't be able to do it fuckin' with ah two drivers", I believe **BASH** affirmed that

20   **GOURLEY** and **RENSHAW** were meant to transport the narcotics to Montana.

21   270.     When **MADSEN** asked **BASH** if she could "take a little bit more out of it", I believe

22   **MADSEN** was asking **BASH** if she could keep a portion of the narcotics meant to be picked up by

23

24   [54] Beginning on approximately September 18, 2020, members of the investigative team
     intercepted several conversations between **BASH**, using TT#9, **MADSEN**, using TT#7, and
25   **RENSHAW**, using TT#15, which detailed a plan for **RENSHAW** to drive from Montana to
     **MADSEN**'s residence and deliver two firearms. From there, **RENSHAW** was to transport narcotics
26   back to Montana. **RENSHAW** was surveilled by members of the investigative team as he transported
     the drug load through California. On September 30, 2020, a traffic stop was conducted on
27   **RENSHAW**'s vehicle and the vehicle was towed. A search warrant was acquired for the vehicle and
     approximately 6.6 pounds of methamphetamine was recovered from inside the vehicle.

28   Affidavit                                113

**GOURLEY** and **RENSHAW**. This was made clearer when **MADSEN** asked, "Alright how much do you think you like books and mail?" I know from my training, experience, and conversations with members of the investigative team that inmates, such as **BASH**, often smuggle drugs and contraband through the use of mail and books with false bindings. Furthermore, when **BASH** asked **MADSEN** "how much do we have exactly", I believe **BASH** was asking **MADSEN** how much drugs **MADSEN** was holding at her residence. I know based on my training and experience that narcotics traffickers often deal with narcotics in pound increments. When **MADSEN** replied that there was "seven pounds but I took out an ounce", I believe **MADSEN** was stating that there was seven pounds of narcotics available, but she removed an ounce of drugs for the "books and mail" described above. At the end of the conversation, I believe **MADSEN** was unsure if the weight of the remaining drugs was seven pounds or four pounds. Based on the entirety on the conversation, I believe **BASH** and **MADSEN** planned to have **RENSHAW** and **GOURLEY** transport and distribute narcotics to Montana.

271.     **MADSEN** and **BASH**'s involvement in the drug conspiracy was made clearer in a text conversation on October 12, 2020, which began at approximately 8:31pm. The messages went as follows:

> **MADSEN**: There is just 4
>
> **MADSEN**: I'm tripping the fuck out
>
> **BASH**: No way can't be
>
> **MADSEN**: *Picture of what appears to be approximately four pounds of methamphetamine*

272.     At the end of the conversation, **MADSEN** sent **BASH** a picture of what appeared to be approximately four pounds of methamphetamine. Based on the exchange, I believe **MADSEN** confirmed that in the previous conversation, **MADSEN** and **BASH** were discussing sending Amanda **GOURLEY** and Jacob **RENSHAW** to Montana with methamphetamine.[55]

---

[55] Based on conversations with law enforcement officers in Montana, I know it is profitable for drug traffickers to bring methamphetamine to Montana.  This is due to the fact that the price per pound for methamphetamine is approximately $2500-$3000 in California, and $7000-$10,000 in Montana.

Affidavit                                                    114

273.      **BASH**'s conversations with **MADSEN** gave context to a previous conversation with **GOURLEY**, which occurred on October 12, 2020, at approximately 6:45pm. **GOURLEY**, using TT#45, sent a text message to **BASH**, using TT#42 which said, "Send him to la in his car tonight he can come back here and hide it away in the rental car then we will head out from here tomorrow before noon." **BASH** replied, "Who shred?" **GOURLEY** responded, "Yes." I know based on my knowledge of the investigation that **RENSHAW** had identified himself as "Shredder" several times during previous interceptions. Based on the exchange, I believe **GOURLEY** was relaying to **BASH** that **RENSHAW** should drive his vehicle to **MADSEN** in the Los Angeles area, the then he can meet with **GOURLEY** and hide the methamphetamine in a rental car, which **GOURLEY** would have. From there, I believe **GOURLEY** told **BASH** they would drive together to Montana.

274.      **GOURLEY**, using TT#45, and **BASH**, using TT#42, continued to communicate through text message about how to transport the narcotics to Montana. Beginning on October 12, 2020, at approximately 6:51pm, **GOURLEY** and **BASH** exchanged the following messages:

> **GOURLEY**: Bad news is can't get the car till tomorrow morning. Good news is I can rent it all by myself and I already put the money in my account to do it
>
> **GOURLEY**: 790 8046
>
> **GOURLEY**: If he thinks his car will make it but I'm not going in his car I'll be pissed if it breaks down
>
> **GOURLEY**: Should I change the rental to Wednesday
>
> **BASH**: Nooooo

275.      I believe based on the exchange **GOURLEY** was relaying to **BASH** that she intended to rent a vehicle to transport the narcotics to Montana. Based on **BASH**'s response not to change the rental day to "Wednesday", I believe **BASH** wanted **GOURLEY** to secure the rental vehicle on October 13, 2020.

276.      On October 13, 2020, at approximately 10:13am, Kenneth **BASH**, using TT#23[56], sent a

---

[56] On October 7, 2020, the Honorable Alvin M. Harrell, Fresno County Superior Court Judge, authorized the interception of wire and electronic communications to and from (925) 321-9508 (TT#23), used by Kenneth **BASH**. **BASH** was identified as the user of TT#23 after several communications were

text message to (559) 446-5211 (TT#5211)[57]. The text message said, "Hey call biggie 417-3835". The user of TT#5211 responded "Yep". I know based on my knowledge of the investigation and conversations with other members of the investigative team, "Biggie" was the moniker for Amanda **GOURLEY**. Based on the exchange, I believe **GOURLEY**'s phone number was confirmed as TT#45.

277.       Shortly after, **BASH**, using TT#23, received a text from TT#45 which said, "You're dead this mother effer is on my nerves already and we're not even on the road yet". **BASH** replied, "Kool you and ▓▓▓▓will leave him in LA lol. Or ▓▓▓▓will put him in his place." Based on the conversation outlined above in which **BASH** and **MADSEN** discussed **GOURLEY** going to Montana with **RENSHAW**, I believe the message indicated that now **RENSHAW**, **GOURLEY**, and ▓▓▓▓▓▓ ▓▓▓▓were meant to go to Montana with the methamphetamine.

278.       On October 13, 2020, at approximately 3:42pm, the user of TT#2891, later identified as ▓▓▓▓▓▓▓▓ called **BASH**, using TT#42. **BASH** and TT#2891 had the following conversation (only the pertinent portions of the conversation were transcribed):

        **BASH**: How are you and Biggie?

        ▓▓▓▓▓▓ I don't even know him boy.

        **BASH**: Her her dog female.

        ▓▓▓▓▓▓ Ok I don't know her at all so I guess I'm good.

        **BASH**: Amanda **GOURLEY** bro.

        ▓▓▓▓▓▓ Ok you said Biggie yeah yeah I love Biggie. I thought you said Dickie. I love Biggie. Why what's up?

        **BASH**: Ok she needs a co-pilot.

        ▓▓▓▓▓▓ eah yeah I love Biggie for sure.

        ….

---

intercepted that identified the user of the phone as "B". Additionally, members of the investigative team recognized **BASH**'s voice over TT#23 based on several prior intercepts.

[57] ▓▓▓▓▓▓ was identified as the user of TT#5211 after **BASH** made several references to ▓▓▓▓▓▓ after speaking with the user of TT#5211. Additionally, the user of TT#5211 was intercepted relaying information that matched the movement of ▓▓▓▓▓▓ as further explained below.

**BASH**: What about Shredder how are you guys?

███████  I'm good

**BASH**: Alright

███████████  Like all three of us or what?

**BASH**: He's a good driver right? And he knows everybody out there right?

███████████  Less is more on this though for sure.

**BASH**: Listen to me dog he's going out there, you're flying back.

….

**BASH**: This fool Shredder he has a key to my storage unit out there where we keep the shit. I need him to show you the fuckin' the lay of the land dog basically real quick. We can shake him at any point in time dog.

…..

**BASH**: Go make a round with this fool. Collecting money and shit bro and getting paid to do it all. You know what I'm saying like it's good bro like it's lovely dude.

279.   I believe when **BASH** told ████ that **GOURLEY** needed a "co-pilot", **BASH** was asking ██████ o travel to Montana with her to deliver drugs. I also believe that when **BASH** asked ██████ about "Shredder", he was talking about **RENSHAW**, and implied that **RENSHAW** was going to Montana as well. I know from my training, experience, and conversations with other law enforcement officers that narcotics traffickers will often keep large quantities of drugs in storage units. This is done both to store the large quantities of drugs and separate the trafficker from the narcotics, so they will not be detected by law enforcement. I also know based on my training and experience, drug traffickers will often use innocuous sounding words to describe narcotics in contraband to hide their activities from law enforcement. In this case, I believe **BASH** used the word "shit" instead of "drugs". I believe that when **BASH** told ██████ that **RENSHAW** had "a key to my storage unit out there where we keep the shit", **BASH** was relaying to ██████ that he had a storage unit, which he used to store drugs. I also believe that when **BASH** told ██████ to "go make a round with this fool" and "get paid to do it all" **BASH** was relaying to ██████ that he should go sell drugs in Montana with

Affidavit                                                    117

1  **RENSHAW**, and collect the profits.

2  280.  On October 13, 2020, at approximately 3:49pm, **BASH**, using TT#42, called

3  **GOURLEY**, using TT#45. **BASH** and **GOURLEY** had the following conversation (only the pertinent

4  portions of the conversation were transcribed):

5  **BASH**: What do you think about you going with – 'cause your gong to fly back right?

6  **GOURLEY**: Yeah

7  **BASH**: So [inaudible] I don't have to leave Shredder unattended 'cause I'm out a lot of

8  money out there bro I'm out like 19,000. Right? And they're good for it all but it's

9  like all fuckin' crazy and shit you know what I mean but um long story short fuckin'

10  ▆▆▆▆ said he's going to go cause he wants to help Samantha clear her fuckin'…you

11  know what I mean? But I want to take Shredder too that way when I leave Shredder out

12  there he has ▆▆▆ and [inaudible] Biggie and get all my money inside and scrape the

13  plate with it fly you back. I don't want to just send Shredder and fuckin' him because

14  obviously fuckin' well one ▆▆▆▆ a fuckin'…basically your fuckin' in charge of it fool.

15  You know what I mean like ▆▆▆▆ good to do it but on a road trip? Negative. You

16  know what I mean and he don't have a license I don't believe.

17  **GOURLEY**: Ok.

18  **BASH**: But Jake does. Nothings in the…is the car in your name or Mama Rene's?

19  **GOURLEY**: Mine I did it all in mine with my name on it.

20  **BASH**: Ok so before we bounce. Before we bounce we're going to put it on or put it in

21  Shredders. I mean before we bounce from Montana.

22  **GOURLEY**: Ok

23  281.  I believe when **BASH** said he was "out 19,000" "out there", **BASH** meant that he lost

24  approximately $19,000 worth of drug profits from incidents in Montana already. I also believe the

25  conversation confirmed that **GOURLEY**, ▆▆▆▆ and **RENSHAW** were going to Montana for the

26  drug load. When **GOURLEY** told **BASH** that the "car" had "her name on it" I believe **GOURLEY**

27  meant that she rented a vehicle with her own personal information that was to be used for the drug route

28  Affidavit                                                118

1   to Montana.

2   282.        On October 13, 2020, at approximately 4:59pm, **BASH**, using TT#42, called

3   **RENSHAW**, using TT#43[58]. **BASH** and **RENSHAW** had the following conversation (only the

4   pertinent portions of the conversation were transcribed):

5                  **BASH**: You're taking 12 or 13 out there.

6                  **RENSHAW**: Ok

7                  **BASH**: She don't know that yet.

8                  **RENSHAW**: Ok. Well I haven't been talking about nothing I just figured she knows

9                  everything already so I don't need to talk about nothing.

10                 **BASH**: [Inaudible] We need to collect bro fuckin' I'm done playing games with these

11                 fools.

12                 **RENSHAW**: Yeah like especially now. I'll run it down to them I'll let them know like

13                 hey fuck dude I fuckin' caught up in..major league fuckin'…I handed you guys the dope

14                 so I need you to hand me the money or [inaudible] situation now.

15                 ….

16                 **RENSHAW**: When I get there I want to get some more guns.

17                 **BASH**: Yeah yeah you need to buy everything you can bro.

18                 **RENSHAW**: Huh?

19                 **BASH**: You need to buy everything you can and this time we're going to keep ours

20                 separate.

21                 **RENSHAW**: Ok like our fuckin' mine and yours?

22                 **BASH**: Yeah motherfucker.

23   283.        I know based on my training and experience that narcotics traffickers typically transport

24

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [58] On October 13, 2020, the Honorable Fresno County Superior Court Judge Alvin M. Harrell
     authorized the interception of wire and electronic communications to and from (559) 903-7536 (TT#43),
26   used by Jacob **RENSHAW**. **RENSHAW** was identified as the user of TT#43 based on previous
     interceptions by **RENSHAW** in which he expressed he was getting a new phone number. TT#43
27   contacted **MADSEN** shortly after and his voice was recognized by members of the investigative team.
     **RENSHAW** was confirmed as the user of TT#43 as explained in this section of the complaint.

28   Affidavit                                    119

1  narcotics by a measurement of weight such as pounds. Based on the fact that **BASH** told **RENSHAW**

2  that "You're taking 12 or 13 out there", I believe **BASH** was relaying to **RENSHAW** that he planned on

3  **RENSHAW** taking 12 or 13 pounds of narcotics to Montana. I also believe that when **BASH** said that

4  "we need to collect bro", **BASH** was relaying that they needed to get paid for the drug shipment. I know

5  based on my training and experience that "dope" is a common slang term for methamphetamine. I

6  believe when **RENSHAW** said he would tell "them" that "I handed you guys the dope so I need you to

7  hand me the money", he was confirming that he was going to transport and sell methamphetamine, and

8  would demand payment for the drug supply.

9    284.    On October 13, 2020, at approximately 6:53pm, **RENSHAW**, using TT#43[59], called

10  **GOURLEY**, using TT#45. During the call **GOURLEY** said, "I need the address", and **RENSHAW**

11  responded, "I don't' have the address". At approximately 7:00pm **RENSHAW** sent a text message to

12  **GOURLEY** that said, "9102 Rittenhouse Lane Fresno. 93710."

13    285.    On October 13, 2020, at approximately 7:10pm, **BASH**, using TT#23, called

14  **GOURLEY**, using TT#45. The following is a transcription of the conversation between **BASH** and

15  **GOURLEY** (only the pertinent portions were transcribed):

16         **GOURLEY**: I'm sitting outside here ahhh Shred's house.

17         **BASH**: Where's Shred at?

18         **GOURLEY**: He went inside. He wouldn't leave the car at my house it's here. It's over

19         here.

20         **BASH**: Oh yah?

21         **GOURLEY**: Yeah.

22         **BASH**: Well fuckin' ah yeah alright. We're going to get that what we're gonna do is I'm

23         going to get ahold of – I'm going to call you from my number right now alright?

24

25  ───────────────
[59] On October 13, 2020, the Honorable Fresno County Superior Court Judge Alvin M. Harrell authorized

26  the interception of wire and electronic communications to and from (559) 903-7536 (TT#43), used by
Jacob **RENSHAW**. **RENSHAW** was identified as the user of the phone after communicating was

27  **MADSEN**, using TT#7. During the intercepted call, **RENSHAW** identified himself as "Shredder"
which is the moniker for **RENSHAW**.

28

**GOURLEY**: Ok

**BASH**: I might have you [inaudible] back down I don't give a fuck.

**GOURLEY**: Ok

**BASH**: You're going to get ready to fuckin' take off or what?

**GOURLEY**: I'm here after I'm done getting ████ and then going.

**BASH**: Well I just need you just need to go to fuckin' ah Pup's dad's house. [Inaudible]

**GOURLEY**: To Where? Ok.

286.     When **GOURLEY** and **BASH** refer to "Shred" I believe they are talking about **RENSHAW**. Based on the conversation, I believe **GOURLEY** was at **RENSHAW**'s house, and intended to pick up him and ████████

287.     On October 13, 2020, members of the investigative team established a physical surveillance on **GOURLEY**, who was located and positively identified at 4745 N. 5th Street, Fresno, CA. Surveillance was maintained until **GOURLEY** navigated to the Hertz rental car located at 105 E. Auto Center Drive, Fresno, California. Members of the surveillance team observed **GOURLEY** who appeared to rent a silver Kia Optima with California license plate 8LUG028 and left the rental car lot.

288.     Surveillance units followed **GOURLEY** as she navigated to pick up Jacob **RENSHAW** and ████████ At approximately 7:02pm **GOURLEY** met **RENSHAW** at 9102 Rittenhouse Lane, Fresno, CA. **RENSHAW** was positively identified getting into the vehicle with **GOURLEY**.

289.     On October 13, 2020, a warrant authorizing the installation of a vehicle tracker on the Kia Optima rented by **GOURLEY** was signed by Fresno County Superior Court Judge Jeff Hamilton. The tracker was installed by members of the investigative team at approximately 2:45 am on October 14, 2020.

290.     On October 13, 2020, at approximately 8:35pm, **MADSEN**, using TT#41, received a call from **BASH**, using TT#42. **MADSEN** and **BASH** had the following conversation (only the pertinent portions of the conversation were transcribed):

**MADSEN**: Nobody came to pick up the backpack

**BASH**: I know they're leaving town right now. They're leaving town fuckin' yeah it's a

fiasco.

….

**BASH**: Are you going to be stuck awake or what?

**MADSEN**: Sorry is the stuff away? Is that what you said?

**BASH**: Yeah

**MADSEN**: It's here in the living room.

**BASH**: Huh?

**MADSEN**: It's here in the living room

**BASH**: Who is?

**MADSEN**: The…did you say the stuff?

**BASH**: No I said are you going to be stuck awake.

**MADSEN**: Oh I'm going to be able to sleep. I'm just worried about people coming over.

**BASH**: Who's coming over?

**MADSEN**: I thought you had..were sending people over.

**BASH**: Oh yeah fuck that they're going to have to wait until tomorrow or something.

291.     I believe when **MADSEN** told **BASH** that "nobody came to pick up the backpack" **MADSEN** was referring to a backpack in which she had packaged the methamphetamine at the direction of **BASH** in their prior conversation. When **MADSEN** told **BASH** that the "stuff" was in the living room, I believe **MADSEN** was relaying that the backpack of methamphetamine was in her living room. Additionally, when **MADSEN** told **BASH** that she was "worried about people coming over" and clarified that she thought **BASH** was sending people over, I believe **MADSEN** was referring to **GOURLEY**, **RENSHAW**, and ███████ coming over to retrieve the methamphetamine for Montana. When **BASH** told **MADSEN** that they would "wait until tomorrow or something", I believe he meant that **GOURLEY**, **RENSHAW**, and ███████ were not going to retrieve the drugs until the following day.

292.     On October 13, 2020, beginning at approximately 8:39pm, **RENSHAW**, using TT#43, and **BASH**, using TT#42, had the following text message conversation:

1         **RENSHAW**: I was thinking u had all these people going cuz you didn't believe in me

2         anymore..?

3         **RENSHAW**: Or that you needed someone to watch me

4         **RENSHAW**: Its gonna be expensive having to pay for a room every night cuz theres

5         someone with me... I was able to stay with people or some chick at the end there…

6         **BASH**: Nah we're going to collect or get paid bro

7    293.     In the above exchange, I believe **RENSHAW** was asking **BASH** if he "needed someone

8 to watch me" due to **RENSHAW**'s recent incident where his vehicle was towed with approximately 6.6

9 pounds of methamphetamine (see footnote 68). When **BASH** told **RENSHAW** that "we're going to

10 collect or get paid bro", I believe **BASH** was telling **RENSHAW** that they would make enough money

11 from trafficking narcotics to make the trip to Montana worth it.

12    294.     On October 13, 2020, at approximately 9:02 pm, **BASH**, using TT#9, called

13 **RENSHAW**, using TT#43. **BASH** and **RENSHAW** had the following conversation (only the pertinent

14 portions of the conversation were transcribed):

15         **BASH**: What's the problem? You're not feeling good you didn't fuckin' this is not

16         sounding like you're ready to fuckin' get this shit done.

17         **RENSHAW**: I'm fine.

18         **BASH**: I'm just saying you're acting like you don't want to get this done. Dude I'm just

19         trying to be on the same page here with everybody.

20         **RENSHAW**: Nah I just said I don't feel good. I was just thinking out loud when I wrote

21         that. Maybe I'm smoking to much weed [inaudible]

22         **BASH**: Huh?

23         **RENSHAW**: I'm good

24         **BASH**: Alright I'm just checking dog I'm trying to get this fuckin' shit done bro. You're

25         the one who knows everybody out there and knows everybody to sell the dope all there is

26         everything dog. Tomorrow we got to put you on the rental car because you have a license

27         you have the fuckin' ID and we're just going to do it from another location. Listen,

28   Affidavit

1      ████ going to drive the fuckin' Taurus when he gets out there.

2      **RENSHAW**: Alright. I was just –

3      **BASH**: It's going to be simple bro when it comes time fuckin' it is what it is we're gonna

4      fuckin' yeah dude with these fools Leon and Dylan we're going to fill up with our

5      [inaudible] we're going to get our money bro.

6      **RENSHAW**: Alright

7      **BASH**: But hopefully they pay. They say if we get them a little bit more dope or

8      whatever they'll come quick which, they're all the way out out there. As soon as you get

9      out there I'm going to give you each at least a half to fuckin' to sell fuckin' you know

10     what I mean? Anything over like 400 a zip is you fuckin' we're gonna do it bro.

11     **RENSHAW**: You know I can do it.

12     **BASH**: I know you can dog that's why I need you to go – you know your way around

13     bro.

14     295.    I know based on my training and experience that "dope" is a common term used to refer

15     to methamphetamine. When **BASH** told **RENSHAW**, "Alright I'm just checking dog I'm trying to get

16     this fuckin' shit done bro. You're the one who knows everybody out there and knows everybody to sell

17     the dope all there is everything dog", I believe **BASH** was relaying that **RENSHAW** was connected to

18     drug customers in Montana, and could easily sell the methamphetamine they transport in the Montana

19     area. I also believe that when **BASH** referred to "Leon and Dylan", he was referring to Leon KAVIS and

20     Dylan MACE. KAVIS and MACE were both identified as distributors of methamphetamine in Montana

21     with connections to **BASH**[60]. In prior intercepts, **BASH** discussed a debt KAVIS owed him from

22     methamphetamine, which was stolen from KAVIS. MACE was involved in a Missoula Police

23     Department drug trafficking investigation and described KAVIS as his business partner to investigators.

24     I believe that when **BASH** told **RENSHAW** that "with these fools Leon and Dylan" they were going to

25

26     ───────────────
       [60] Leon KAVIS and Dylan MACE have been identified by the Missoula Drug Task Force as
27     being involved in a drug conspiracy in which approximately five pounds of methamphetamine was
       shipped to KAVIS from **MADSEN'S** address and was intercepted by law enforcement.

28     Affidavit                                    124

"get our money", he meant that they would sell and distribute methamphetamine with Leon KAVIS and Dylan MACE in Montana for a large profit. I also know based on my training and experience that a "zip" is a common term for a quantity of drugs, usually referring to an ounce. When **BASH** told **RENSHAW**, "Anything over 400 a zip is you, we're gonna do it bro" I believe **BASH** was suggesting that they would sell methamphetamine in Montana for at least $400 per ounce.

296.　　On October 14, 2020, at approximately 7:41am, **MADSEN**, using TT#7, sent a text message to **GOURLEY**, using TT#45, which said, "Good morning This is **BASH**'s girl. Trying to see when you guys are coming over?" Shortly after at approximately 8:07am, **MADSEN**, using TT#7, called **RENSHAW**, using TT#43. During the call, **MADSEN** stated that she "tried to call Amanda a couple times but there's not answer". **RENSHAW** relayed that "They're sleeping". **RENSHAW** and **MADSEN** then had the following conversation (only the pertinent portions of the conversation were transcribed):

> **RENSHAW**: If you're ready to just get this over with or whatever I can…I'm like twenty minutes away I can just walk down here to the store.
>
> **MADSEN**: That's fine I just I didn't know.
>
> [**MADSEN** and **RENSHAW** talk over each other]
>
> **RENSHAW**: Ok no I will call first and make sure everything is approved with you before we go anywhere. I mean before we go to your house.
>
> **MADSEN**: Ok cool.
>
> **RENSHAW**: For sure I will do that.

297.　　**RENSHAW** said he would wake "them" up in an hour and ended the call. I believe when **RENSHAW** told **MADSEN** that he was ready if she wanted to "get this over with", I believe **RENSHAW** was telling **MADSEN** that if she wanted **RENSHAW**, **GOURLEY**, and ▮▮▮▮▮ to pick up the drugs, he was available. I also believe that when **RENSHAW** said he would call "before we go to your house", he confirmed that the drugs were being held by **MADSEN** at her residence.

298.　　On October 14, 2020, at approximately 9:26am, **BASH**, using TT#42, called **RENSHAW**, using TT#43. **BASH** and **RENSHAW** had the following conversation (only the pertinent

Affidavit　　　　　　　　　　　125

1  portions of the conversation were transcribed):

2  **BASH**: Where are you at right now?

3  **RENSHAW**: The Terrace..at a hotel it's called in Gardena

4  **BASH**: [inaudible]

5  **RENSHAW**: Huh?

6  **BASH**: [inaudible]

7  **RENSHAW**: Right now [inaudible]

8  **BASH**: You said they're both sleeping?

9  **RENSHAW**: Yeah

10  **BASH**: Um let's extend the room right and then go grab the shit and come back.

11  **RENSHAW**: Ah ok you want me to have her go get it?

12  **BASH**: If you want to let them sleep I can have you go grab the shit package it and

13  fuckin' ah and then ah we can extend the room and you can leave in the morning. Three

14  in the morning.

15  **RENSHAW**: I mean I'm wide awake I slept all the way over here.

16  **BASH**: I know that's what I'm saying but it's still good to do this other shit.

17  ….

18  **RENSHAW**: Do you want me to go to Stephanie's right now?

19  **BASH**: Do you have the car?

20  **RENSHAW**: No but the keys are here with them.

21  **BASH**: I know I'm just wondering if we should extend the room.

22  …..

23  **RENSHAW**: I'll probably wake ▮▮▮▮ p because before they went to sleep I said I'm

24  going to go for a walk I said here here's the key and I just smacked it on the bed so I gave

25  it to ▮▮▮▮

26  **BASH**: What?

27  **RENSHAW**: I said I gave ▮▮▮▮ the car key earlier when I went out for – to go walk to

28  Affidavit                                        126

buy a soda? I go here here's the car key and I gave it to him so I'll probably wake him up right now and explain to him that I'm going to go to Stephanie's and handle some business for you real quick. That that's what you want and I'll be back for them and extend the room.

….

**BASH**: Go tell them **BASH** wanted me to come get – **BASH** wants me to grab the shit and come back here and let you guys rest while I go grab the shit. 'Cause she has family over too you know? Yeah just go do it you can have them call me or whatever just tell them **BASH** called me right now and wants me to go grab the shit while you get some fuckin' rest. He told me to extend the room if need be.

…..

**RENSHAW**: Either way I should grab the car and head over there real quick.

**BASH**: You should go get the door panel ready.

**RENSHAW**: Yeah I know prep it. That's what I was thinking too.

299.     I know based on my training and experience that "shit" is a common slang term used to mean methamphetamine. When **BASH** told **RENSHAW** to go "grab the shit", I believe **BASH** was telling **RENSHAW** to go get the methamphetamine from **MADSEN**. I also know that narcotics traffickers typical attempt to conceal their contraband in unusual places within a vehicle when transporting narcotics. When **BASH** told **RENSHAW** that he should "get the door panel ready", I believe **BASH** was telling **RENSHAW** to create a cavity within a door of the rental vehicle, so the drugs could be hidden and remain undetected by law enforcement.

300.     Based on the fact that **RENSHAW** stated he was at "Terrace" a hotel in Gardena, members of the investigative team believed **RENSHAW**, ▮▮▮▮▮ and **GOURLEY** were staying at the Gardena Terrace Inn, located at 15902 S. Western Ave, Gardena, CA. A physical surveillance was established at the Gardena Terrace Inn and agents observed the rental vehicle at the Inn.

301.     At approximately 9:45am, **RENSHAW**, using TT#43, sent a text message to **BASH**, using TT#42, which said, "Im leaving for stephs now". **BASH** replied, "Call and tell her". **RENSHAW**

then sent a text message to **MADSEN**, using TT#7, which said, "I'm coming by myself..talked to **BASH**..be there in 25 to 30 minutes.." Based on the text messages, I believe **RENSHAW** left the hotel to meet **MADSEN** and retrieve the drugs.

302.    At approximately 9:50am, **BASH**, using TT#42, called **MADSEN**, using TT#41. **BASH** and **MADSEN** had the following conversation (only the pertinent portions of the conversation were transcribed):

> **BASH**: All the shit Johnny brought? Will you lay it out – lay all the shit out and take a picture [inaudible]
>
> **MADSEN**: Take pictures with what?
>
> **BASH**: With all the shit Johnny brought?
>
> **MADSEN**: Uh-huh
>
> **BASH**: Will you take a picture just so I can see what it looks like and shit?
>
> **MADSEN**: Yah did I tell you did you hear me earlier when I told you it was covered in hot sauce?
>
> **BASH**: It still is covered in hot sauce?
>
> **MADSEN**: I'm not taking it off
>
> **BASH**: No I said it's covered in hot sauce?
>
> **MADSEN**: Yeah you know how ours was covered in soap?
>
> **BASH**: Yeah
>
> **MADSEN**: This one is hot sauce.
>
> **BASH**: Ok
>
> **MADSEN**: But it's all packaged like it used to you know? I think it was. I sent you pictures of it before.

303.    When **BASH** told **MADSEN** to "lay all the shit out" I believe he was using the word "shit" in place of methamphetamine. Additionally, I know based on my training and experience that narcotics traffickers will often cover packages of narcotics with strong scents in an effort to hide the smell of drugs from K-9 police dogs. When **MADSEN** relayed that "it was covered in hot sauce" and

then said "ours was covered in soap", I believe **MADSEN** was describing two packages of methamphetamine that were covered in soap and hot sauce, respectively, to hide the scent of the drugs. I also believe, when **MADSEN** told **BASH** that she sent him pictures of "it" before, she was referring to the picture of suspected methamphetamine she sent **BASH** on October 12, 2020.

304.     At approximately 10:00am, members of the investigative team established physical surveillance in the area of **MADSEN**'s residence location at 21014 Reynolds Drive, Torrance, California. At approximately 10:15am, surveillance units observed **RENSHAW** arrive at **MADSEN**'s address in the rental vehicle. Surveillance units observed **RENSHAW** enter **MADSEN**'s apartment. At approximately 11:41am, surveillance units observed **RENSHAW** exit **MADSEN**'s residence with a blue backpack over his shoulder and the backpack appeared to be full. Based on the observations, and since **MADSEN** previously described having the "stuff" in a backpack in her residence, I believe **RENSHAW** picked up the methamphetamine at **MADSEN**'s residence.

305.     At approximately 11:42am, **MADSEN**, using TT#7, received a call from **GOURLEY**, using TT#45. **GOURLEY** and **MADSEN** had the following conversation (only the pertinent portions of the conversations are transcribed):

> **MADSEN**: **BASH** wanted to know what time Jake left you guys
>
> **GOURLEY**: Ok right when I called him. At ten o'clock yah.
>
> **MADSEN**: Ok. Jesus Christ ok. He's on his way back right now – **BASH** is getting – the whole building is getting searched – so he just picked up everything from me, he went to Autozone but he should be back to get you guys and **BASH** wanted you guys on the road as soon as possible. I know that Jake lags though so if you could -
>
> **GOURLEY**: Ok
>
> **MADSEN**: Make sure he doesn't lag.
>
> …..
>
> **MADSEN**: Jake said that you had the money right?
>
> **GOURLEY**: Yeah
>
> **MADSEN**: Ok so…then he said you guys didn't have any more money?

**GOURLEY**: We have some.

**MADSEN**: Ok. Ok. I'll let him know that – I'm not going to let Jake know but Jake told me you guys were out of money which kind of blew my mind.

**GOURLEY**: Jake doesn't have – yeah no um 400 of mine on the rental car because of deposit and the fees or whatever and then no we still have like 300 dollars.

**MADSEN**: Ok

**GOURLEY**: We have plenty I have money of my own too so we'll be fine to make it there.

**MADSEN**: Ok alright and do you have your Cashapp set up to make it there just in case?

**GOURLEY**: Yeah I have Cashapp and Chime

**MADSEN**: Ok.

306.     During this call, when **MADSEN** told **GOURLEY**, "He's on his way back right now…so he just picked up everything from me….**BASH** wanted you guys on the road as soon as possible", **MADSEN** was relaying to **GOURLEY** that **RENSHAW** picked up the methamphetamine from her residence and would return to **GOURLEY** and ███████ soon. I also believe **MADSEN** relayed that **BASH** wanted **GOURLEY**, **RENSHAW**, and ███████ to depart for Montana with the drug load as soon as possible. When **GOURLEY** told **MADSEN** that "we'll be fine to make it there", I believe **GOURLEY** was expressing that she, **RENSHAW**, and ███████ would be able to transport the narcotics to Montana successfully.

307.     On October 14, 2020, at approximately 11:41am, **RENSHAW**, using TT#43, called ███████ using TT#5211. During the call, **RENSHAW** asked ███████ if they were getting "kicked out" of the hotel and ███████ said "yah".  **RENSHAW** then said, "Since they're kicking you out I'm going to come get you guys before I put this stuff in the door".

308.     On October 14, 2020, at approximately 12:46am, **RENSHAW**, using TT#43, sent a text message with a picture to **BASH**, using TT42. The picture showed a "trim removal tool set" and had the caption, "Look at this!!!"  Based on **RENSHAW**'s comments to ███████ that he was going to "put this stuff in the door", in conjunction with the picture of the Trim Removal Tool Set which **RENSHAW**

Affidavit                                      130

showed **BASH**, I believe **RENSHAW** intended to remove the panel of a door on the rental car in order to conceal the drugs.

309.     At approximately 1:00pm, surveillance units observed **RENSHAW**, ▮▮▮▮ and **GOURLEY** leave the hotel. Surveillance units tracked **RENSHAW,** ▮▮▮▮ and **GOURLEY**'s vehicle to the San Manuel Casino, located at 777 San Manuel Blvd, Highland, CA, where the vehicle stopped at approximately 3:00pm.

310.     On October 14, 2020, at approximately 11:12am, **MADSEN**, using TT#41 sent a text message to **BASH**, using TT#42. The text message said, "So, the minions decided to stop at a casino in San Bernardino, (out of the way)…Apparently been Biggy hit big, will be paying you back they money she owes you??? And she will be bailing out J." I believe the text message confirmed that **GOURLEY**, ▮▮▮▮ and **RENSHAW** stopped at the San Manuel Casino, and I believe **MADSEN** was frustrated since the casino was not on the way to Montana to deliver the drugs.

311.     On October 14, 2020, at approximately 5:41pm, surveillance units followed the rental vehicle as **GOURLEY**, **RENSHAW**, and ▮▮▮▮ left San Manuel Casino. Surveillance observed the rental vehicle navigate to the Walmart Supercenter located at 4210 E Highland Ave, Highland, CA. In the parking lot of the Walmart, agents observed **RENSHAW** appear to move the driver's side rear door panel. Shortly after, **GOURLEY**, **RENSHAW**, and ▮▮▮▮ left the Walmart and stopped at Albertsons, located at 7201 Boulder Ave, Highland, CA. **RENSHAW** was observed by agents as he exited the vehicle and appear to take apart the door panel once again. Based on the fact that **BASH** and **RENSHAW** discussed concealing the drugs in a door panel, I believe **RENSHAW** took the driver's side rear door panel off in order to hide to narcotics. Members of the surveillance team monitored precise location ping for the tracker on the rental vehicle until it came to rest in Barstow, CA on the night of October 14, 2020.

312.     On October 14, 2020, at approximately 11:39pm, **RENSHAW**, using TT#43, called **BASH**, using TT#42, and reported that they stopped for the night at a Holiday Inn in Barstow, CA. **RENSHAW** also relayed that **GOURLEY** no longer wished to continue on the trip and wanted to return to Fresno.

Affidavit                                        131

313.     On October 14, 2020, at approximately 11:59pm, **RENSHAW**, using TT#43, sent a text message to **BASH**, using TT#42, which said, "Bro I know how you want this shit done but when people are brought in on this they like to do things how they do them…" **BASH** replied and said, "Ok for starters where are you Exactly Bro? When you guys went and picked up The Rest Of The BRANDS dope where did you guys Go?"

314.     Based on my training and experience, I know that in the gang context, such as the Aryan Brotherhood, contraband owned by members of the gang is typically referred to as owned by "the brand". I believe when **BASH** asked **RENSHAW** about the "BRANDS dope" he was relaying to **RENSHAW** that the methamphetamine he was transporting was owned by the Aryan Brotherhood in order to convey a sense of urgency in the delivery and security of the drugs.

315.     On October 15, 2020, at approximately 8:39am, **GOURLEY**, using TT#45, called **RENSHAW**, using TT#43. **GOURLEY** and **RENSHAW** had the following conversation (only the pertinent portions of the conversation were transcribed):

> **GOURLEY:** Have you talked to **BASH?**
>
> **RENSHAW:** Not since last night I didn't.
>
> **GOURLEY:** Well we're all in trouble.
>
> **RENSHAW:** Last night…I just woke up.
>
> **GOURLEY:** Well we're in trouble.
>
> **RENSHAW:** Why?
>
> **GOURLEY:** 'Cause we're still in California.
>
> **RENSHAW:** Yeah I know.
>
> **RENSHAW:** Like all this shit that he's been losing lately? Like do you know that this ain't all his money?
>
> **GOURLEY:** No
>
> **RENSHAW:** You know that like that like they they could kill him for this?
>
> **GOURLEY:** No
>
> **RENSHAW:** Yeah that's what time it is right now.

1   **RENSHAW:** And he's like fucking worried that something's gonna happen right now

2   he's like I gathered all this fuckin bit of shit up he goes this fuckin' this aint my fuckin'

3   you think I can come up with twelve pounds like that like nothing? He goes this is the

4   fuckin' brand's dope bro.  Like I'm trying to get out of the hole with this fuckin' shit and

5   you guys are fuckin sitting in California…

6   316.     When **RENSHAW** relayed to **GOURLEY** that **BASH** said, "this aint my fuckin' you

7   think I can come up with twelve pounds like that like nothing?" I believe **RENSHAW** confirmed that

8   they were transporting approximately twelve pounds of methamphetamine to Montana on behalf of

9   **BASH** and the AB.  This was made clearer when **RENSHAW** relayed to **GOURLEY** that **BASH** said,

10  "this is the fuckin' brand's dope bro." Based on the comment, I believe the methamphetamine

11  **GOURLEY**, ▮▮▮▮▮▮ and **RENSHAW** was transporting was purchased with funds controlled by the

12  AB.

13  317.     On October 15, 2020, at approximately 11:36am, **GOURLEY**, using TT#45, sent a text

14  to **RENSHAW**, using TT#43 which said, "Ok hurry hey check out time and we have to be in Vegas by

15  3:00 my flight leaves at 3:50." Based on the message, I believe **GOURLEY** intended to fly back to

16  Fresno when they arrived in Las Vegas, NV.

17  318.     **GOURLEY**'s plan was confirmed shortly after. On October 15, 2020, at approximately

18  1:30pm, Stephanie **MADSEN**, using TT#7, sent a text message to Jacob **RENSHAW**, using TT#15, and

19  **BASH**, using TT#42, which said, "Just so we are all on the same page, Biggy said she is leaving on an

20  airplane from Vegas to Fresno, she has B's money". Based on the text message, I believe "Biggy"

21  referred to **GOURLEY**, and "B" referred to **BASH**. I believe the **MADSEN** meant that **GOURLEY**

22  was using money supplied by **BASH** to return to Fresno while **RENSHAW** and ▮▮▮▮▮▮ ontinued to

23  Montana with the methamphetamine load. **RENSHAW** responded that he would continue to send

24  **MADSEN** updates on their location, but relayed that his cell phone had low power.

25  319.     On October 15, 2020, at approximately 1:34pm, **MADSEN**, using TT#7, sent an

26  additional message to **RENSHAW**, using TT#15, which said, "Well, if we could trust everyone to get to

27  point A-B you wouldn't have to share it lol Let's make sure we get to the destination. Just because B is

28  Affidavit                                                                    133

away right now doesn't mean it's time to lollygag You three accepted a job. B is always there to help out even though he's not in an ideal position to, he deserves the respect of loyalty and truthfulness…let's keep that in mind." **RENSHAW** responded shortly after with a text message that said, "I agree 100%". When **MADSEN** told **RENSHAW**, "You three accepted a job", I believe **MADSEN** was stating that **RENSHAW**, **GOURLEY**, and ▮▮▮▮▮ knowingly accepted the task of transporting the narcotics to Montana on behalf of **BASH**. When **RENSHAW** responded, "I agree 100%", I believe **RENSHAW** was stating he was aware of the "job" he accepted, and intended to complete the task of bringing the drugs to Montana for distribution.

320.　　On October 15, 2020, at approximately 6:42pm, **RENSHAW**, using TT#43, received a call from **BASH**, using TT#42. During the conversation, **RENSHAW** relayed that **GOURLEY**'s flight departed at 3:50pm on flight AA2063. **BASH** requested that **RENSHAW** send him the flight information for **GOURLEY**. Based on the conversation, I believe that at the time of the flight specified by **RENSHAW**, **GOURLEY** left **RENSHAW** and ▮▮▮▮▮ with the rental vehicle and narcotics and returned to Fresno.

321.　　On October 15, 2020, at approximately 7:11pm, surveillance units monitored **RENSHAW** and ▮▮▮▮▮ in the rental vehicle as they navigated into Arizona. At approximately 9:20pm, **RENSHAW** and ▮▮▮▮▮ stopped in the area of the La Quinta Inn & Suites by Wyndham Cedar City located at 1377 S Main St, Cedar City, UT.

322.　　On October 15, 2020, at approximately 10:30pm, an officer from the Utah Highway Patrol observed the Silver KIA Optima occupied by **RENSHAW** and ▮▮▮▮▮ in the area on the La Quinta Inn. The officer observed the vehicle drive to a Shell gas station located at 1355 S Main Street in Cedar City.  The officer observed the vehicle exit the gas station and continue onto S Main Street without the tail lights illuminated, in violation of the Utah State Vehicle Code. Based on the violation, the officer stopped the vehicle near 1157 S Main Street, Cedar City, UT.

323.　　During the stop, officers identified the driver of the vehicle as **RENSHAW** from his California Driver's License. **RENSHAW** relayed to officers on scene that the vehicle was a rental. **RENSHAW** told officers on scene that his friend, "Amanda" rented the vehicle. **RENSHAW** told

Affidavit　　　　　　　　　　　　　　　　134

officers on scene that "Amanda" went back to California. **RENSHAW** told officers that he was bound for Missoula, Montana, to visit family. During the stop, **RENSHAW** gave several answers to officers on scene about the purpose of his trip that were inconsistent and raised the officers' suspicions about the reason he was travelling to Montana.

324.      **RENSHAW** identified the passenger in the vehicle as ▓▓▓▓ Officers made contact with the passenger and later identified him a ▓▓▓▓▓▓▓▓▓ dvised officers that he was going to Montana to visit friends ▓▓▓▓ told officers that he was along for the ride with **RENSHAW** and did not know how long they would be in Montana.

325.      An officer on scene of the traffic stop deployed a K9 certified in narcotic detection on the vehicle occupied by **RENSHAW** and ▓▓▓▓. The K9 promptly alerted to the passenger side door. The K9 continued to walk around the vehicle and also alerted on the driver's side door. Based on the K9 alerts, officers conducted a search of the rental vehicle. In the center console, a glass pipe associated with methamphetamine was located. Inside a backpack in the trunk of the vehicle, a vape pen was located with what appeared to be marijuana concentrate. In the same backpack, a tool kit was located that contained upholstery forks, screw drivers, and nut drivers. Under the hood of the vehicle, officers located a "golf ball" sized package containing what appeared to be heroin which was wrapped in multiple layers of plastic. Officers continued to search and removed the interior plastic door panel off the left rear door. Officers noted that there were two missing bolts from the door. Inside the door, officers located four large plastic sacks containing a white crystal substance consistent with methamphetamine. ▓▓▓▓ and **RENSHAW** were taken into custody at 2345 and charged accordingly for the narcotics.

326.      Following the arrest of ▓▓▓▓ and **RENSHAW**, a more detailed search of the vehicle was conducted. A portable X-ray device was utilized to scan the remaining 3 doors on the car. During the scan, additional packages were revealed in the right rear door of the vehicle. The door was disassembled revealing eight more packages of methamphetamine. The total weight of the methamphetamine recovered was approximately twelve pounds. Based on the discovery of the methamphetamine inside the vehicle, I believe **RENSHAW** and ▓▓▓▓ were transporting the

narcotics picked up by **RENSHAW** at **MADSEN**'s residence at the direction of **BASH**.

327.        Based on the above information, I believe probable cause exists that **BASH**, **MADSEN**, **RENSHAW**, **GOURLEY**, and [redacted] committed the following offenses: Conspiracy to Manufacture, Distribute, and Possess With Intent to Distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1); and Manufacture, Distribution, and Possession With Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Section 841(a)(1).

Respectfully submitted,

ANTHONY T. GONZALES

Special Agent, ATF

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) before me this ___17___ day of ___November___, 2020.

THE HONORABLE ERICA P. GROSJEAN,
UNITED STATES MAGISTRATE JUDGE

APPROVED AS TO FORM BY:

/s/ *Stephanie M. Stokman*

STEPHANIE M. STOKMAN
ASSISTANT UNITED STATES ATTORNEY

Affidavit

136